# EXHIBIT A
# TO COMPLAINT

# NOTE

**EXHIBIT A**

## PROMISSORY NOTE

Amount:     $481,218.96                                        November 1, 2011

FOR VALUE RECEIVED, Walker & Company, LLP, a District of Columbia limited liability partnership ("Maker"), promises to pay to the order of Computing TechnologieS, Inc., a Virginia corporation (hereinafter referred to as the "Holder", which term shall include any subsequent holder of this Note), at such place as the Holder may from time to time designate in writing to Maker, the principal sum of Four Hundred Eighty-One Thousand Two Hundred Eighteen and 96/100 Dollars ($481,218.96), together with interest on the amount thereof outstanding from time to time at the rate of five percent (5%) per annum.  Interest shall accrue from the date hereof on the unpaid principal balance of this Note from time to time outstanding until paid in full, and interest shall be calculated on the basis of the actual number of days elapsed.

Interest and principal in the amounts set forth on Schedule A attached hereto ("Principal and Interest") shall be payable in monthly installments beginning on November 1, 2011 and on the first day of every month thereafter until paid in full.  All outstanding principal accrued and unpaid interest shall be due and payable in full no later than August 1, 2014, unless this Note shall be accelerated sooner pursuant to any provision hereof.  In addition Maker shall pay a late charge of two percent (2%) on any payment ("Late Charge") which is not made by Maker within five (5) days of when such payment is due.

This Note may be prepaid, in whole or in part, at any time without premium or penalty.

All payments received hereunder shall be applied first to late charges, then to accrued interest and the balance, if any, shall be applied to principal.

Payments of Principal and Interest and Late Charges (collectively, "Note Payments"), if any, under this Note are to be offset against any amounts ("Rent") due Maker from Holder under that certain Sublease Agreement dated the date hereof between Maker as Sublandlord and Holder as Subtenant attached hereto as Exhibit A (the "Sublease").  To the extent that on the first day of any month Maker owes Holder under the terms of this Note more Note Payments than Holder owes Maker as Rent under the terms of the Sublease, then no Rent shall be due Maker under the Sublease on such date, and Maker shall pay Holder only the difference between (i) the Note Payment owed by Maker to Holder for such month and (ii) the Rent owed by Holder to Maker for such month as full satisfaction of the Note Payments due on such date hereunder.  To the extent that Holder owes Maker under the terms of the Sublease more Rent than Maker owes Holder as Note Payments under this Note, then no Note Payment shall be due Holder under this Note on such date, and Holder shall pay Maker only the difference between (i) the Rent owed by Holder for such month and (ii) the Note Payments owed by Maker to Holder for such month in full satisfaction of the Rent due on such date under the Sublease.  In the event that on the first day of any month the Rent owed under the Sublease shall be equal to the Note Payments owed under this Note, then neither party shall owe the other.

In no event will termination of the Sublease for any reason, or the default by either party under the terms of the Sublease, terminate the obligations of the Maker pursuant to this Note,

\35352851.5

**EXHIBIT A**

which obligations of the Maker shall continue with or without offset for Rent, until paid in full as set forth herein.

Upon the occurrence of any of the events described below, notwithstanding anything set forth herein or in the Sublease, Holder shall have the right, at its sole option, to declare the entire unpaid principal balance of this Note and all accrued interest thereon to be immediately due and payable:

(a)     In the event Maker fails to pay when due any payment required by this Note and such failure continues for a period of five (5) days after such payment is due.

(b)     In the event Maker defaults in the performance of any agreement, covenant, condition or obligation to be performed by Maker under the Sublease.

Failure or forbearance by Holder, upon the occurrence of any of the events described above, to avail itself fully or partially of any remedy provided for herein or under applicable law shall not constitute a waiver thereof, but such remedies shall remain available to Holder continuously thereafter unless waived in writing by Holder.  All remedies are expressly declared to be cumulative.

If this Note is not paid when due, whether at maturity or by acceleration, Maker agrees to pay all costs and expenses of collection, whether or not suit is filed, including reasonable attorneys' fees incurred by Holder.

Maker and all others who may become liable for all or any part of this Note, agree herby to be jointly and severally bound, and jointly and severally (i) waive and renounce any and all homestead exemption rights and the benefits of all valuation and appraisement privileges as against this debt or any renewal or extension hereof; (ii) waive presentment, demand, protest, notice of nonpayment, notice of dishonor, and any and all lack of diligence or delays in the collection or enforcement hereof; (iii) consent to the release or substitution of any of the collateral securing this Note; and (iv) consent to any extension of the time for payment of this Note and any other indulgence or forbearance by Holder.  Any such extension, release, substitution, indulgence or forbearance may be made without notice to any party and without in any way affecting the personal liability of any party liable heron.

In no event shall the amount of interest due or payable hereunder exceed the maximum rate of interest allowed by applicable law, and in the event any payment is made which exceeds such maximum lawful rate, then the amount of such excess sum shall be credited as a payment of principal.  It is the express intent hereof that Maker shall not pay and the Holder shall not receive, directly or indirectly, interest in excess of what may lawfully be paid by Maker under applicable law.

It is understood and agreed that all payments due under this Note shall be made when due without any set-off or deduction whatsoever.

Maker herby represents and warrants that the indebtedness evidenced by this Note is being obtained for the purpose of acquiring and carrying on a business or commercial enterprise

2

**EXHIBIT A**

and all proceeds of such indebtedness will be used solely in connection with such business or commercial investment.

This Note shall be governed by and construed in accordance with the laws of the District of Columbia.

This Note shall be binding on Maker and its successors and assigns and shall inure to the benefit of Holder and its successors and assigns.

IN WITNESS WHEREOF, the undersigned, with full power and authority to do so, have executed and delivered this Promissory Note as of the day and year first above written on behalf of the Maker, Walker & Company, LLP.

Witness:

Walker & Company, LLP, a District of Columbia limited partnership

By: _____
       General Partner

_____

Name: _____

By: _____
       General Partner

_____

Name: _____

\35352851.5

**EXHIBIT A**

EXHIBIT A

SUBLEASE

## SUBLEASE AGREEMENT

This SUBLEASE AGREEMENT (this "**Sublease 2**") is made and entered into as of the 1st day of November, 2011 by and between **Walker & Company, LLP**, a District of Columbia limited liability partnership ("**Sublandlord 2**"), and COmputing TechnologieS, Inc., a Commonwealth of Virginia corporation ("**Subtenant 2**") (Sublandlord 2 and Subtenant 2 will hereinafter be collectively referred to as the "**Parties**").

WITNESSETH:

WHEREAS, **Garrison Associates, L.L.C.**, as landlord ("**Prime Landlord**"), and Muldoon Murphy and Aguggia LLP, as tenant ("**Tenant**"), entered into that certain Lease Agreement dated May 29, 2007, as amended (as the same may hereafter be amended, and as redacted, the "**Prime Lease**", which Prime Lease is attached hereto as **Exhibit "A" and incorporated herein by reference**); whereby Tenant leased from Prime Landlord certain premises containing, in the aggregate, approximately 22,126 rentable square feet and more particularly described in the Prime Lease (the "**Prime Lease Premises**"), in the building located at 5101 Wisconsin Avenue, N.W., Washington, D.C. (the "**Building**");

WHEREAS, Tenant assigned its interest as tenant under the Prime Lease to **Kilpatrick Stockton, L.L.P.** ("**Prime Sublandlord**" or "**Sublandlord**" ), and Sublandlord assumed Tenant's interest in the Prime Lease by an Assignment of Lease;

WHEREAS, Sublandlord further sublet to Sublandlord 2 a portion of the Prime Lease Premises consisting of 8,730 square feet being the entire 5th floor of the Building (the "**Fifth Floor Premises**") pursuant to a Sublease Agreement dated as of October 11, 2010 and attached hereto as **Exhibit A-1** (the "**Sublease Agreement**"); and

WHEREAS, Sublandlord 2 desires to sublease to Subtenant 2 a portion of the Fifth Floor Premises, consisting of approximately 2,216 rentable square feet, as more particularly depicted on **Exhibit "B"** attached hereto and incorporated herein by reference (the "**Sublease Premises**"), and Subtenant 2 desires to sublease the Sublease Premises from Sublandlord 2, all upon the terms and subject to the conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the premises, the mutual covenants contained herein, ten dollars ($10.00) and other good and valuable consideration, the receipt, sufficiency and adequacy of which are hereby acknowledged by all parties hereto, the Parties, intending to be legally bound, hereby covenant, acknowledge, represent and agree as follows:

1. **DEMISE; TERM**. Sublandlord 2 hereby subleases the Sublease Premises to Subtenant 2, and Subtenant 2 hereby subleases the Sublease Premises from Sublandlord 2, on the terms and conditions contained herein. The term of this Sublease 2 (the "**Sublease Term 2**" or the "**Term**" of this Sublease) shall commence on November 1, 2011 (the "**Commencement**

4

\35307074.6

**EXHIBIT A**

Date"). As of the Commencement Date, Sublandlord 2 has executed and delivered to Subtenant 2 a Promissory Note dated as of November 1, 2011 in the form attached hereto a **Exhibit D** (the "**Promissory Note**" or the "**Note**") and has delivered to Subtenant 2 the written approval for this Sublease 2 from each of Prime Landlord and Sublandlord (collectively, the "Consents"), which Consents include permission to install a smart card locking system on all doors to the Sublease Premises (the "Security System") and acknowledgement of Section 15(c) hereof . The Term including the First Lease Year and the option year, the Second Lease Year (each defined in section 2(a) herein) of this Sublease shall expire on **August 1, 2014 (the "Expiration Date")** or on such earlier date upon which the Term of this Sublease shall expire or be cancelled or terminated pursuant to any of the conditions or covenants of this Sublease or pursuant to law. Anything contained in this Sublease to the contrary notwithstanding, in the event the Prime Lease or the Sublease Agreement is terminated for any reason, then this Sublease (but not the Promissory Note) shall   terminate as of the date prior thereto.   Upon the occurrence of the Commencement Date, either party shall have the right to require both parties hereto to confirm the Commencement Date in writing.

2.   **RENT**.

(a)   **Sublease Base Rent**. Subtenant 2 agrees to pay to Sublandlord 2 monthly rent for the Sublease Premises (the **"Sublease Base Rent"**) commencing on November 1st 2011, as follows:

| Period | Per Square Foot Monthly Rent | Monthly Base Rent |
|---|---|---|
| First Lease Year Term November 1, 2011 – July 31, 2013 | $30.50 | $5,632.33 |
| Second Lease Year term August 1, 2013 – July 31, 2014 | $31.26 | $5,772.68 |

(b)   Sublease Base Rent, if any, shall be paid to Sublandlord 2 at the address for delivery of notices to Sublandlord 2 as set forth herein or at such other address as Sublandlord 2 directs by written notice to Subtenant 2 from time to time.

(c)   Reference is made to the Prime Lease for the definitions of "Operating Costs" and "Real Estate Taxes". Commencing with the beginning of the Second Lease Year, Subtenant 2 shall pay to Sublandlord 2, in addition to Sublease Base Rent, (i) 3.53% of the amount by which all Operating Costs[1] for each calendar year exceeds the amount of all Operating Costs attributable to the calendar year 2011, and (ii) 3.53% of the amount by which all Real Estate Taxes for each D.C. fiscal tax year exceeds the amount of Real Estate Taxes attributable to the D.C. fiscal tax year ending September 30, 2010 (individually, and collectively referred to herein as the **"Sublease Base Year"**), adjusted, if necessary, to reflect a ninety-five percent (95%) occupied Building.   The

---

[1]   Calculation is 25% of the 14.12% of the Operating Costs for the Building due under Sublandlord 2's subtenancy.

\35307074.6

determination of Operating Expenses and Real Estate Taxes by Prime Landlord shall be conclusive upon Subtenant 2. Commencing with the beginning of the second Lease Year, Subtenant 2 shall make monthly payments to Sublandlord 2 on account of estimated increases in Operating Costs and Real Estate Taxes for each calendar year. Sublandlord 2 shall submit to Subtenant 2 an estimate as soon as practicable after Sublandlord 2's receipt of Prime Landlord's estimate thereof after the end of each calendar year. Following the receipt of each such estimate, Subtenant 2 shall pay to Sublandlord 2, monthly, on the first day of each month through and including the month in which Subtenant 2 receives Sublandlord 2's next such estimate, an amount equal to one-twelfth (1/12th) of Subtenant 2's share of estimated increases in Operating Costs and Real Estate Taxes. If Subtenant 2's total payments on account of estimated increases in Operating Costs and Real Estate Taxes made through December of the immediately preceding calendar year exceed the amount of the increase actually due for that calendar year, Sublandlord 2 shall credit the difference against the next installment of Sublease Additional Rent due from Subtenant 2. If, on the other hand, such payments were less than the amount of the increase actually due, Subtenant 2 shall pay the difference to Sublandlord 2 with its next installment of Base Sublease Rent due (but no sooner than thirty (30) days). Subtenant 2's liability for Subtenant 2's share of increases in Operating Costs and Real Estate Taxes for the last calendar year of the Sublease Term of this Sublease shall survive the expiration of this Sublease. Similarly, Sublandlord 2's obligation to refund to Subtenant 2 the excess, if any, of the amount of Subtenant 2's payment on account of estimated increases for such last calendar year over Subtenant 2's actual liability therefor shall survive the expiration of the Sublease Term. Sublandlord 2 may at any time or from time to time, but not more than once per year, furnish to Subtenant 2 a revised estimate for any calendar year and in such case Subtenant 2's payments on account of estimated increases for such calendar year shall be adjusted accordingly.

(d)     **Other Payments.** Other than Base Annual Rent (as defined in the Prime Lease) and Tenant's Share of Operating Costs and Tenant's Share of Real Estate Taxes (as such terms are defined in the Prime Lease), unless otherwise provided in this Sublease, Subtenant 2 agrees to pay to Sublandlord 2 all payments for which Sublandlord 2 shall become responsible to Prime Landlord under the Prime Lease attributable to the Sublease Premises accruing during the Sublease Term, Subtenant 2's use or occupancy of the Sublease Premises, or by reason of any act or omission of Subtenant 2 or Subtenant 2 Parties, including, without limitation, any payments accruing as a result of (i) any increases in insurance premiums resulting from any act or omission of Subtenant 2, (ii) any sums payable on account of Subtenant 2's use of extra heating, ventilation or air conditioning, and (iii) any sums payable on account of any services requested by and provided to Subtenant 2 (**"Other Payments"**).

(e)     **Net Rent.** All sums due under this **Section 2**, including, without limitation, Sublease Base Rent, shall be payable without offset, reduction or abatement for any cause except as otherwise specifically provided in this Sublease. For purposes of this Sublease, all sums due under this Section or under any other provision of this Sublease, other than Sublease Base Rent, shall be collectively referred to herein as **"Sublease Additional Rent"**, and all Sublease Base Rent and Sublease Additional Rent

**EXHIBIT A**

shall be collectively referred to herein as **"Rent"**. Sublease Additional Rent shall be due on demand unless otherwise specifically provided herein.

(f)     **Lease Year; Option.**   **Lease Year Terms** shall have the meaning articulated in Section 2 (a) herein. The Second Lease Year Term is at the option of Subtenant 2; however, written notice to extend into any option year must be provided in writing no less than 90 calendar days prior to the end of the prior Lease Year Term.

(g)     **Offset of Rent Against Amounts Due Subtenant 2 Under Note.** Notwithstanding anything set forth in this Sublease all payments of Rent, if any, under this Sublease are to be offset against any amounts of Principal, Interest and Late Charges (collectively, **"Note Payments"**) due Subtenant 2 from Sublandlord 2 under the Note between Sublandlord 2, as Maker, and Subtenant 2, as Holder. To the extent that on the first day of any month Subtenant 2 owes Sublandlord 2 under the terms of this Sublease 2 less Rent than Sublandlord 2 owes Subtenant 2 as Note Payments under the terms of the Note, then no Rent shall be due Sublandlord 2 under this Sublease, and Sublandlord 2 shall pay Subtenant 2 only the difference between (i) the Note Payment owed by Sublandlord 2 to Subtenant 2 for such month and (ii) the Rent owed by Subtenant 2 to Sublandlord 2 as full satisfaction of the Note Payments due on such date thereunder. To the extent that on the first day of any month Subtenant 2 owes Sublandlord 2 under the terms of this Sublease more Rent than Sublandlord 2 owes Subtenant 2 as Note Payments under the Note, then no Note Payment shall be due Subtenant 2 under the Note, and Subtenant 2 shall pay Sublandlord 2 only the difference between (i) the Rent owed by Subtenant 2 for such month and (ii) the Note Payments owed by Sublandlord 2 to Subtenant 2 in full satisfaction of the Rent due on such date under this Sublease. In the event that on the first day of any month the Rent owed under the Sublease shall be equal to the Note Payments owed under this Note, then neither party shall owe the other.

(h)     **Parking.**   Sublandlord 2 shall assign to Subtenant 2 **four (4)** garage parking spaces and **one (1)** surface parking space. Subtenant 2 shall pay Sublandlord the cost thereof at the rate charged to Sublandlord 2 by Sublandlord, such payments to be made on the first day of every month, provided Subtenant 2 receives prior written notice of any increases in the cost therefore.

3.     **INSURANCE.**   Subtenant 2 shall carry, at its sole cost and expense, (a) commercial general liability insurance, on an occurrence form, including premises operations, products/completed operations, hazard and contractual coverage, and coverage for all of Subtenant 2's indemnity obligations under this Sublease, with limits of no less than $1,000,000 per occurrence and $3,000,000 general aggregate with an umbrella with a $5,000,000 aggregate, (b) fire and extended coverage property insurance in an amount equal to the full replacement value of the contents of the Sublease Premises, including without limitation, all leasehold improvements, the Furniture and Fixtures (as hereinafter defined) and all of the personal property, and removable trade fixtures located in the Sublease Premises, and (c) such insurance as set forth in the Prime Lease and as required by the Prime Landlord. All insurance required under this Sublease shall be written by a carrier licensed to write insurance in the District of Columbia with a Best's rating of A- IX or better and otherwise reasonably acceptable to Sublandlord 2, and such insurance shall show Sublandlord 2 and Prime Landlord together with any other party as Sublandlord 2 shall require

\35307074.6

as additional insureds, as their interests may appear. Additionally, Subtenant 2, at its sole cost and expense, shall carry workers' compensation insurance with liability limits required by the laws of the District of Columbia and such other insurance as may be required by "Law" (as hereinafter defined). All policies required of Subtenant 2 hereunder shall be primary and shall contain a provision whereby the same cannot be canceled, terminated, reduced or materially changed unless Sublandlord 2 and Prime Landlord are given at least thirty (30) days' prior written notice. Subtenant 2 covenants to deliver to Sublandlord 2 copies of all policies required of Subtenant 2 hereunder and/or certificates evidencing such coverage. Subtenant 2 acknowledges and agrees that it is solely responsible for any damage to its personal property from any cause whatsoever, and Subtenant 2 waives and releases any and all rights it may have against Sublandlord 2 and Prime Landlord for such damage.

4. **ASSIGNMENT; SUBLETTING.** Subtenant 2 will not sublet the Sublease Premises, or any portion thereof, or assign this Sublease in whole or in part, for collateral purposes or otherwise, or permit use or occupancy of the Sublease Premises, or any portion thereof, by others without the prior written consent of Sublandlord 2 in each instance being first obtained, which consent shall be in the sole discretion of Sublandlord 2. In the event Sublandlord 2 shall consent to any specific assignment, subletting or occupancy, such consent shall not be construed as relieving Subtenant 2 from any liability under this Sublease or from responsibility for obtaining Sublandlord 2's prior written consent to any further assignment, subletting or occupancy. With respect to the allocable portion of the Sublease Premises sublet, (i) in the event all of the Sublease Premises is sublet, Subtenant 2 shall pay to Sublandlord 2 **seventy five percent (75%)** of the Excess (as hereinafter defined) within ten (10) days of receipt of the same, and (ii) in the event less than all of the Sublease Premises is sublet, Subtenant 2 shall pay to Sublandlord 2 **fifty percent (50%)** of the Excess within ten (10) days of receipt of the same, and such amount shall be deemed a component of Rent under this Sublease. With respect to any assignment of this Sublease, Subtenant 2 shall pay to Sublandlord 2, within ten (10) days of receipt of the same, **fifty percent (50%)** of the Excess. For purposes hereof, the "**Excess**" shall mean the gross revenue received by Subtenant 2 from the assignee or sublessee, less (a) the Rent paid to Sublandlord 2 by Subtenant 2 with respect to the subleased space during the period of the sublease term or attributable to the period from and after the effective date of the assignment, (b) any improvement allowance or other economic concession (planning allowance, moving expenses, etc.) actually paid or provided by Subtenant 2 to the sublessee or assignee, and (c) reasonable brokerage commissions and legal fees and any fees to Prime Landlord or Sublandlord 2 actually paid in connection with such sublease or assignment. Subtenant 2 shall not mortgage, convey, encumber or hypothecate its interest under this Sublease.

5. **CONDITION OF SUBLEASE PREMISES.** SUBTENANT 2 ACKNOWLEDGES THAT IT HAS FULLY INSPECTED THE SUBLEASE PREMISES AND THE FURNITURE AND FIXTURES, IS SATISFIED WITH THE CONDITION THEREOF AND IS TAKING THE SUBLEASE PREMISES IN AN "**AS-IS**" AND "**WHERE-IS**" CONDITION, "**WITH ALL FAULTS,**" AND SUBLANDLORD 2 MAKES NO REPRESENTATIONS OR WARRANTIES (EITHER EXPRESS OR IMPLIED) OF HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND SUBLANDLORD 2 EXPRESSLY DISCLAIMS THE SAME. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, NEITHER SUBLANDLORD 2 NOR ANY

\35307074.6

**EXHIBIT A**

EMPLOYEE, AGENT OR REPRESENTATIVE OF SUBLANDLORD 2 HAS MADE ANY PROMISE TO ALTER, REMODEL OR IMPROVE THE SUBLEASE PREMISES OR THE FURNITURE AND FIXTURES, OR ANY PORTION THEREOF OR ANY REPRESENTATION (EITHER EXPRESS OR IMPLIED) RESPECTING THE CONDITION OF THE SUBLEASE PREMISES OR THE FURNITURE AND FIXTURES. SUBTENANT 2'S TAKING OF POSSESSION OF THE SUBLEASE PREMISES AND THE FURNITURE AND FIXTURES SHALL CONSTITUTE AN UNCONDITIONAL ACCEPTANCE BY IT OF THE CONDITION THEREOF AS SUITABLE FOR THE PURPOSES INTENDED. SUBTENANT 2 SPECIFICALLY ACKNOWLEDGES AND AGREES THAT IT HEREBY WAIVES, RELEASES AND DISCHARGES ANY CLAIM IT HAS, MIGHT HAVE HAD OR MAY HAVE AGAINST SUBLANDLORD 2 WITH RESPECT TO THE CONDITION OF THE SUBLEASE PREMISES AND THE FURNITURE AND FIXTURES, EITHER PATENT OR LATENT.

6.    **PERMITTED USE OF SUBLEASE PREMISES; COMPLIANCE WITH LAWS.** Subtenant 2 covenants and agrees that it shall use the Sublease Premises only for general office purposes. Subtenant 2 shall not use the Sublease Premises for any other purpose except as expressly provided in this Section without first obtaining the prior written consent of Sublandlord 2, which consent may be withheld in Sublandlord 2's sole and absolute discretion. Subtenant 2 shall have access to the Sublease Premises through key card 24 hours a day 7 days a week and shall have the right to quiet enjoyment of the Sublease Premises and the rights of tenant under the Prime Lease to the Sublease Premises (as a portion of the Prime Lease Premises) as described in the Prime Lease. Anything contained in this Section to the contrary notwithstanding, Subtenant 2 shall, at all times and at Subtenant 2's sole cost and expense, (a) use the Sublease Premises and cause the same (including compliance by all employees, agents, servants, licensees, invitees, contractors, representatives and others acting on Subtenant 2's behalf (collectively, the **"Subtenant 2 Parties"**)) to be in full and strict compliance with all applicable federal, state, local, city, county, administrative and other laws, ordinances, codes, rules, regulations and orders, whether present or future, foreseen or unforeseen, including, without limitation, all judicial and regulatory interpretations of the same and the requirements of any Board of Fire Underwriters (collectively, **"Laws"**), provided that Subtenant 2 shall not be responsible for any structural alterations unless the need therefor arises out of Alterations or Subtenant 2's particular use of the Sublease Premises, (b) not engage in any activities on the Sublease Premises or act in any way which may be considered to be ultra-hazardous or extra-hazardous or which would violate any Laws, and (c) install (to the extent there are none or insufficient numbers thereof) and maintain in good and working order throughout the Sublease Premises fire extinguishers in such number and in such locations as may be required by Laws or as may be reasonably required by Prime Landlord (except to the extent the Prime Lease requires Prime Landlord to install and maintain same) in order to minimize the risk of fire resulting from Subtenant 2's use of the Sublease Premises.

7.    **ALTERATIONS.**

(a)    Except for the Security System which is hereby approved by Sublandlord 2 and has been approved by each of Prime Landlord and Sublandlord, Subtenant 2 shall not make any alterations or improvements to the Sublease Premises (**"Alterations"**) unless Subtenant 2 shall have first obtained the prior written consent of Sublandlord 2

9

**EXHIBIT A**

(not to be unreasonably withheld, delayed or conditioned), and Prime Landlord. Alterations shall be made in accordance with and subject to the provisions of a Work Letter. Alterations may be made only at Subtenant 2's expense, by contractors or subcontractors approved by Prime Landlord and, and only after Subtenant 2 has obtained all necessary permits from governmental authorities having jurisdiction and has furnished copies of the permits to Sublandlord 2. All Alterations which affect or in any way relate to the mechanical, electrical, plumbing, heating, air conditioning, or structural systems of the Building shall be done only by Prime Landlord or Prime Landlord's contractor or agent at Subtenant 2's expense (unless Prime Landlord agrees that Subtenant 2 may use another contractor). Any Alterations permitted under this Sublease shall be made by Subtenant 2 in a good, workmanlike and lien-free manner using new materials, and, upon completion, such Alterations shall remain a part of the Sublease Premises and be surrendered along with the rest of the Sublease Premises at the expiration or earlier termination of the Term of this Sublease, all without any compensation to Subtenant 2 therefor. Notwithstanding the foregoing to the contrary, prior to the Expiration Date, or upon any earlier termination of this Sublease, Subtenant 2, at the request of Prime Landlord (but only to the extent Prime Landlord is entitled to impose such requirement pursuant to the Prime Lease), shall remove all Alterations, repair all damage resulting from such removal and, if so required by Prime Landlord (but only to the extent Prime Landlord is entitled to impose such requirement pursuant to the Prime Lease), restore the Sublease Premises to the condition as of the date possession was delivered to Subtenant 2. If Subtenant 2 fails or refuses to remove such Alterations, or fails to correct, repair and restore the Sublease Premises, Prime Landlord or Sublandlord 2 may cause the same to be removed, and repairs and restoration to be made, in which event Subtenant 2 shall reimburse to the party who caused said Alterations to be removed and repairs made, the cost of such removal, repairs and restoration, together with any and all damages which Prime Landlord or Sublandlord 2 may suffer and sustain by reason of Subtenant 2's failure or refusal to remove said Alterations. In no event, however, shall Subtenant 2 be obligated to remove any data/telecom cabling from the Sublease Premises. In no event shall Subtenant 2 be required to remove or to pay for any part of the removal of any interior stairwell in the Fifth Floor Premises.

(b)    Subject to any required consent of Prime Landlord, Sublandlord 2 grants to Subtenant 2 the right to listings identifying Subtenant 2 and up to three (3) of Subtenant 2's principals on the building directory at Sublandlord 2's cost.

8.    **REPAIRS AND MAINTENANCE.**   Subtenant 2, during the Term of this Sublease, shall, at its sole cost and expense, make all repairs and maintenance as shall be necessary to keep the Sublease Premises in good condition, working order and repair, normal wear, loss by fire or other casualty not caused by Subtenant 2 or the Subtenant 2 Parties, and condemnation excepted. Subtenant 2 further agrees that all damage or injury of whatever nature done to the Sublease Premises by the Subtenant 2, the Subtenant 2 Parties or by any other person in or upon the Subtenant 2 Premises shall be repaired by Subtenant 2 at its sole cost and expense.

9.    **INDEMNIFICATION.**

10

(a)     Subtenant 2 hereby indemnifies and agrees to defend and hold Sublandlord 2 harmless from and against any and all costs, claims, actions, damages, demands, expenses (including, without limitation, reasonable attorneys' and consultants' fees, each expense and fee paid upon demand), injuries, judgments, settlements, liabilities, penalties, losses and suits (individually and collectively, **"Losses"**), suffered, sustained or incurred by Sublandlord 2, its employees, officers, directors, agents, or representatives in connection with, or as a result of, any accident, act or omission, claim, hazard, injury, violation of any environmental, health, fire, zoning, building or safety codes or Laws, death or damage to person or property arising, directly or indirectly, in whole or in part, from any act or omission of Subtenant 2 or any Subtenant 2 Party, or the breach or default by Subtenant 2 or any Subtenant 2 Party of any term, provision, covenant, or condition contained in the Prime Lease or this Sublease, or from the use by Subtenant 2 or any of the Subtenant 2 Parties of the Sublease Premises, whether or not in compliance with the terms of this Sublease. The scope of this indemnification shall, at Sublandlord 2's option, include, but not be limited to, defending or resisting, with attorneys reasonably satisfactory to Sublandlord 2, any action, suit, claim, demand or proceeding that may be filed, instituted or brought against Sublandlord 2 or to which Sublandlord 2 may be made a party. The indemnification obligations contained in this Section are in addition to and not in lieu of the indemnification obligations which Subtenant 2 incurs by virtue of the Prime Lease as set forth in **Section 12, infra**.

(b)     Sublandlord 2 hereby indemnifies and agrees to defend and hold Subtenant 2 harmless from and against any and <u>Losses</u>, suffered, sustained or incurred by Subtenant 2, its employees, officers, directors, agents, or representatives in connection with, or as a result of, any accident, act or omission, claim, hazard, injury, violation of any environmental, health, fire, zoning, building or safety codes or Laws, death or damage to person or property arising, directly or indirectly, in whole or in part, from any act or omission of Sublandlord 2 or any Sublandlord 2 party, or the breach or default by Sublandlord 2 or any Sublandlord 2 party of any term, provision, covenant, or condition contained in the Prime Lease, the Sublease Agreement or this Sublease, or from the use by Sublandlord 2 or any of the Sublandlord 2 Parties of the Sublease Premises, whether or not in compliance with the terms of this Sublease. The scope of this indemnification shall, at Subtenant 2's option, include, but not be limited to, defending or resisting, with attorneys reasonably satisfactory to Subtenant 2, any action, suit, claim, demand or proceeding that may be filed, instituted or brought against Subtenant 2 or to which Subtenant 2 may be made a party. The indemnification obligations contained in this Section are in addition to and not in lieu of the indemnification obligations which Sublandlord 2 incurs by virtue of the Prime Lease as set forth in **Section 12, infra**.

10.     **WAIVER OF CLAIMS.** Sublandlord 2, its employees, agents or servants shall not be liable to Subtenant 2, the Subtenant 2 Parties or to any other person for any damage (including consequential damage) to, injury to, loss of, compensation for or claim with respect to property, including but not limited to, claims for the interruption of or loss to Subtenant 2's business, based on, arising out of or resulting from any cause whatsoever (except as otherwise provided in this **paragraph 10**), including but not limited to the following:  repairs to any portion of the Sublease Premises; interruption in the use of the Sublease Premises or any equipment therein; any accident or damage resulting from the use or operation (by Sublandlord

11

**EXHIBIT A**

2, Subtenant 2 or any other person or entity) of elevators, or of the heating, cooling, electrical, sewerage, or plumbing equipment or apparatus; the termination of this Sublease by reason of the destruction of the Sublease Premises or the Building; any fire, robbery, theft, vandalism, mysterious disappearance and/or any other casualty; the actions of any other tenants of the Building or of any other person or entity; and any leakage in any part or portion of the Sublease Premises or the Building, or from water, rain, ice or snow that may leak into, or flow from, any part of the Sublease Premises or the Building, or from drains, pipes or plumbing fixtures in the Building. Any goods, property or personal effects stored or placed by Subtenant 2, its employees or agents in or about the Sublease Premises shall be at the sole risk of Subtenant 2, and Sublandlord 2 shall not in any manner be held responsible therefor. Inasmuch as the aforesaid waiver will preclude the assignment of any such claim by way of subrogation or otherwise to an insurance company or any other person, Subtenant 2 agrees to give each insurance company which has issued fire and extended coverage or other property coverage, written notice of the terms of said waiver immediately and shall have said insurance policies properly endorsed with a waiver of subrogation. Evidence of said waiver shall be forwarded to Sublandlord 2 within **thirty (30) days** after the execution of this Sublease.

11.    **SUBJECT TO THE PRIME LEASE**.

      (a)    This Sublease, at all times, shall be subject and subordinate to the terms and conditions of the Prime Lease and all matters to which it is subject or subordinate.

      (b)    All the obligations imposed by the Prime Lease upon Sublandlord 2, as tenant under the Prime Lease, are hereby imposed upon Subtenant 2 and accepted and assumed by Subtenant 2 with respect to the Sublease Premises, except as otherwise expressly set forth in this Sublease. Subtenant 2 shall, with respect to the Sublease Premises, duly, fully and strictly keep, observe and perform each and every term and covenant on Sublandlord 2's part to be observed and performed as tenant under the Prime Lease, except as such terms and covenants are redacted from the Prime Lease attached hereto or expressly by reference thereto herein modified by the terms of this Sublease. Anything to the contrary contained herein notwithstanding, Subtenant 2 shall not, except for the payment of rent to Prime Landlord under the Prime Lease, (i) take any action or fail to take any action which is or would be inconsistent with the terms of the Prime Lease, (ii) do or permit to be done by any of the Subtenant 2 Parties anything prohibited to Sublandlord 2 as the tenant under the Prime Lease, or which would constitute, with or without the giving of notice or the passage of time or both, a default under the Prime Lease, or (iii) take any action, fail to take any action or do or permit anything which would result in any additional cost or liability to Sublandlord 2 under the Prime Lease. With respect to any provision of the Prime Lease that provides for an abatement of rent under certain circumstances during the Sublease Term, Subtenant 2 shall not be entitled to any rent abatement thereunder unless Sublandlord 2 actually receives a rent abatement under the Prime Lease with respect to the Sublease Premises. If Prime Landlord is released from liability to Sublandlord 2 for any actions or omissions of Prime Landlord or for any causes whatsoever, then Sublandlord 2 shall not be liable to Subtenant 2 for such actions or omissions and causes. Any inconsistency between the Prime Lease and this Sublease which relates to obligations of, or restrictions on, Subtenant 2 shall be resolved

\35307074.6

**EXHIBIT A**

in favor of that obligation which is more onerous to Subtenant 2 or that restriction which is more restrictive of Subtenant 2, as the case may be.

(c)     Sublandlord 2 shall not be obligated to perform and shall not be liable for the performance by Prime Landlord of any of the obligations of the Prime Landlord under the Prime Lease. Without limiting the generality of the foregoing, Sublandlord 2 shall have no obligation to render any services to Subtenant 2 in or to the Sublease Premises, to construct any improvements or make any alterations on the Sublease Premises, nor shall Sublandlord 2 have any obligation to repair or restore the Sublease Premises following a casualty or condemnation. Sublandlord 2 shall not be liable with respect to any representations or warranties of Prime Landlord contained in the Prime Lease. Subtenant 2 shall have no claim against Sublandlord 2 by reason of any default on the part of Prime Landlord, and Subtenant 2 hereby waives and relinquishes any and all such claims Subtenant 2 might have, whether known or unknown, matured or contingent, foreseeable or unforeseeable. In furtherance of the foregoing, Subtenant 2 shall not make any claim against Sublandlord 2 for any damages which may arise by reason of any act or omission, whether intentional or negligent, of Prime Landlord. Nothing herein contained shall be deemed to authorize Subtenant 2 to represent Sublandlord 2 in connection with any suit or claim by or against Prime Landlord. Subtenant 2 agrees to look solely to Prime Landlord for the furnishing of any services to which Subtenant 2 may be entitled under the Prime Lease. Provided Subtenant 2 is not in default under this Sublease, Sublandlord 2 agrees to cooperate with Subtenant 2 and to use reasonable efforts (without, however, incurring any third party liabilities or material expenses, apart from necessary legal fees,) to enforce, for the benefit of Subtenant 2 at Subtenant 2's written request, the obligations of the Sublandlord and/or Prime Landlord to Sublandlord 2 under the Sublease and/or the Prime Lease insofar as they relate to the Sublease Premises. Any and all reasonable and documented third party out-of-pocket expenses of Sublandlord 2 arising from Sublandlord 2's action taken pursuant to this **Section 11(c)** shall be reimbursed by Subtenant 2 as Sublease Additional Rent, which shall be either at Subtenant 2's option be (i) due within **ten (10) days** or (ii) added to offset the amount of Note Payment next owed Subtenant 2 by Sublandlord 2 under the Note after receipt of written demand therefor in reasonable detail. The foregoing shall not be deemed to require that Sublandlord 2 commence legal action to enforce the obligations of Prime Landlord.

(d)     The provisions of the Prime Lease redacted on the copy of the Prime Lease attached hereto shall not apply to Subtenant 2 and shall not be incorporated into this Sublease. In addition, the terms of this Sublease shall not include the discretionary elections and consents provided to Sublandlord, as tenant, under the Prime Lease. The right to make all such elections and provide all such consents shall be reserved solely to Sublandlord, and Sublandlord 2 shall in no event be liable to Subtenant 2 for any loss or damage occasioned by or resulting from any elections made or not made or consents given or not given by Sublandlord 2, as tenant, under the Prime Lease. In the event of any inconsistency between the terms and provisions of this **Section 11(d)** and the other terms and provisions of this Sublease, the terms and provisions of this **Section 11(d)** shall control.

\35307074.6

(e)     Sublandlord 2 represents and warrants that the Prime Lease and the Sublease are currently in force and effect, and that Sublandlord 2 has not received within the twelve (12) month period prior to the date of this Sublease written notice from either Prime Landlord or Sublandlord 2 alleging any breach or default by Sublandlord 2 under the Sublease Agreement, or of Sublandlord under the Prime Lease. Provided Subtenant 2 is not in default of this Sublease beyond any applicable notice or cure period: during the Term of this Sublease, Sublandlord 2 shall not (i) do anything that results in a default under the Sublease or the Prime Lease; (ii) agree to any voluntary termination of the Sublease Agreement or the Prime Lease (except by reason of casualty damage or condemnation or any matter under the Prime Lease or the Sublease Agreement that gives Sublandlord 2 the right to terminate Sublease Agreement or the Prime Lease); or (iii) modify, amend or otherwise change any of the terms and conditions of the Prime Lease or the Sublease Agreement which would have a material and adverse effect on Subtenant 2 or the Sublease Premises or Subtenant 2's intended use of the Sublease Premises.

(f)     Sublandlord 2 shall secure from Sublandlord and provide Subtenant 2 with an estoppel certificate from Sublandlord to Subtenant 2 containing the same items in Section 11(e) hereof vis a vis the Sublease.

12.     **CONSENT OF SUBLANDLORD 2.**  Whenever the consent of Sublandlord 2 is required under this Sublease, such consent may not be unreasonably withheld, conditional or delayed except to the extent otherwise provided herein.  Anything contained herein to the contrary notwithstanding, in any case where this Sublease 2, the Sublease Agreement or the Prime Lease requires Subtenant 2 to obtain the consent or approval of Sublandlord 2, whether prior to the taking of any action or otherwise, Subtenant 2 shall, in addition to obtaining the consent or approval of Sublandlord 2, obtain (at the time required) the consent or approval of Sublandlord and Prime Landlord, if such consent or approval is required by the Prime Lease or the Sublease Agreement.  In the event that Prime Landlord's and/or Sublandlord's consent or approval is so required, Subtenant 2 shall not contact Prime Landlord or Sublandlord directly, but Subtenant 2 shall instead deliver a written request to Sublandlord 2 to obtain the consent or approval of Prime Landlord and Sublandlord.  Sublandlord 2 shall promptly transmit to Prime Landlord and Sublandlord Subtenant 2's request for such consent or approval.  Sublandlord 2 shall keep Subtenant 2 apprised of any communications between Prime Landlord, Sublandlord and Sublandlord 2.  To the extent either or both of the Prime Landlord or Sublandlord withholds its consent or fails to respond to any request for consent, then Sublandlord 2 may withhold its consent to the matter, and such withholding of consent by Sublandlord 2 shall be conclusively presumed to have been reasonable, and Subtenant 2 shall have no claim or cause of action against Sublandlord 2 on account thereof.

13.     **DEFAULT.**

(a)     If Subtenant 2 shall default in the fulfillment of any of its covenants and agreements set forth herein or under the Prime Lease (without the benefit of any applicable notice and/or cure periods provided under the Prime Lease, provided that if any applicable notice and/or cure period is provided to Sublandlord 2 under the Prime Lease, then Subtenant 2 shall be entitled to the same notice and/or cure period as provided in the Prime Lease less two (2) Business Days), Sublandlord 2 shall have the

14

**EXHIBIT A**

same rights and remedies with respect to such default as provided to Prime Landlord under the Prime Lease in addition to those rights available to Sublandlord 2 at law or in equity. Notwithstanding the foregoing, and not in limitation thereof, Sublandlord 2 shall also have the right at any time, but shall not be obligated, to cure any breach or default of Subtenant 2 under this Sublease, or in the Prime Lease, and any and all costs incurred by Sublandlord 2 in connection with the curing of any such breach or default shall become immediately due and payable to Sublandlord 2 as Sublease Additional Rent and subject to offset against the Note Payments.

(b)     If Sublandord 2 shall default in the fulfillment of any of its covenants and agreements set forth herein or under this Sublease 2, the Sublease Agreement or the Prime Lease (without the benefit of any applicable notice and/or cure periods provided under the Sublease Agreement or the Prime Lease, provided that if any applicable notice and/or cure period is provided to Sublandlord 2 under the Sublease Agreement or the Prime Lease, then Sublandlord 2 shall be entitled to the same notice and/or cure period as provided in the Sublease Agreement or the Prime Lease less two (2) Business Days), Subtenant 2 shall have the same rights and remedies with respect to such default as provided Sublandlord 2 under the Sublease Agreement or to the Prime Sublandlord under the Prime Lease in addition to those rights available to Subtenant 2 at law or in equity. Notwithstanding the foregoing, and not in limitation thereof, Subtenant 2 shall also have the right at any time, but shall not be obligated, to cure any breach or default of Sublandlord 2 under this Sublease, or in the Sublease Agreement or the Prime Lease, and any and all costs incurred by Subtenant 2 in connection with the curing of any such breach or default shall become immediately due and payable to Subtenant 2 as Note Payments under the Note.

14.     **NON-WAIVER.** Failure of Sublandlord 2 or Subtenant 2 to declare any default immediately upon occurrence thereof, or any delay in taking any action in connection therewith, shall not waive such action in law or in equity. No waiver by Sublandlord 2 or Subtenant 2 of a default by the other shall be implied, and no express waiver by Sublandlord 2 or Subtenant 2 shall affect any such default other than the default specified in such waiver and then only for the time and extension therein stated. No payment by Subtenant 2 or receipt by Sublandlord 2 of a lesser amount than the correct amount or manner of payment of rental due hereunder shall be deemed to be other than a payment on account, nor shall any endorsement or statement on any check or any letter accompanying any check or payment be deemed to effect or evidence an accord and satisfaction, and Sublandlord 2 may accept any checks or payments as made without prejudice to Sublandlord 2's right to recover the balance or pursue any other remedy in this Sublease or otherwise provided at law or equity.

15.     **SURRENDER; HOLD OVER.**

(a)     Upon expiration of the Sublease Term, or if, at any time prior to expiration of the Sublease Term, this Sublease shall be terminated, Subtenant 2 shall immediately quit and surrender up to Sublandlord 2 possession of the Sublease Premises in broom-clean condition and in good and working order and repair, ordinary wear and tear excepted, and Subtenant 2 shall remove all of its property therefrom. To the extent Subtenant 2 fails to remove all of its property from the Sublease Premises on or before

15

the expiration or earlier termination of the Sublease Term, then such of its property remaining thereon thereafter shall be conclusively deemed to have been abandoned by Subtenant 2, and Sublandlord 2, thereafter, may dispose of the same in such manner as Sublandlord 2 deems desirable, and Subtenant 2 shall not be entitled to any proceeds from such disposal, but Subtenant 2 shall be obligated to reimburse Sublandlord 2, as Sublease Additional Rent, for the actual costs incurred in removing and disposing of such abandoned property within ten (10) days after receipt of written demand therefor. Subtenant 2's obligation to observe and perform the covenants set forth in this Section shall survive the expiration or termination of this Sublease. IN NO EVENT SHALL SUBTENANT 2 REMOVE ANY OF PRIME LANDLORD'S PERSONALTY.

(b)     Should Subtenant 2 hold over after the termination of this Sublease, Subtenant 2 shall become a tenant at sufferance and shall be bound by each and all of the terms herein provided as may be applicable to such tenancy at sufferance. Any such holding over shall not constitute an extension of this Sublease by Law or otherwise. Subtenant 2 shall indemnify and hold harmless Sublandlord 2 for all costs, expenses and liabilities in connection with such hold over, including, without limitation, reasonable attorneys' fees and disbursements, any damages incurred by Sublandlord 2 arising directly or indirectly out of such hold over, including without limitation, any damages for which Sublandlord 2 is liable to Prime Landlord for the failure of Sublandlord 2 to deliver possession of the Prime Lease Premises to Prime Landlord as required by the Prime Lease.

(c)     Notwithstanding anything set forth herein, in the event that (i) Sublandlord 2's default under the terms of the Sublease Agreement, and/or (ii) Sublandlord 2's and/or Sublandlord's default under the terms of the Prime Lease shall be the reason for the termination of this Sublease 2, and provided that (a) Subtenant 2 is not in default of its obligations pursuant to this Sublease 2 and (b) that Subtenant 2 shall attorn to either or both of Prime Landlord and Sublandlord, as appropriate, each of Prime Landlord and Sublandlord hereby agree to allow Subtenant 2 to remain in the Sublease Premises undisturbed for the term of this Sublease 2, pursuant to the terms of this Sublease 2 as if either Prime Landlord or Sublandlord , as appropriate, were Sublandlord 2 hereof.

16.     **NOTICES.** All notices, requests, demands and other communications required or permitted to be given hereunder shall be by certified first-class U.S. mail with adequate postage prepaid and with return receipt requested, by hand delivery, or by overnight courier, in each case with all applicable delivery charges paid by the sender, to the Parties at the addresses set forth below or by facsimile at the numbers set forth below. Such notices shall be in writing in the English language and shall be deemed to have been received on the earlier of actual receipt or refusal to accept receipt or inability to deliver because of a change of address of which no notice has been given in accordance with this Section. The term **"Business Day"** shall mean any day which is not a Saturday, Sunday or legal holiday on which banks in Washington, D.C. are authorized or required to close. The notice addresses for the Parties are as follows:

| If to Sublandlord 2: | Walker & Co., LLP |
| --- | --- |

\35307074.6

**EXHIBIT A**

| with a copy to: | 5101 Wisconsin Avenue, N.W., 20016 |
| | Fifth Floor |
| | Ronald P. Walker, Managing Partner |
| If to Subtenant 2: | COmputing TechnologieS, Inc. |
| | Attn: David Turnbull, COO, VP |
| | 3028 Javier Road, Suite 400 |
| | Fairfax, VA 22301 |
| With a copy to:: | McGuireWoods LLP |
| | Attn: Dorothea W. Dickerman, Esquire |
| | 1750 Tysons Boulevard, Suite 1800 |
| | Tysons Corner, VA 22102 |

Sublandlord 2 shall give Subtenant 2 prompt written notice of all written notices from Prime Landlord and Sublandlord to Sublandlord 2 under the Prime Lease and/or the Sublease Agreement which affects the Sublease Premises. Subtenant 2 shall give Sublandlord 2 prompt written notice of all written notices from Prime Landlord and Sublandlord to Subtenant 2 which affects the Sublease Premises or any other portion of the Prime Lease Premises.

17.    **RECORDING.**  Subtenant 2 shall not record this Sublease or any memorandum or summary thereof without the prior written consent of Sublandlord 2, which may be withheld in Sublandlord 2's sole and absolute discretion.

18.    **FURNITURE AND FIXTURES.**  Sublandlord 2 leases to Subtenant 2 such furniture and fixtures presently in the Premises as are listed on **Exhibit C** annexed hereto (the **"Furniture and Fixtures"**) for the Sublease Term at no additional charge. Sublandlord 2 has removed from the Premises all furniture and fixtures not listed on Exhibit C. The Furniture and Fixtures shall remain the property of Sublandlord 2, but Subtenant 2 shall maintain and repair the Furniture and Fixtures during the Sublease Term in good condition, wear and tear excepted, at Subtenant 2's expense; however Subtenant 2 shall have no obligation to replace any of the Furniture and Fixtures that reaches the end of its useful life during the Sublease Term. Subtenant 2 shall re-deliver the Furniture and Fixtures to Sublandlord 2 at the end of the Sublease Term or earlier termination of this Sublease in good condition, reasonable wear and tear excepted.

19.    **MISCELLANEOUS.**

(a)    This Sublease constitutes the entire agreement of the Parties relative to the subject matter hereof, and all prior negotiations, conversations, representations, agreements and understandings are specifically merged herein and superseded hereby. This Sublease may be modified only by written instrument executed by the Parties hereto. This Sublease is the result of the prior negotiations, conversations, representations, agreements and understandings of the Parties and is to be construed as the jointly prepared product of the Parties.

(b)    TIME IS OF THE ESSENCE OF THIS SUBLEASE.

(c)    This Sublease shall be construed in accordance with and governed by the laws of the District of Columbia without reference to its conflicts of laws.

17

\35307074.6

(d)     The paragraph headings used in this Sublease have been inserted for convenience of reference only and should not be construed to limit or restrict the terms and provisions, covenants and conditions hereof.

(e)     If any term or provision of this Sublease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Sublease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each remaining term and provision of this Sublease shall be valid and be enforced to the fullest extent permitted by law.  To that end, each of the terms and provisions of this Sublease are hereby declared to be severable.

(f)     Sublandlord 2's default under the Promissory Note or the termination or payment in full of the Promissory Note shall have no effect on the term of this Sublease 2, or the rights and the obligations of the parties hereto.

(g)     This Sublease may be executed in two or more counterparts, each of which shall be deemed an original and which together shall constitute one and the same instrument.

(h)     Sublandlord 2 reserves the right to amend or modify the Sublease Agreement, in any manner that does not have a material adverse impact upon Subtenant 2 or the use of the Sublease Premises without obtaining Subtenant 2's consent, and Subtenant 2, upon receiving notice of such amendment or modification, shall be bound by the same in accordance with the terms of this Sublease.

(i)     Any provision to the contrary contained in this Sublease notwithstanding, either party's obligations to indemnify the other hereunder shall survive the expiration of the Sublease Term or any earlier termination of this Sublease.

(j)     Each party hereto warrants and represents that such party has full and complete authority to enter into this Sublease and each person executing this Sublease on behalf of a party warrants and represents that he has been fully authorized to execute this Sublease on behalf of such party and that such party is bound by the signature of such representative.

(k)     Notwithstanding anything contained herein, this Sublease shall be deemed to be a sublease of a portion of the Prime Lease Premises and not an assignment, in whole or in part, of Sublandlord 2's interest in the Prime Lease.

20.     **LIMITATION OF LIABILITY**.  Subtenant 2 acknowledges and agrees that (A) no partner or partners of Sublandlord 2 are personally or individually liable or responsible for any of the duties, obligations, liabilities or responsibilities of Sublandlord 2 under this Sublease; (B) neither the owners nor any individual shareholder of Sublandlord 2: (1) shall be personally liable or responsible for any of the duties, obligations, liabilities or responsibilities of Sublandlord 2 under this Sublease or (2) shall have any duty or obligation, enforceable by or for the benefit of Subtenant 2, to make contributions of capital or any other contributions to

18

**EXHIBIT A**

Sublandlord 2 to satisfy any liability of Sublandlord 2 under this Sublease or otherwise; and (C) Subtenant 2 shall not take any action or institute any proceedings against the partners or any partner, the estates of the partners or any partner, or the personal assets of the partners or any partner, of Sublandlord 2, for the enforcement or recovery of any of liability of Sublandlord 2 under this Sublease or otherwise.

21.     **PRIME LANDLORD'S AND SUBLANDLORD'S CONSENT.** Prime Landlord and Sublandlord have each given its written consent to this Sublease (the "**Consent**") and it is hereby acknowledged by Sublandlord 2 and Subtenant 2 (by their execution of this Sublease) that the giving of Prime Landlord's and Sublandlord's consent to this Sublease: (i) shall not make Prime Landlord or Sublandlord a party to this Sublease; (ii) shall not be deemed approval of any signage, parking, alterations or other improvements, if any, to be made or given in connection with this Sublease; (iii) shall not create any right, entitlement, or benefit on the part of Subtenant 2 from Prime Landlord or Sublandlord; (iv) shall not create any contractual liability or duty on the part of Prime Landlord or Sublandlord to Subtenant 2; and (v) shall not in any manner increase, decrease or otherwise affect the rights and obligations of Prime Landlord or Sublandlord and Sublandlord 2, as the tenant under the Prime Lease, in respect of the Sublease Premises.

22.     **BROKER.** Each party hereto covenants, warrants and represents to the other party that it has had no dealings, conversations or negotiations with any broker concerning the execution and delivery of this Sublease. Each party hereto agrees to defend, indemnify and hold harmless the other party against and from any claims for any brokerage commissions and all costs, expenses and liabilities in connection therewith, including, without limitation, reasonable attorneys' fees and disbursements, arising out of its respective representations and warranties contained in this Section being untrue. The provisions of this Section shall survive the expiration or earlier termination of this Sublease.

23.     **ESTOPPEL CERTIFICATE.** Subtenant 2 shall, without charge, at any time, and from time to time, within five (5) Business Days after receipt of written request by Sublandlord 2, execute, acknowledge and deliver to Sublandlord 2 a written estoppel certificate certifying to Prime Landlord, Sublandlord 2, any mortgagee, ground lessor, assignee of a mortgagee or ground lessor, or any purchaser of the Building or any other person designated by Sublandlord 2, as of the date of such estoppel certificate, the following: (i) whether or not Subtenant 2 is in possession of the Sublease Premises; (ii) whether or not this Sublease is unmodified and in full force and effect (or if there has been a modification, that this Sublease is in full force and effect as modified and setting forth such modification); (iii) whether or not there are then existing any set-offs or defenses against the enforcement of any right hereunder (and, if so specifying the same in detail); (iv) the dates, if any, to which rent or other charges have been paid in advance; (v) that Subtenant 2 has no knowledge of any then uncured defaults on the part of Sublandlord 2 of Sublandlord 2's obligations under this Sublease or of Prime Landlord or Prime Landlord's obligations under the Lease (or if Subtenant 2 has knowledge of any such uncured defaults, specifying the same in detail); (vi) that Subtenant 2 has no knowledge of any event having occurred that authorizes the termination of this Sublease by Sublandlord 2 (or if Subtenant 2 has such knowledge, specifying the same in detail); and (vii) the address to which notices to Subtenant 2 should be sent. Any such estoppel certificate delivered pursuant to this Section may be relied upon by Prime Landlord, Sublandlord 2 or any prospective purchaser or

19

\35307074.6

mortgagee of the Building or any part thereof or estate therein. Subtenant 2's failure or refusal to deliver such certificates within the time period aforesaid, if it continues for five (5) days following notice to Subtenant 2 stating that the certificate was not delivered when required hereunder, shall be deemed a default for which Subtenant 2 shall not be entitled to a further notice or cure period.

*[SIGNATURES APPEAR ON FOLLOWING PAGE]*

20

\35307074.6

IN WITNESS WHEREOF, the Parties have executed and delivered this Sublease as of the date first set forth above.

SUBLANDLORD 2:

WALKER & COMPANY, LLP, a District of Columbia limited liability partnership

By:_____
Name:_____
Title:_____


SUBTENANT 2:

COmputing TechnologieS, Inc. a Commonwealth of Virginia corporation

By:_____
Name:  David R. Turnbull
Title:  COO, VP


Acknowledged and agreed to:

PRIME LANDLORD:

GARRISON ASSOCIATES, L.L.C.


By:_____
Name:_____
Title:_____


SUBLANDLORD:

KILPATRICK STOCKTON, L.L.P.


By:_____
Name:_____
Title:_____


\35307074.6

**EXHIBIT A**

**EXHIBIT "A"**

**Prime Lease between Garrison and Muldoon**

[See Attached]

EXHIBIT A

EXECUTED COPY

LEASE AGREEMENT
BETWEEN
GARRISON ASSOCIATES, L.L.C.
LANDLORD
AND
MULDOON MURPHY & AGUGGIA LLP
TENANT

**EXHIBIT A**

## TABLE of CONTENTS

| Paragraph | | Page |
|---|---|---|
| 1. | DEMISED PREMISES | 1 |
| 2. | TERM | 1 |
| 3. | RENT | 2 |
| 4. | SECURITY DEPOSIT | 6 |
| 5. | USE OF DEMISED PREMISES | 6 |
| 6. | MAINTENANCE AND REPAIR | 7 |
| 7. | ALTERATIONS | 8 |
| 8. | ASSIGNMENT AND SUBLETTING | 9 |
| 9. | INSTALLATIONS AFFECTING BUILDING AND BUILDING SYSTEMS | 10 |
| 10. | ACCESS | 10 |
| 11. | COVENANTS OF LANDLORD | 10 |
| 12. | RULES AND REGULATIONS | 11 |
| 13. | SIGNS | 11 |
| 14. | INSURANCE | 12 |
| 15. | LIMITATION OF LIABILITY | 12 |
| 16. | SERVICES | 13 |
| 17. | PARKING | 13 |
| 18. | DAMAGE BY FIRE OR OTHER CASUALTY | 14 |
| 19. | CONDEMNATION | 15 |
| 20. | DEFAULT | 16 |
| 21. | TENANT HOLDING OVER | 16 |
| 22. | ATTORNMENT AND CURE RIGHTS | 17 |
| 23. | MORTGAGEE REQUIREMENTS | 17 |
| 24. | ESTOPPEL CERTIFICATES | 18 |
| 25. | FORCE MAJEURE | 18 |
| 26. | TRANSFER BY LANDLORD | 18 |
| 27. | WAIVER | 18 |
| 28. | GENERAL PROVISIONS | 21 |
| 29. | ENTIRE AGREEMENT | 21 |
| 30. | NO OPTION | 21 |
| 31. | OPTION TO RENEW | 21 |
| 32. | OPTION TO EXPAND | 22 |

Addendum
Exhibit   A Site Plan
Exhibit   B (Deleted)
Exhibit   C Rules and Regulations
Exhibit   D Form of Certificate
Exhibit   E Cleaning Specifications

i

<div align="center">

LEASE AGREEMENT

</div>

This Lease Agreement (the "Lease") made this 29 day of May, 2007, by and between GARRISON ASSOCIATES, L.L.C., a District of Columbia limited liability company (hereinafter called "Landlord") and MULDOON MURPHY & AGUGGIA LLP, a District of Columbia limited liability partnership (hereinafter called "Tenant").

<div align="center">

WITNESSETH:

</div>

1.   DEMISED PREMISES

     1.1   For and in consideration of the covenants and agreements hereinafter set forth and the rent hereinafter specifically reserved, Landlord hereby leases unto Tenant and Tenant hereby leases from Landlord, 22,126 rentable square feet of space at 5101 Wisconsin Avenue, N.W., Washington, D.C., on the entire fourth (4th) and fifth (5th) floors of the Building, which space is outlined on Exhibit A attached hereto and made part hereof, and which is hereafter referred to as the "demised premises."

     1.2   Tenant shall accept the Premises in its "as-is" condition, with the exception of what is defined below:

     Landlord, at its sole cost, shall make the following repairs to both the roof and to Tenant's Premises, based on persistent water damage that Tenant has incurred:

- Landlord has retained Prospect Waterproofing to begin work to replace roof starting January 23, 2007, for approximately six (6) weeks, weather permitting.
- Once the roof replacement has been completed, drywall damaged as a result of previous roof leaks, shall be re-spackled and repainted.
- Office drapes damaged by previous roof leaks shall be sent out to be professionally cleaned.
- Carpet damaged as a result of the previous roof leaks shall be replaced with the same (or if same is unavailable) similar quality carpet to be selected by Tenant from samples provided by Landlord.
- Promptly following the roof replacement completion, a mold/mildew inspection shall be performed by a qualified 3rd party testing firm, with remediation performed as necessary

     In addition, Landlord, at its sole cost, shall renovate the common areas of the Building to include the following;

- Restrooms on Tenant's floors, including added ventilation and/or exhausting, and installing all new fixtures and commodes (commodes to be repaired/replaced as necessary) by March 1, 2008
- Main lobby by end of 2009
- Elevator cab finishes by end of 2008
- Parking level elevator lobby by end of 2008

     All Building code, fire code, and Building related Americans with Disabilities Act (ADA) improvements that are required in the common areas of the Building including all core areas for any full or partial floors, including restrooms, water coolers and elevator call buttons as well as Base Building emergency exit doors (as distinct from doors for Tenant's Premises), occupied by Tenant shall be the responsibility of Landlord and at Landlord's cost, which cost may be considered an Operating Cost under Paragraph 3.2 hereof.

     1.3   The square footage of the demised premises, the Base Annual Rent, and the Lease Commencement Date shall be set forth in the certificate attached hereto and made part hereof as Exhibit D, which Tenant shall execute within thirty (30) days of Landlord's execution and delivery of same to Tenant.

2.   TERM

     This Lease shall commence on the first day of the first calendar month following its full execution and delivery (the "Lease Commencement Date") and shall thereupon replace the existing lease, as amended, heretofore governing the parties. Each March 1 following the Lease Commencement Date shall begin a new "Lease Year", with March 1, 2008, to constitute the beginning of Lease Year 1. The Lease shall be for a term ("Term") ending February 28, 2015.

3.    RENT

3.1    Base Annual Rent. The base monthly rent from the Lease Commencement Date through February 29, 2008, shall be calculated on a per annum basis of $30.42 per rentable square foot for a full service lease (based upon 20,692 rentable square feet), inclusive of real estate taxes and operating expenses. Notwithstanding the foregoing, said base monthly rent for the first seven (7) full calendar months following the Lease Commencement Date shall be at one-half the base monthly rent so calculated. However, if this Lease is terminated pursuant to Paragraph 20 hereof, Tenant shall become liable to Landlord for the unamortized portion of any rent so abated in addition to Landlord's other remedies under Paragraph 20. Commencing with Lease Year 1, Tenant shall pay base annual rent ("Base Annual Rent") in equal monthly installments, in accordance with the schedule set forth below.

| Lease Year | Base Annual Rent Per Rentable Square Foot Based Upon 22,126 Rentable Square Feet |
|---|---|
| 1 | $34.00 |
| 2 | $34.85 |
| 3 | $35.72 |
| 4 | $36.61 |
| 5 | $37.53 |
| 6 | $39.53 |
| 7 | $40.52 |

3.2    Operating Costs/Real Estate Taxes.

(a)    Commencing at the beginning of Lease Year 2, Tenant shall pay to Landlord during the Term hereof, in addition to Base Annual Rent, (i) Tenant's proportionate share of the amount by which all Operating Costs, as hereinafter defined, for each calendar year exceeds the amount of all Operating Costs attributable to the calendar year 2007 and (ii) Tenant's proportionate share of the amount by which all Real Estate Taxes, as hereinafter defined, for each D.C. fiscal tax year exceeds the amount of Real Estate Taxes attributable to the D.C. fiscal tax year ending September 30, 2007 (individually, and collectively referred to herein as the "Base Year"), adjusted, if necessary, to reflect a ninety-five percent (95%) occupied building. There shall be no pass-through to Tenant for any expense related to roof replacement as described in Paragraph 1.2 above. Tenant's proportionate share of Operating Costs shall be 35.77% ("Tenant's Share of Operating Costs"). In the event, and only in the event, the use of all or a portion of the first floor retail area changes from its current general office use to a retail use whereby the tenant(s) pay some or all of its operating costs separately, Tenant's proportionate share be appropriately increased. Tenant's proportionate share of Real Estate Taxes shall be 35.77% ("Tenant's Share of Real Estate Taxes"). Landlord and Tenant stipulate and agree that Tenant's Share of Operating Costs and Tenant's Share of Real Estate Taxes set forth in the certificate shall be deemed conclusive for the purposes of this Lease and shall not be further adjusted unless the amount of rentable square feet comprising the demised premises or the Building is increased or decreased and an amendment to the Lease setting forth the adjusted Tenant's Share of Operating Costs and Tenant's Share of Real Estate Taxes is executed by Landlord and Tenant. Base Annual Rent, additional rent and all other amounts payable to Landlord hereunder shall be collectively referred to herein as "Rent".

(b)    The costs of operating the Building (the "Operating Costs") shall include, electricity, water, sewer and other utility charges (including surcharges) of every type and nature; premiums and other charges incurred by Landlord with respect to all insurance relating to the Building and the operation and maintenance thereof, including, without limitation, all risk of physical damage or fire and extended coverage insurance, public liability insurance, elevator insurance, workmen's compensation insurance, boiler and machinery insurance, sprinkler insurance, if any, rent insurance, use and occupancy insurance, and health, accident and group life insurance for employees; personnel costs of the Building, including, but not limited to, salaries, wages, fringe benefits and other direct and indirect costs of engineers, superintendents, watchmen, porters and any other Building personnel; costs of service and maintenance contracts, including, but not limited to, chillers, boilers, controls, elevators, mail chute, window and security services; management fees (not to exceed four percent (4%) of annual gross rentals payable to Landlord at the Building); all other maintenance and repair expenses and supplies which are deducted by Landlord in computing its Federal income tax liability; amortization and/or depreciation for capital expenditures (amortized over their useful life in accordance with generally accepted accounting principles and in compliance with current and applicable tax laws) incurred by Landlord in connection with additions, replacements or

-2-

**EXHIBIT A**

improvements reasonably calculated by Landlord to reduce operating expenses, or which are incurred in connection with compliance with governmental orders which are enacted after the date of this Lease and which require compliance after the date of this Lease; the costs of any additional services not provided to the Building at the Lease Commencement Date but thereafter provided by Landlord in the prudent management of the Building; vault rentals; the costs of char service (allocable to the actual space in the Building being serviced); any District of Columbia Business, Professional and Occupational License tax and Business Improvements Districts Tax payable by Landlord with respect to the Building; auditing and accounting fees including accounting fees incurred in connection with the preparation and certification of any and all statements required under this Lease; all miscellaneous taxes (including, without limitation, all sales and excise taxes on the expenditures enumerated in this Paragraph) applicable to the Building and any taxes imposed on personal property in the Building owned by Landlord; the cost of licenses, permits and similar fees and charges; and any other costs and expenses, including attorney's fees, incurred by Landlord in maintaining or operating the Building. Operating Costs shall not include principal or interest payments on any mortgage, deed of trust, or ground lease; leasing commissions payable by Landlord; deductions for depreciation for the Building, except to the extent included above; capital improvements that are not deducted by Landlord in computing its Federal income tax liability, except to the extent included above; or the costs of special services or utilities separately charged to individual tenants of the Building. Operating Costs shall also not include:

(i) costs incurred in connection with the original construction of the Building or in connection with any major change in the Building, such as adding or deleting floors;

(ii) costs of alterations or improvements of the demised premises or the premises of other tenants;

(iii) costs of correcting defects in or inadequacy of the initial design or construction of the Building, or capital expenditures incurred in connection with compliance with governmental orders (such as ADA and similar regulations) which are applicable and in effect on the date hereof;

(iv) expenses directly resulting from the gross negligence of or violation of law by Landlord, its agents, servants or employees;

(v) legal fees, space planners' fees, real estate brokers' leasing commissions and advertising expenses, incurred in connection with the original development or original leasing of the Building or future leasing of the Building;

(vi) costs insured against for which Landlord is reimbursed by its carrier under policies that Landlord is required to maintain in effect under this Lease or for which Landlord is reimbursed by any tenant's carrier;

(vii) any bad debt loss, rent loss, reserves for bad debts or rent loss;

(viii) costs associated with the operation of the business of the partnership or entity which constitutes the Landlord, as the same are distinguished from the costs of operation of the Building, including partnership accounting and legal matters, costs of defending any lawsuits with any mortgagee (except as the actions of Tenant may be in issue), costs of selling, syndicating, financing, mortgaging, or hypothecating any of Landlord's interest in the Building, costs of any disputes between Landlord and its employees (if any) not engaged in Building operation, disputes of Landlord with Building management, or outside fees paid in connection with disputes with other tenants (unless in connection with the enforcement of Building rules and regulations);

(ix) the portion of the wages of any employee properly allocable to other buildings to which such employee devotes time;

(x) fines, penalties and interest;

(xi) any damage or loss resulting from any casualty insured against pursuant to insurance required by an institutional lender except to the extent of customary deductibles;

**EXHIBIT A**

(xii) wages and fees incurred in connection with the ownership, management and operation of the Building's garage;

(xiii) any operating expense in connection with any portion of the Building devoted to retail operation, except for expenses that cannot reasonably be apportioned;

(xiv) any ground lease rental;

(xv) advertising and promotional expenditures, and costs of signs in or on the Building identifying the owners of the Building or any tenant of the Building;

(xvi) costs arising from the presence of hazardous materials or substances, as defined by applicable laws in effect on the date of this Lease, in or about the Building (unless introduced into or caused by Tenant);

(xvii) costs for sculpture, paintings or other objects of art;

(xviii) all costs and expenses incurred by Tenant or any other tenants of the Building and paid for or payable directly by Tenant or such other tenants either to third parties or to Landlord under agreements for direct payment or reimbursement for benefits or services;

(xix) costs of replacing or otherwise correcting defects (but not the costs of repair of normal wear and tear) in the initial construction of (i) the foundation, structure and curtain wall of the Building or the parking garage, and (ii) space for tenant occupancy;

(xx) salaries and benefits paid to officers and executives of Landlord;

(xxi) the cost of any additions, changes, replacements and other items which are made in preparing, completing, fixturing, furnishing, renovating or otherwise improving, decorating or redecorating space in Tenant's demised premises;

(xxii) any expenses for repairs or maintenance which are recovered under warranties and service contracts; legal expenses arising out of (i) the negotiation, preparation or termination of leases or other occupancy agreements, (ii) the interpretation of leases or other occupancy agreements, (iii) the enforcement of the provisions of any lease or other occupancy agreement affecting the land or Building other than the enforcement of Building Rules and Regulations, (iv) any action against a present or former tenant or occupant under a lease or other occupancy agreement, including, without limitation, eviction, distraint, levy and collection actions;

(xxiii) costs in connection with a change in ownership or financing or refinancing of the Building; or incurred as a result of the violation by Landlord or any other tenant of the terms and conditions of any lease other than for the enforcement of Building Rules and Regulations;

(xxiv) the cost of any item paid to any entity or person related to or affiliated with Landlord to the extent such cost exceeds the amount payable for such services at then existing market rates to unrelated persons or entities;

(xxv) Real Estate Taxes, or any taxes excluded from Real Estate Taxes;

(xxvi) costs of additional insurance premiums for the Building due to any tenant's operations within such tenant's demised premises;

(xxvii) imputed rent for any on-site offices of Landlord or its managing agent;

(xxviii) any other costs or expenses for which Landlord actually receives reimbursement from any source, including without limitation, insurance, condemnation awards, warranties or tenants;

-4-

(xxix)   any other cost or expense which, under GAAP, would not be a normal and customary operating expense in comparable first-class office buildings in the Washington, D.C. metropolitan area;

(xxx)   reserves for repairs, maintenance and replacements; and

(xxxi)   Landlord's general overhead expenses.

(c)    _Real Estate Taxes._ All taxes, assessments, water and sewer rents, if any, and other charges, if any, general, special or otherwise, including all assessments for schools, public betterments and general or local improvements, levied or assessed upon or with respect to the ownership of and/or all other taxable interests in the Building imposed by any public or quasi-public authority having jurisdiction. Except for taxes, fees, charges and impositions described in the next succeeding sentence, Real Estate Taxes shall not include any income inheritance, estate, succession, transfer, gift, or profit tax or capital levy. If at any time during the Term the methods of taxation are altered by the appropriate governmental authority so that in addition to or in lieu of or as a substitute for the whole or any part of any Real Estate Taxes levied, assessed or imposed there shall be levied, assessed or imposed (i) a tax, license fee, excise or other charge on the rents received by Landlord, or (ii) any other type of tax or other imposition in lieu of, or as a substitute for, or in addition to, the whole or any portion of any Real Estate Taxes, then the same shall be included as Real Estate Taxes. A tax bill or true copy thereof, together with any explanatory or detailed statement of the area or property covered thereby, submitted by Landlord to Tenant shall be presumptive evidence of the amount of taxes assessed or levied, as well as of the items taxed. In the event any building or land adjacent to the Building in which Landlord has an interest is not separately assessed and taxed, Landlord shall have the right to allocate a proportionate share to each such building and Landlord's reasonable determination thereof, subject to Tenant's reasonable approval, shall be binding on the parties hereto. If any real property tax or assessment levied against the land, buildings or improvements covered hereby or the rents reserved therefrom, shall be evidenced by improvement or other bonds, or in other form, which may be paid in annual installments, only the amount paid or accrued in any Lease Year shall be included as Real Estate Taxes for such Lease Year. Real Estate Taxes which Landlord contests shall be included for purposes of Tenant's liability under this Paragraph, provided that if Landlord contests and thereafter receives a refund of any portion of such Real Estate Taxes, then Landlord shall pay Tenant its proportionate share thereof.

(d)    Commencing at the beginning of Lease Year 2, Tenant shall make monthly payments to Landlord on account of estimated increases in Operating Costs and Real Estate Taxes for each calendar year. Landlord shall submit to Tenant an estimate as soon as practicable after the end of each calendar year.

Following its receipt of each such estimate, Tenant shall pay to Landlord, monthly, on the first day of each month through and including the month in which Tenant receives Landlord's next such estimate, an amount equal to one-twelfth (1/12th) of Tenant's Share of estimated increases in Operating Costs and Real Estate Taxes. Each year, when Landlord submits its estimate for that calendar year, Landlord shall also submit a detailed statement, on a line item basis, of the Operating Costs and Real Estate Taxes actually incurred during the immediately preceding calendar year. Landlord shall respond promptly to any questions Tenant may raise in writing within thirty (30) days of Tenant's receipt of any such statement. Additionally, Tenant may audit Landlord's books and records relating any such statement provided Tenant notifies Landlord in writing within ninety (90) days after receiving such statement of its wish to so audit. Tenant shall withhold no payment pending such audit, and shall bear all costs of such audit, including those of Tenant's and Landlord's independent accountants in connection therewith except Tenant shall not bear the cost of the accountants if such audit discloses a material error (as defined below) which favors Landlord. In the event of such a material error, Landlord shall pay the costs of Tenant's and Landlord's accountants. If such audit discloses any error, the party favored by the error shall promptly pay to the other party the amount necessary to correct such error. For the purposes of this Lease, a "material error" means a discrepancy in Operating Costs or Real Estate Taxes of more than five percent (5%). If Tenant's total payments on account of estimated increases in Operating Costs and Real Estate Taxes made through December of the immediately preceding calendar year exceed the amount of the increase actually due for that calendar year, Landlord shall credit the difference against the next installment of Rent due from Tenant. If, on the other hand, such payments were less than the amount of the increase actually due, Tenant shall pay the difference to Landlord with its next installment of Base Annual Rent due (but no sooner than thirty (30) days). Tenant's liability for Tenant's Share of increases in Operating Costs and Real Estate Taxes for the last calendar year of the Term of this Lease shall survive the expiration of the Lease. Similarly, Landlord's obligation to refund to Tenant the excess, if any, of the amount

of Tenant's payment on account of estimated increases for such last calendar year over Tenant's actual liability therefor shall survive the expiration of the Term of this Lease. Landlord may at any time or from time to time, but not more than once per Lease Year, furnish to Tenant a revised estimate for any calendar year and in such case Tenant's payments on account of estimated increases for such calendar year shall be adjusted accordingly.

3.3   Rent Payments. Payments of Rent shall be payable in advance on the first (1st) day of each and every month during the Term of this Lease, with appropriate proration for the first and last months. Rent shall be paid promptly when due without notice or demand and without deduction, diminution, abatement, counterclaim or set-off of any amount or for any reason whatsoever, except as specifically provided herein. Rent checks are to be made payable to Garrison Associates, L.L.C. and are to be delivered to the office of The Lenkin Company Management, Inc., 4922-A St. Elmo Avenue, Bethesda, Maryland 20814, or to such other person, firm or corporation as Landlord may designate in writing.

3.4   Delinquent Rent Payments.  Any installment of Base Annual Rent, or any additional rent, which is not received by Landlord within five (5) days after the same becomes due and payable (but in the case of the first such delinquency in any Lease Year, five (5) days after written notice from Landlord of such delinquency) shall obligate Tenant to pay, as additional rent, a late fee equal to five percent (5%) of such delinquent Rent, unless a lower amount is required by law, said additional rent to be payable with the next monthly installment of Base Annual Rent. In addition, if the Tenant defaults in the making of a payment or the doing of any act herein required to be made or done by Tenant, then the Landlord may, but shall not be required to, make such payment or do such act, and the amount of the expense thereof, if made or done by Landlord, shall be paid by Tenant to Landlord together with interest thereon from the date due until paid at the rate of five percent (5%) per annum above the prime rate of interest of Bank America, and shall constitute additional rent hereunder due and payable with the next monthly installment of Base Annual Rent. The provisions of this Paragraph shall not be deemed to affect Landlord's right to pursue any of its remedies under Paragraph 20 hereof.

4.   **SECURITY DEPOSIT**

There shall be no security deposit payable under the Lease. No personal guaranty shall attach to the Lease. Tenant shall provide Landlord with its then most current and available financial statements as Landlord may reasonably request from time to time (but in no event more than one time per year). Landlord agrees to treat all information furnished to Landlord as confidential and to make it available only to a bona fide purchaser or lender conducting a financial analysis of the Building precedent to such sale, financing or refinancing.

5.   **USE OF DEMISED PREMISES**

5.1   The Tenant shall use and occupy the demised premises for general office purposes and for no other purpose whatsoever. The Tenant shall not use or permit the demised premises or any part thereof to be used for any disorderly, unlawful, or extra hazardous purpose and will not manufacture any commodity therein. Tenant shall comply with all present and future laws, statutes, codes, ordinances (including zoning ordinances and land use requirements), regulations and orders of all governmental and/or quasi-governmental authorities having jurisdiction over the demised premises. Landlord represents that no zoning ordinances or deed restrictions exist that would interfere with the use of the demised premises for general office purposes.

5.2   Tenant shall pay any business, rent or other taxes that are now or hereafter levied upon Tenant's use or occupancy of the demised premises, the conduct of Tenant's business in the demised premises, or Tenant's equipment or other personal property. In the event that any such taxes are enacted, changed or altered so that any of such taxes are levied against Landlord, or the mode of collection of such taxes is changed so that Landlord is responsible for collection or payment of such taxes, Tenant shall pay any and all such taxes to Landlord upon written demand from Landlord.

5.3   The Tenant will not do, or permit anything to be done in the demised premises or the Building of which they form a part or bring or keep anything therein which shall, in any way, increase the rate of fire or other insurance on the Building, or on the property kept therein, or obstruct, or interfere with the rights of other tenants, or in any way injure them, or those having business with them or conflict with them, or conflict with the fire laws or regulations, or with any statutes, rules or regulations enacted or established by the District of Columbia or Federal Governments.

-6-

**EXHIBIT A**

6.   MAINTENANCE AND REPAIR

6.1     Tenant will keep the demised premises and the fixtures and equipment therein in a clean, safe and sanitary condition, will take good care thereof, will suffer no waste or injury thereto, and will, at the expiration or other termination of the Term of this Lease or any renewal thereof, surrender the same, broom clean, in the same order and condition in which they are on the commencement of the Term of this Lease, except for ordinary wear and tear and damage by the elements, fire and other casualty. Tenant shall not be responsible for maintaining base Building systems running to the demised premises or any structural components of the demised premises. Subject to paragraphs 14.5 and 14.7, all breakage, injury or damage to the demised premises caused by Tenant, its agents, servants, employees, invitees or clients or damage to the Building other than the demised premises caused by the gross negligence of Tenant, its agents, servants, and employees, shall be promptly repaired by the Tenant at its expense.

6.2     If Tenant shall fail to commence to make any repairs or to perform any maintenance which it is obligated to make or perform under the Lease within ten (10) days after written notice from Landlord to do so or such additional time as may reasonably be necessary to do the same with diligence, or in the event of any emergency, Landlord may make or perform the same for the account of Tenant, without liability to Tenant for any loss or damage that may accrue to Tenant's fixtures or other property or to Tenant's business by reason thereof and Tenant shall pay, as additional rent, within five (5) days after Landlord shall have billed Tenant therefor, Landlord's cost for making such repairs and/or performing such maintenance (which such cost may include a reasonable amount for Landlord's overhead). Nothing herein contained, shall imply any duty on the part of Landlord to do any such work which under any provision of this Lease Tenant may be required to do, nor shall it constitute a waiver of Tenant's default in failing to do the same.

6.3     Landlord shall be responsible for maintaining the exterior and demising walls, foundations, roof and common areas that form a part of the Building, and the mechanical, electrical, life safety, HVAC and plumbing systems, pipes and conduits that are provided by Landlord in the operation of the Building and the Premises in clean, safe, sanitary and operating condition in accordance with all Laws and the standard customarily maintained by landlords of buildings of comparable size, age, class and location, and will make all required repairs thereto. The garage and all common or public areas of the Building and the land upon which it is situated shall be maintained by Landlord in accordance with standards customarily maintained by landlords of buildings of comparable size, age, class, and location and all required repairs thereto.   Landlord shall (or shall cause its garage operator to) maintain the garage in accordance with standards customarily maintained by landlords of buildings of comparable size, age, class and location.

7.   ALTERATIONS

7.1     Except for cosmetic, non-structural alterations in which event Landlord's consent shall not be unreasonably withheld, conditioned or delayed, Tenant will not make or permit anyone to make any alterations, additions or improvements, (hereinafter referred to as "Alterations"), in or to the demised premises or the Building, without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. As a condition to any such written consent of Landlord, Tenant agrees to obtain and deliver to Landlord, upon completion of any Alterations, written, unconditional waivers of mechanics' and materialmens' liens against the Building and the land upon which it is situated from all contractors, sub-contractors, laborers and material suppliers from all work, laborers and materials furnished in connection with Alterations.  If, notwithstanding the foregoing, any mechanic's lien is filed against the demised premises, the Building, and/or the land on which the Building is located, for work or materials as done for, or furnished to, Tenant (other than for work or materials supplied by Landlord), such mechanic's lien shall be discharged by Tenant within twenty (20) days after receiving notice of such lien, at Tenant's sole cost and expense, by the payment thereof or by the filing of any bond required by law. If Tenant shall fail to discharge any such mechanic's lien, Landlord may, at its option, discharge the same and treat the cost thereof as additional rent hereunder, payable with the monthly installment of Base Annual Rent next becoming due and such discharge by Landlord shall not be deemed to waive the default of Tenant in not discharging the same.  Tenant will indemnify and hold Landlord harmless from and against any and all expenses (including attorney's fees), liens, claims or damages to any person or property which may or might arise by reason of the making by Tenant of any Alterations.

7.2    Alterations may be made only at Tenant's expense, by contractors or subcontractors approved by Landlord (which approval shall not be unreasonably withheld, conditioned or delayed), and only after Tenant have obtained all necessary permits from governmental authorities having jurisdiction and has furnished copies of the permits to Landlord. Landlord shall have the right, at its expense, to have the making of any Alterations supervised by its architects, contractors or workmen. All Alterations which affect or in any way relate to the mechanical, electrical, plumbing, heating, air conditioning, or structural systems of the Building shall be done only by Landlord or Landlord's contractor or agent at Tenant's expense.

7.3    If any Alterations which require Landlord's prior consent are made without the prior written consent of Landlord, Landlord may correct or remove the same, and Tenant shall be liable for all expenses so incurred by Landlord. All Alterations in or to the demised premises or the Building made by either party shall immediately become the property of Landlord and shall remain upon and be surrendered with the demised premises as a part thereof at the end of the Term or any renewal thereof; provided, however, that if Tenant is not in default in the performance of any of its obligations under this Lease, Tenant shall remove its personal property, equipment and trade fixtures from the Premises, and Tenant shall have the option to remove alterations, including fixtures, which can be removed without causing damage to the Premises or the Building. Notwithstanding anything herein to the contrary, Tenant shall have no obligation to remove (a) the internal stairwell, (b) wiring/cabling in and through the demised premises (i.e., above the ceiling, below the floor and behind the walls), and (c) any alteration or improvement that exists in the demised premises as of the date of this Lease. Notwithstanding anything herein to the contrary, subject to the provisions of the sentence which immediately precedes this sentence, Landlord may only require that an alteration or improvement be removed upon the expiration or earlier termination of the Term if Landlord notified Tenant that such removal would be required at the time Landlord approved the alteration or improvement, and if such alteration (i) is of the type that is not customarily found in buildings of comparable class, age, size, and location, and (ii) would, as a result of the unique nature of such items or the anticipated difficulty or expense required to remove such items, expose Landlord to unreasonable expense and effort in order to remove such items.

8.    ASSIGNMENT AND SUBLETTING

8.1    Tenant may not assign, transfer, mortgage or encumber this Lease, nor shall any assignment or transfer of this Lease be effectuated by operation of law or otherwise, without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. The withdrawal or change, whether voluntary, involuntary or by operation of law, of persons or entities owning a controlling interest in Tenant, or the sale of Tenant's business, shall be deemed a voluntary assignment of this Lease and subject to the provisions of this Paragraph.

8.2    Tenant shall not sublease the demised premises or any part thereof or transfer possession or occupancy thereof to any person, firm or corporation without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed.

8.3    If any sublease or assignment (whether by operation of law or otherwise, including without limitation an assignment pursuant to the provisions of the Bankruptcy Code or any other Insolvency Law) provides that the subtenant or assignee thereunder is to pay any amount in excess of the rental and other charges due under this Lease, then whether such excess be in the form of an increased monthly or annual rental or a lump sum payment (and if the subleased or assigned space does not constitute the entire demised premises, the existence of such excess to be determined on a pro-rata basis), Tenant shall pay to Landlord fifty (50%) of any "Profit" (as defined below) applicable to the sublease or assignment, which amount shall be paid by Tenant to Landlord as additional rent within ten (10) days after any receipt thereof by Tenant. "Profit" shall be defined as the difference between (i) any and all consideration received by Tenant in the aggregate from any assignment of the Lease and/or subletting of the demised premises, and (ii) the sum of (A) the rent and charges due to Landlord from Tenant under the terms of this Lease (and if the subleased or assigned space does not constitute the entire demised premises, the rent and charges payable by Tenant shall be determined on a pro-rata basis), (B) Tenant's reasonable attorneys' fees and brokerage costs in connection with such assignment or subletting that are paid to a third party that is not related to or affiliated with Tenant, (C) Tenant's actual out-of-pocket cost of performing alterations to the demised premises in connection with such assignment or subletting, (D) the actual amount of any rent abatement that is granted in connection with such assignment or subletting, and (E) the actual amount of improvement allowance that is paid in connection with such assignment or subletting.

8.4 Any sublease or assignment shall be subject to the following conditions:

(a) Landlord's satisfactory review of the most recent financial statement or other evidence of financial responsibility of any proposed assignee or subtenant, which financial statement shall be submitted by Tenant to Landlord when it requests Landlord's consent. Provided Tenant remains in occupancy of a portion of the Demised Premises and further provided Tenant is not then subleasing (including accounting for the then proposed subject sublease) in the aggregate, greater than 5,000 rentable square feet of the Demised Premises, the financial condition of the proposed subtenant will not be a reason for Landlord withhold its consent.

(b) At the time of making such assignment or sublease, there is no uncured default under any of the agreements, terms, covenants and conditions on the part of the Tenant to be performed under this Lease.

(c) Such assignment or sublease shall be in writing, shall certify the amount of rental, bonus and/or lump sum payment paid or to be paid to Tenant, shall contain an agreement on the part of the assignee or subtenant to abide by all of the terms and provisions of this Lease, and shall be duly executed and acknowledged by Tenant and Tenant's assignee or subtenant.

(d) Such assignment or sublease shall expressly prohibit the assignee or subtenant from removing any of the Landlord's personalty from the demised premises without the Landlord's express written consent.

(e) No assignment or sublease shall obligate Landlord to make any Alterations (as that term is defined in Paragraph 7 above) nor to do any finishing or remodeling work in or to all or any part of the demised premises, nor shall any such assignment or sublease result in a decrease of any amounts payable to Landlord pursuant to the terms of this Lease.

(f) No assignment or sublease shall release or discharge, in whole or in part, Tenant's liability for the full performance of the agreements, terms, covenants and conditions contained in this Lease.

(g) If all or any part of the demised premises shall be subleased or occupied by any person or entity other than the Tenant, the Landlord may, after default by the Tenant beyond any applicable notice and cure period, collect rent from any such subtenant(s) or occupant(s), and apply the amount collected to the Rent reserved herein, and, for so long as such default remains uncured, Tenant hereby assigns to Landlord the rent due from any subtenant or assignee of Tenant and hereby authorizes each such subtenant or assignee to pay said rent directly to Landlord but no such collection shall be deemed a waiver of any agreement, term, covenant or condition hereof nor the acceptance by the Landlord of any subtenant or occupant as Tenant.

(h) Wherever notice, demand, request, or any other communication of any nature is required to be given by the Landlord or by any mortgagee to the Tenant, no such notice, demand, request, or communication shall, in any event, be required to be given to any such sublessee, and any notice, demand, request or communication shall be given only to the Tenant herein.

8.5 If Landlord withholds approval to a proposed subletting or assignment, and such approval is required hereunder, this Lease shall remain in full force and effect. In the event Landlord does not exercise any of its rights specified in this Paragraph 8 or does not respond to Tenant's request for Landlord's consent to an assignment or sublease within thirty (30) days after Tenant's first request therefor, and an additional ten (10) days after Tenant's second request therefor, Landlord shall be deemed to have approved the sublease or assignment. Notwithstanding any of the foregoing provisions in this Paragraph 8, in no event will Landlord consent to a sublease or assignment of this Lease to a corporation, partnership, or any other entity, nor to any affiliate of any of the foregoing unless such corporation, partnership, entity or any affiliate thereof shall have qualified to do business in the District of Columbia.

8.6 Notwithstanding anything herein to the contrary, Tenant shall have the right, without the consent of Landlord, but upon prior written notice to Landlord, (i) to assign this Lease to a business entity that controls, is controlled by or is under common control with Tenant or which acquires substantially all of the assets or common stock of Tenant, or (ii) to merge, consolidate or reorganize, or (iii) to sublease all or any portion of the demised premises to a business entity that controls, is controlled by or is under common control with Tenant. Notwithstanding anything

**EXHIBIT A**

herein to the contrary, Tenant shall have the right, without the necessity of obtaining Landlord's consent, to (i) have partners or shareholders withdraw and/or retire from the firm, and (ii) to add partners or shareholders to the firm. Notwithstanding anything herein to the contrary, the provisions of Paragraph 8.3 shall not be applicable to any transaction that is governed by the provisions of this Paragraph.

9.   INSTALLATIONS AFFECTING BUILDING AND BUILDING SYSTEMS

9.1    Landlord shall have the right to prudently prescribe the weight and method of installation and position of safes, heavy fixtures, shelving, files, library stacks, equipment or machinery and Tenant will not install any such items which would place a load upon any floor exceeding the floor load per square foot which such floor was designed to carry. All damage done to the Building or any part thereof caused by Tenant taking in or removing a safe or any other article of Tenant's office equipment, or in keeping the same in the demised premises, shall be repaired at the expense of the Tenant. No freight, furniture, or other bulky matter of any description will be received into the Building or carried in the elevators, except as approved by the Landlord. All moving of furniture, material, and equipment shall be subject to the reasonable supervision of the Landlord who shall, however, not be responsible for any damage to or charges for moving the same. Tenant agrees to promptly remove from the public area adjacent to the Building and from any common area within the Building any of Tenant's merchandise or property there delivered or deposited.

9.2    Except as may be specifically permitted by the terms of this Lease, Tenant shall not install or use any equipment of any kind or nature whatsoever which will or may necessitate any changes, replacements or additions to, or require the use of the water, plumbing, heating, air-conditioning, or electrical system of the demised premises without the prior written consent of the Landlord. In addition, all of the work described in the foregoing sentence shall be done only by Landlord or Landlord's contractor or agent at Tenant's expense. Landlord's consent shall not be unreasonably withheld or delayed, but may be conditioned upon the payment by the Tenant of additional rent as compensation for such excess consumption of utilities and the payment for other alterations as may be required for such equipment, as and if established by appropriate engineers.

10.   ACCESS

Tenant agrees to allow Landlord, its agents or employees to enter the demised premises at all reasonable times and upon reasonable notice (except in case of emergency) to examine, inspect or protect the same or to prevent damage or injury to the same; to make such alterations and repairs as the Landlord may deem necessary; or to exhibit the same to prospective tenants during the last fourteen (14) months of the Term. All such entries shall be made in a manner so as not to unreasonably interfere with the operation of Tenant's business therein.

11.   COVENANTS OF LANDLORD

11.1    Landlord covenants that it has the right to make this Lease for the Term aforesaid, and that if Tenant shall pay all Rent when due and punctually perform all of the covenants, terms, conditions and agreements of this Lease to be performed by Tenant, Tenant shall, during the Term hereby created, freely, peaceably and quietly occupy and enjoy the full possession of the demised premises without molestation or hindrance by Landlord or any party claiming by, through or under Landlord, subject, however, to the provisions of this Lease, including but not limited to, the rules and regulations and the provisions of Paragraph 11.2 below. Tenant acknowledges and agrees that its leasehold estate in and to the demised premises vests on the date this Lease is executed, notwithstanding that this Lease will not commence until a future date.

11.2    Landlord hereby reserves to itself and its successors and assigns the following rights (all of which are hereby consented to by Tenant): (1) to change the street address and/or name of the Building (in which event Landlord shall reimburse Tenant for the cost of changing its then existing inventory of stationery, business cards and marketing materials) and/or the arrangement and/or location of entrances, passageways, stairs, doors, doorways, corridors, elevators, atria, toilets, or other public parts of the Building; (2) to erect, use and maintain pipes and conduits in and through the demised premises above the ceiling and below the floor; (3) to grant to anyone the exclusive right to conduct any particular business or undertaking in the Building not inconsistent with Tenant's use of the demised premises under Paragraph 5; and (4) the exclusive right to use and/or lease the roof areas, and the sidewalks and other exterior areas. Landlord may exercise any or all of the foregoing rights without being deemed to be guilty of an eviction, actual or constructive, or a disturbance or interruption of the business of

-10-

**EXHIBIT A**

Tenant or of Tenant's use or occupancy of the demised premises. Notwithstanding the foregoing, Landlord shall not permanently adversely or unreasonably interfere with Tenant's access and use of the demised premises (e.g., totally prevent access by Tenant to the demised premises), diminish the aesthetic quality of the demised premises, or diminish the first class standards of the Building.

12.    RULES AND REGULATIONS

   Tenant, its agents and employees shall abide by and observe the rules and regulations attached hereto as Exhibit C. Tenant, its agents and employees shall abide by and observe such other reasonable rules or regulations as may be promulgated from time to time by Landlord for the operation and maintenance of the Building provided that the same are generally applicable to all office tenants and are not inconsistent with the provisions of this Lease and a copy thereof is sent to Tenant. Landlord shall enforce the rules and regulations against other tenants if their noncompliance with the rules and regulations materially interferes with Tenant's use of the demised premises.

13.    SIGNS

   No sign, advertisement or notice which is visible from outside the demised premises shall be inscribed, painted, affixed or displayed by Tenant on any part of the outside or the inside of the Building except on the doors of offices, on the Building directory, and in the elevator lobby/common area of floors fully and partially occupied by Tenant, and then only in such place, number, size, color and style as is approved by Landlord, such approval not to be unreasonably withheld, and if any such sign, advertisement or notice is exhibited, without Landlord's approval, Landlord shall have the right to remove the same and Tenant shall be liable for any and all expenses incurred by Landlord for such removal. All such signs, directories and name plates shall be at the sole expense of the Tenant. Tenant shall have the right to install signage in the elevator lobby common area of the full floors of the Building leased and occupied by Tenant. Landlord hereby approves all the Tenant's existing signs in the demised premises as of the date of this Lease.

14.    INSURANCE

   14.1    Tenant shall procure and keep in force at its own expense during the Term of this Lease, public liability and property damage insurance in a company reasonably acceptable to Landlord, naming Landlord and any mortgagee of the Building as additional insureds, with a minimum combined single limit coverage of Three Million Dollars ($3,000,000.00) (which may be a combination of primary and umbrella coverages) (to include "independent contractors" coverage, broad form "contractual" liability, "personal injury" liability and a broad form CGL endorsement). If at any time Tenant does not comply with the foregoing provisions of this Paragraph, Landlord may, at its option, upon five (5) days' prior written notice to Tenant, cause such insurance to be issued and in such event Tenant shall pay the premium(s) for such insurance promptly upon Landlord's demand.

   14.2    In addition to the above, Tenant shall self-insure or maintain All Risk Property Insurance covering all of Tenant's leasehold improvements, trade fixtures and personal property from time to time in, on or upon the demised premises and any alterations, improvements, additions or changes made by Tenant thereto in an amount not less than one hundred percent (100%) of their full replacement cost from time to time during the Term of this Lease. If Tenant elects to self-insure, Tenant shall promptly replace all leasehold improvements damaged by fire or other casualty or pay to Landlord the full replacement value thereof.

   14.3    All insurance policies required to be obtained and maintained by Tenant under this Lease (1) must be issued by insurance companies approved by Landlord which approval shall not be unreasonably withheld, conditioned or delayed; (2) must be written as primary policy coverage and not contributing with or in excess of any coverage which Landlord may carry; (3) must contain an express waiver of any right of subrogation by the insurance company against Landlord and its agents; and (4) must provide that the policy may not be canceled unless Landlord shall have received thirty (30) days prior written notice of such cancellation. Tenant shall deliver to Landlord certificates of insurance, of each such policy or renewal policy, not later than ten (10) days after the Lease Commencement Date, and at least fifteen (15) days before the expiration of the expiring policies previously furnished. Any insurance required of Tenant under this Paragraph 14 may be carried under a blanket policy covering the demised premises and other locations of Tenant, provided that Tenant shall deliver to Landlord a certificate of insurance of each blanket policy. Neither the issuance of any such insurance policy nor the minimum limits specified in this Paragraph 14 with respect to Tenant's insurance

coverage shall be deemed to limit or restrict in any way Tenant's liability arising under or out of this Lease.

14.4    In the event of increases in the insurance rates for fire insurance or other insurance carried by Landlord due to Tenant's activity or property in or about the demised premises or the Building, or for improvements to the demised premises for which Tenant is responsible, Tenant shall be liable for such increases and shall reimburse Landlord immediately upon demand therefor. Statements by an insurance company or by the applicable insurance rating bureau that such increases are due to such activity, property or improvements shall be conclusive evidence for determining the liability of Tenant.

14.5    Neither Landlord nor Tenant shall be liable to the other for any business interruption or any loss or damage to property or injury to or death of persons occurring on the demised premises or adjoining property, or in any manner growing out of or connected with the Tenant's use of the demised premises, whether or not caused by the negligence or other fault of Landlord or Tenant or of their respective agents, employees, subtenants, licensees or assigns. This release shall apply only to the extent that such business interruption, loss or damage to property, or injury to or death of persons is covered by insurance, regardless of whether such insurance is payable to or protects the Landlord or Tenant or both. Nothing in this Paragraph 14 shall be construed to impose any other or greater liability upon either the Landlord or Tenant than would have existed in the absence of this Paragraph. This release shall be in effect only so long as the applicable insurance policies contain a clause to the effect that this release shall not affect the right of the insured to recover under such policies. Such clauses shall be obtained by the parties whenever possible.

14.6    Landlord shall provide full replacement value property insurance coverage on the Building as well as comprehensive general liability, and each such policy shall contain a waiver of subrogation in favor of Tenant. Evidence of such insurance shall be made available to Tenant at Tenant's request.

14.7    Notwithstanding anything in this Lease to the contrary, Tenant waives and relinquishes all rights and claims, whether by subrogation and assignment or otherwise, against Landlord for any damage to Tenant's property located within the demised premises even if caused in whole or in part by the negligence of Landlord or the condition of the demised premises or the Building or any part thereof. To the extent Tenant chooses to insure this property, Tenant shall request its insurance carrier to endorse all applicable policies waiving the carrier's right of recovery under subrogation or otherwise in favor of Landlord and to provide a certificate of insurance verifying this wavier.

Notwithstanding anything in this Lease to the contrary, Landlord waives and relinquishes all rights and claims, whether by subrogation and assignment or otherwise, against Tenant for damage to the demised premises or the Building even if caused in whole or in part by the negligence of Tenant. Landlord shall request its insurance carrier to endorse all applicable policies waiving the carrier's right of recovery under subrogation or otherwise in favor of Tenant and to provide a certificate of insurance verifying this wavier at the request of Tenant.

15.    LIMITATION OF LIABILITY

15.1    Landlord, its employees, agents or servants shall not be liable to Tenant, its employees, agents, invitees or guests or to any other person for any damage (including consequential damage) to, injury to, loss of, compensation for or claim with respect to property, including but not limited to, claims for the interruption of or loss to Tenant's business, based on, arising out of or resulting from any cause whatsoever (except as otherwise provided in this Paragraph 15), including but not limited to the following: repairs to any portion of the demised premises; interruption in the use of the demised premises or any equipment therein; any accident or damage resulting from the use or operation (by Landlord, Tenant or any other person or entity) of elevators, or of the heating, cooling, electrical, sewerage, or plumbing equipment or apparatus; the termination of this Lease by reason of the destruction of the demised premises or the Building; any fire, robbery, theft, vandalism, mysterious disappearance and/or any other casualty; the actions of any other tenants of the Building or of any other person or entity; and any leakage in any part or portion of the demised premises or the Building, or from water, rain, ice or snow that may leak into, or flow from, any part of the demised premises or the Building, or from drains, pipes or plumbing fixtures in the Building. Any goods, property or personal effects stored or placed by Tenant, its employees or agents in or about the demised premises shall be at the sole risk of Tenant, and Landlord shall not in any manner be held responsible therefor. Notwithstanding the foregoing provisions of this Paragraph 15.1, Landlord shall not be released from liability to Tenant for any injury to any natural person caused by the

gross negligence or willful misconduct of Landlord or its employees to the extent such injury is not covered by insurance carried by Tenant or required by this Lease to be carried by Tenant.

15.2   Landlord assumes no liability or responsibility whatsoever with respect to the conduct and operation of the business to be conducted by Tenant in the demised premises. Landlord shall not be liable for any accident to or injury to any person or persons or property in or about the demised premises which are caused by the conduct or operation of said business or by virtue of equipment or property of Tenant in said demised premises.

16.   **SERVICES**

16.1   Landlord will provide the following services:

(a)   Automatically operated elevator service twenty-four (24) hours per day, seven days per week;

(b)   Heating, ventilation and air-conditioning via a central air system ("HVAC") to service the demised premises from 8:00 a.m. to 7:00 p.m. Mondays through Fridays and from 8:00 a.m. to 1:00 p.m. Saturdays, exclusive of holidays, namely, New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, and Christmas Day.  After hours service shall be available upon reasonable notice and at Landlord's actual direct cost therefor from time to time, which cost is currently $ 65 per hour (3 hour minimum), with a minimum of 24 hours notice for overtime weekday service and notice no later than 9:00 AM the business day preceding holiday or weekend requested service ;

(c)   Janitorial service as is normal and customary in comparable buildings in the Washington, D.C. area Monday through Friday, exclusive of holidays, after normal business hours, and more fully described in Exhibit E hereto;

(d)   Replacement of light tubes or bulbs for Building standard lighting fixtures. All light tubes or bulb replacements for other than Building standard fixtures shall be furnished at Tenant's expense, and will be installed by Landlord when so requested, at Tenant's expense;

(e)   Restroom facilities and reasonably adequate lavatory supplies, including hot and cold running water, at those points of supply provided for the general use of other tenants in the Building, and routine maintenance, painting and electrical lighting services for all public areas and special service areas of the Building in the manner and to the extent that is standard for comparable quality office buildings in the Washington, D.C. central business district; and

(f)   Access to the demised premises and Building garage on a full-time twenty-four (24) hour basis seven (7) days per week, subject to such reasonable regulations and/or security systems which Landlord may impose for security purposes. Tenant shall have the right, at its sole cost and expense, to expand the Building's access/monitoring system to provide additional monitoring for the demised premises and stairwells servicing those floors solely occupied by Tenant, provided the same is fully integrated into the Building's existing system and receives Landlord's prior written approval, which shall not be unreasonably withheld, conditioned or delayed.

16.2   Any failure by Landlord to furnish the foregoing services as a result of governmental restrictions, energy shortages, equipment breakdowns, maintenance, repairs, strikes, scarcity of labor or materials, bombs or bombscares, or from any cause beyond the control of Landlord, shall not render Landlord liable in any respect for damages to any person or property, nor be construed as an eviction of Tenant, nor work an abatement of Rent, nor relieve Tenant from Tenant's obligations hereunder, except as provided in Paragraph 25. If the Building equipment should cease to function properly, Landlord shall use reasonable diligence to repair the same promptly.

17.   **PARKING**

Tenant shall purchase monthly permits for thirty-three (33) parking spaces in the Building garage and seven (7) spaces on the surface lot of the Building, throughout the Term of the Lease.  Covered garage spaces are currently $120 per space per month, plus DC Tax. Parking rates shall increase on each January throughout the Term, by five percent (5%) of the previous year's monthly rate.  As Tenant occupies additional space, if any, in the Building, parking shall be based on the same ratio as under the occupancy at the Lease Commencement Date.  The parking rates applicable for the extended term, if any, shall be at the then prevailing market rates.

-13-

**EXHIBIT A**

18.   DAMAGE BY FIRE OR OTHER CASUALTY

18.1   If the demised premises shall be damaged by fire or other casualty, Landlord shall, as soon as practicable after such damage occurs (subject to being able to obtain all necessary permits and approvals, including, without limitation, permits and approvals required by any agency or body administering environmental laws, rules, or regulations, and taking into account the time necessary to effectuate a satisfactory settlement with any insurance company) repair such damage at Landlord's expense and this Lease shall not terminate. It is understood and agreed that the Building, whether partially or totally damaged or destroyed, shall be restored to substantially the same condition as existed prior to such damage or destruction and to a condition architecturally harmonious and consistent with the demised premises and the balance of the Building. Landlord shall not be required to expend more for any repair, rebuilding, reconstruction, restoration, or replacement of the demised premises and/or the Building pursuant to this Paragraph than the amount of insurance proceeds paid to Landlord in connection therewith including any deductible. If the Building is so substantially damaged that it is reasonably necessary, in Landlord 's judgment, to demolish the same for the purpose of reconstruction, Landlord may demolish the same, in which event Landlord   may treat such demolition as if it had been caused by the same cause as that which caused the damage.

18.2   Except as otherwise provided herein, if all of the demised premises are rendered untenantable by reason of any such damage, the Rent shall abate for the period from the date of the damage to the date the damage is repaired, and if only a part of the demised premises are so rendered untenantable, the Rent shall abate for the same period in the proportion that the area of the untenantable part bears to the total area of the demised premises; provided, however, that if, prior to the date when all of the damage has been repaired, any part of the demised premises so damaged are rendered tenantable and shall be used or occupied by or through Tenant, then the amount by which the Rent abates shall be apportioned for the period from the date of such use or occupancy to the date when all the damage has been repaired. No compensation or reduction of Rent will be paid or allowed by Landlord for inconvenience, annoyance, or injury to Tenant's business arising from the need to repair the demised premises or the Building.

18.3   Landlord shall have no obligation to repair damage to or to replace Tenant's personal property or any other property located in the demised premises.

18.4   Notwithstanding the foregoing provisions, if (a) the demised premises shall be so damaged by fire or other casualty that they cannot be fully repaired within one hundred eighty (180) days from date of damage, or (b) the Building shall be so damaged by fire or other casualty that, in Landlord's opinion, substantial alteration or reconstruction of the Building is required (whether or not the demised premises have been damaged or rendered untenantable), then Landlord at its option, shall have the right, exercisable by giving Tenant written notice within ninety (90) days after the date of damage, to terminate this Lease effective as of the date of such damage and, in the event such notice is given, this Lease and the Term shall terminate (whether or not the Term shall have commenced) upon the expiration of thirty (30) days after the date of notice with the same effect as if the date of date of expiration of the thirty (30) days were the date initially fixed for expiration of the Term, and all Rent shall be apportioned as of such date. In the event Landlord does not elect to terminate this Lease, but the demised premises are not fully repaired within two hundred ten (210) days from the date of damage, Tenant may elect to terminate this Lease by giving Landlord written notice within two hundred twenty-five (225) days of the date of damage so long as the demised premises have not been repaired prior to Landlord's receipt of such notice.

18.5   If the demised premises or the Building shall be damaged by fire or other casualty and Landlord determines that such casualty is not capable of being repaired within two hundred ten (210) days after the date of the casualty, then Landlord shall provide Tenant with prompt written notice thereof and Tenant shall have a period of (30) days after its receipt of such notice to terminate this Lease. In the event Tenant timely exercises such termination right, then this Lease shall terminate and the parties shall have not further liability hereunder.

19.   CONDEMNATION

19.1   Tenant agrees that if the whole or a substantial part of the demised premises shall be taken or condemned for public or quasi-public use or purpose by any competent authority, Tenant shall have no claim against the Landlord and shall not have any right to any portion of the amount that may be awarded as damages or paid as a result of any such condemnation, and all right of the Tenant to damages for the unexpired leasehold estate and leasehold improvements that are, have become, or will become, by the terms and conditions of

**EXHIBIT A**

this Lease, the property of the Landlord, if any, are hereby assigned by the Tenant to the Landlord; provided, however, that Tenant shall have the right to make an independent claim against the condemning authority for relocation expenses and leasehold improvements installed at Tenant's expense. Upon such entire or substantial condemnation or taking, the Term of this Lease shall cease and terminate from the date of such governmental taking or condemnation, and the Tenant shall have no claim against the Landlord for the value of any unexpired term of this Lease. If less than a substantial part of the demised premises is taken or condemned by any governmental authority for any public or quasi-public use or purpose, the Rent shall be equitably adjusted on the date when title vests in such governmental authority and the Lease shall otherwise continue in full force and effect. For purposes of this Paragraph, a substantial part of the demised premises shall be considered to have been taken if more than fifty percent (50%) of the demised premises are thereafter unusable by Tenant.

19.2    If any part of the Building (including, without limitation, the Common Areas) is taken by condemnation so as to render, in Landlord's judgment, the remainder unsuitable for use as an office building containing retail stores, then provided Landlord terminates all of the leases in the Building, Landlord shall have the right to terminate this Lease upon notice in writing to Tenant within one hundred twenty (120) days after possession is taken by such condemnation. If Landlord terminates this Lease upon a condemnation of the Building as herein provided, it shall terminate as of the day possession is taken by the condemning authority, and Tenant shall pay Rent and perform all of its other obligations under this Lease up to that date with a proportionate refund by Landlord of any Rent as may have been paid in advance for a period subsequent to such possession. In the event Landlord does not elect to terminate this Lease, but the demised premises are not fully repaired within one hundred twenty (120) days from the date of such condemnation, Tenant may elect to terminate this Lease by giving Landlord written notice within one hundred fifty (150) days of the date of such condemnation so long as the demised premises have not been repaired prior to Landlord's receipt of such notice.

20.    DEFAULT

20.1    If the Tenant shall:

(a)    fail to pay the Base Annual Rent or any installment thereof as aforesaid, and/or any additional rent as herein provided, and/or any late fee, when the same shall become due and payable, and such default shall continue for more than five (5) days after Tenant receives written notice of such failure; or

(b)    default in the performance of any of the other covenants, conditions, terms, agreements, rules or regulations herein contained, or hereafter established, on the part of the Tenant to be kept and performed and such default shall continue for more than ten (10) days after Tenant's receipt of written notice of such default from Landlord; provided, however, that if such failure is incapable of practicably being cured with reasonable diligence within such ten (10) day period and if Tenant shall proceed promptly to cure the same and thereafter shall prosecute such curing with diligence, then the time period within which such failure may be cured shall be extended for such period as may be reasonably necessary to complete the curing the same with diligence; or

(c)    be a corporation and shall fail to remain in good standing in the District of Columbia or the state of its incorporation or shall, if a foreign corporation, fail to maintain a duly registered agent in the District of Columbia; then, and in each and every such event from thenceforth, and at all times thereafter, at the option of the Landlord, the Tenant's right of possession shall thereupon cease and terminate, and the Landlord shall be entitled to possession of the demised premises and to re-enter the same without demand of Rent or demand of possession of the demised premises by process of law, notice to quit or of intention to re-enter the same being hereby expressly waived by the Tenant, however, if self-help remedies become available to Landlord under District of Columbia law, Landlord shall not avail itself of such remedies without first giving Tenant written notice of any alleged default hereunder and fifteen (15) days' opportunity to cure. And in the event of such re-entry by process of law or otherwise, the Tenant nevertheless agrees to remain liable for any and all damages which the Landlord may sustain by such re-entry including, without limitation, deficiency in or loss of Rent, attorney's fees, other collection costs and all expenses of placing the demised premises in first-class rentable condition, including the costs of subdividing all or part of the demised premises.

20.2    If this Lease and/or Tenant's right of possession is terminated by reason of Tenant's default, Landlord may relet the demised premises or any part thereof, alone or together with other premises, for such term(s) (which may be greater or less than the period which otherwise would have constituted the balance of the Lease Term) and on such terms and conditions (which may include concessions of free rent and alterations of the demised premises)

-15-

**EXHIBIT A**

as Landlord, in its commercially reasonable discretion, may determine, but Landlord shall not be liable for, nor shall Tenant's obligations hereunder be diminished by reason of, any failure by Landlord to relet the demised premises or any failure by Landlord to collect any Rent due upon such reletting. Notwithstanding the foregoing, Landlord does covenant to use commercially reasonable efforts to mitigate its damages in the event of Tenant's default to the extent required by applicable law.

20.3   If this Lease is terminated by reason of Tenant's default, Tenant nevertheless shall remain liable for any Base Annual Rent, additional rent or damages which may be due or sustained prior to such default, all costs, fees and expenses including, but not limited to, reasonable attorneys' fees, brokerage fees, expenses incurred in placing the demised premises in first-class rentable condition (which attorneys' fees, brokerage fees and other expenses shall be pro-rated based on Tenant's remaining Lease Term), and other costs and expenses incurred by Landlord in pursuit of its remedies hereunder, or in renting the demised premises to others from time to time (all such Base Annual Rent, additional rent, damages, costs, fees and expenses being hereinafter referred to as "Termination Damages") and additional damages (hereinafter referred to as "Liquidated Damages"), which shall be an amount equal to the Base Annual Rent and additional rent which would have become due during the remainder of the Term of this Lease, less the amount of Rent if any, which Landlord shall receive during such period from others to whom the demised premises may be rented (other than any additional rent received by Landlord as a result of any failure of such other person to perform any of its obligations to Landlord), in which case such Liquidated Damages shall be computed and payable in monthly installments, in advance, on the first day of each calendar month following Tenant's default and continuing until the date on which the Term of this Lease would have expired but for Tenant's default. Separate suits or actions may be brought to collect any such Liquidated Damages for any month(s), and such separate suits or actions shall not in any manner prejudice the right of Landlord to collect any Liquidated Damages for any subsequent month(s) by similar proceedings, or Landlord may defer any suits or actions until after the expiration of the Lease Term.

20.4   If Tenant shall (i) generally not pay Tenant's debts as such debts become due or become insolvent, (ii) make a general assignment for the benefit of creditors, (iii) file, be the entity subject to, or acquiesce in a petition in any court (whether or not pursuant to any statute of the United States or any state) in any bankruptcy, reorganization, composition, extension, arrangement, or insolvency proceedings, or (iv) make any application in any proceedings for, be the entity subject to, or acquiesce in, the appointment of a custodian, trustee, receiver or agent for Tenant or all of Tenant's property, or (v) acquiesce in any petition filed against Tenant in any court (whether or not pursuant to any statute of the United States or any state) in any bankruptcy, reorganization, composition, extension, arrangement or insolvency proceedings, in which Tenant is the subject entity, and, in any of the foregoing enumerated events, (1) an order for relief be issued thereon, or (2) such petition shall be approved by any court, or (3) such proceedings shall not be dismissed, discontinued, terminated or vacated within thirty (30) days after such petition is filed; then, in any of said events, this Lease shall immediately cease and terminate at the option of Landlord with the same force and effect as though the date of occurrence of said event was the date herein fixed for expiration of the Term of this Lease. In case any of the foregoing provisions are unenforceable or invalid under the Bankruptcy laws of the United States or the insolvency laws or laws for the relief of debtors of any state or territory, the remaining provisions of this Paragraph shall not be affected thereby, but shall remain in full force and effect. No trustee, interim trustee, debtor in possession, debtor engaged in business, custodian, receiver or assignee, or any fiduciary by whatever name, in dominion, control, custody or title acting under the purported authority of any law, may assume or assign this Lease without the prior written consent of Landlord unless all requirements of the Bankruptcy Laws of the United States are fully satisfied. Requirements in the event of a proceeding under 11 U.S.C. §101, et seq., include specifically, but without limitation, full compliance with 11 U.S.C. §§366(b)(1)(A), (B) and (C), (b)(3)(A), (B) and (C), (b)(4) and (f)(2)(A) and (B). If the property of Tenant is under administration pursuant to the provision of 11 U.S.C. §§101, et seq., then no claim of Landlord for failure or refusal of Tenant to perform the covenants of this Lease shall exceed amounts allowable under 11 U.S.C. §§502(b)(6)(A) and (B), together with any other amounts allowable to Landlord under other provisions of 11 U.S.C. or interpretations thereof.

21.   **TENANT HOLDING OVER**

If Tenant remains in possession of the demised premises or any part thereof after the expiration or earlier termination of the Term, or any renewal thereof, with Landlord's consent, such occupancy shall be a tenancy from month to month upon all the terms and conditions of this Lease pertaining to the obligations of Tenant, except that the monthly installment of Base Annual Rent payable shall for the first two (2) months of such holdover, be equal to one hundred

**EXHIBIT A**

fifty percent (150%) of the monthly Installment of Base Annual Rent payable immediately preceding the termination date of this Lease, and thereafter be equal to two hundred percent (200%) of the monthly Installment of Base Annual Rent payable immediately preceding the termination date of this Lease. If Tenant remains in possession of the demised premises or any part thereof after the expiration of the Term hereof without Landlord's consent, Tenant shall, at Landlord's option, be treated as a tenant at sufferance or a trespasser. Nothing contained herein shall be construed to constitute Landlord's consent to Tenant holding over at the expiration or earlier termination of the Term. Tenant hereby agrees to indemnify, hold harmless and defend Landlord from any cost, loss, claim or liability (including attorneys' fees) Landlord may incur as a result of Tenant's failure to surrender possession of the demised premises to Landlord upon the termination of this Lease.

22.    ATTORNMENT AND CURE RIGHTS

22.1    This Lease is subject and subordinate to all ground or underlying leases and to all mortgages and/or deeds of trust which may now or hereafter affect this Lease or the Building of which the demised premises form a part or the land on which the Building is erected, and to all renewals, modifications, consolidations, replacements and extensions thereof. In confirmation of such subordination, Tenant shall, within five (5) business days after receipt of written request therefor, execute any certificate which the Landlord or any of Landlord's lenders may request. If Tenant fails to execute such certificate, then such failure shall be deemed a default for which Tenant shall not be entitled to a notice of cure. Tenant agrees that in the event any proceeding is brought for the foreclosure of any mortgage encumbering the Building, Tenant shall attorn to the purchaser at such foreclosure sale and shall recognize such purchaser as the landlord under this Lease, and Tenant waives the provisions of any statute or rule of law, now or hereafter in effect, which may give or purport to give Tenant any right to terminate or otherwise adversely affect this Lease and the obligations of Tenant hereunder in the event any such foreclosure proceeding is prosecuted or completed. Tenant agrees that upon such attornment, such purchaser shall not be (1) bound by any payment of Base Annual Rent or additional rent for more than one (1) month in advance, except prepayments in the nature of security for the performance by Tenant of its obligations under this Lease but only to the extent such prepayments have been delivered to such purchaser, (2) bound by any amendment of this Lease made without the consent of any lender providing construction or permanent financing for the Building, (3) liable for damages for any act or omission of any prior landlord, or (4) subject to any offsets or defenses which Tenant might have against any prior landlord, provided, however, that after succeeding to Landlord's Interest under this Lease, such purchaser shall perform in accordance with the terms of this Lease all obligations of Landlord arising after the date such purchaser acquires title to the Building. Upon request by such purchaser, Tenant shall execute and deliver an Instrument or Instruments confirming its attornment.

22.2    If the demised premises or any part thereof or the Building of which the demised premises are a part are at any time subject to a mortgage, deed of trust or other similar Instrument and this Lease or the rentals are assigned to such mortgagee, trustee or beneficiary and the Tenant is given written notice thereof, including the post office address of such assignee, then the Tenant shall not terminate this Lease for any default on the part of the Landlord without first giving written notice by certified or registered mail, return receipt requested, to such assignee, Attention: Mortgage Loan Department, specifying the default in reasonable detail, and Tenant shall afford such assignee a reasonable opportunity to make performance, at its election, for and on behalf of the Landlord.

22.3    Landlord shall obtain a nondisturbance agreement for Tenant, from Landlord's current mortgagee, on the current mortgagee's standard form. Landlord shall also use reasonable efforts to obtain a nondisturbance agreement for Tenant from any future mortgagee on such future mortgagee's standard form.

23.    MORTGAGEE REQUIREMENTS

Tenant shall, at its expense, comply with all reasonable requirements and notices of any financial institution(s) providing funds to finance or refinance the construction of the Building or providing funds for the permanent financing or refinancing of the Building, respecting all matters of occupancy, use, condition or maintenance of the demised premises provided the same shall not unreasonably interfere with the conduct of Tenant's business nor materially limit or affect the rights of the parties under this Lease.

**EXHIBIT A**

24. ESTOPPEL CERTIFICATES

Tenant shall, without charge, at any time, and from time to time, within five (5) business days after receipt of written request therefore by Landlord, execute, acknowledge and deliver to Landlord a written estoppel certificate certifying to Landlord, any mortgagee, ground lessor, assignee of a mortgagee or ground lessor, or any purchaser of the Building or any other person designated by Landlord, as of the date of such estoppel certificate, the following: (1) whether or not Tenant is in possession of the demised premises ; (2) whether or not this Lease is unmodified and in full force and effect (or if there has been a modification, that the Lease is in full force and effect as modified and setting forth such modification); (3) whether or not there are then existing any set-offs or defenses against the enforcement of any right hereunder (and, if so specifying the same in detail); (4) the dates, if any, to which Rent or other charges have been paid in advance; (5) that Tenant has no knowledge of any then uncured defaults on the part of Landlord of Landlord's obligations under this Lease (or if Tenant has knowledge of any such uncured defaults, specifying the same in detail); (6) that Tenant has no knowledge of any event having occurred that authorizes the termination of this Lease by Tenant (or if Tenant has such knowledge, specifying the same in detail); and (7) the address to which notices to Tenant should be sent. Any such statement delivered pursuant hereto may be relied upon by Landlord or any prospective purchaser or mortgagee of the Building or any part thereof or estate therein. Tenant's failure or refusal to deliver such certificates within the time period aforesaid shall be deemed a default for which Tenant shall not be entitled to a notice to cure.

25. FORCE MAJEURE

This Lease and the obligations of Tenant to pay Rent and perform all of the provisions on the part of Tenant to be performed hereunder shall in no way be affected, impaired, or excused because Landlord, due to unavoidable delays beyond its reasonable control, (1) is unable to fulfill any of its obligations under this Lease; (2) is unable to supply or is delayed in supplying any service expressly or impliedly to be supplied; (3) is unable to make or is delayed in making any repairs, replacements, additions, alterations or decorations; or (4) is unable to supply or is delayed in supplying any improvements, equipment or fixtures. Landlord shall in each instance exercise its best efforts and due diligence to effect performance when and as soon as possible, however Landlord shall be under no obligation to pay overtime labor rates.

However, if any service or utility is interrupted or in the event Landlord fails to comply with its obligations hereunder, or if for any other reason (other than default by Tenant) all or any portion of the demised premises is untenantable by Tenant in the ordinary course of its business for more than five (5) consecutive days and such interruption/untenantability is within Landlord's reasonable control, then Tenant's rent shall abate (with respect to demised premises or such untenantable portion thereof, as applicable) until the demised premises is again rendered tenantable. Landlord shall give Tenant at least three business days prior written notice of any planned interruption of any utility or other condition that may render any portion of the demised premises untenantable and reasonable notice thereof in the event of emergency interruption. In all events, Landlord shall use commercially reasonable efforts to minimize any interference with Tenant's business operations in the demised premises.

26. TRANSFER BY LANDLORD

Landlord may freely sell, assign, or otherwise transfer all or any portion of its interest under this Lease or in the demised premises or the Building, and in the event of any such sale, assignment or other transfer, the party originally executing this Lease as Landlord, and any successor or affiliate of such party, shall, without further agreement between Landlord and Tenant or between Landlord and/or Tenant and the person or entity who is the purchaser, assignee or other transferee of Landlord, be relieved of any and all of its obligations under this Lease, and Tenant shall thereafter be bound to such purchaser, assignee or other transferee, as the case may be, with the same effect as though the latter had been the original Landlord hereunder.

27. WAIVER

If under the provisions hereof Landlord shall institute proceedings and a compromise or settlement thereof shall be made, the same shall not constitute a waiver of any covenant herein contained nor of any of Landlord's rights hereunder. No waiver of any breach of any covenant, condition, term or agreement herein contained shall operate as a waiver of the covenant, condition, term or agreement itself, or of any subsequent breach thereof. No provision of this Lease shall be deemed to have been waived by Landlord or Tenant unless such waiver shall be in writing signed by the waiving party. No payment by Tenant or receipt by Landlord of a lesser amount than the monthly installment of Rent herein stipulated shall be deemed to be other than

on account of the earliest stipulated Rent nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction, and the Landlord may accept such check or payment without prejudice to the Landlord's right to recover the balance of such Rent or pursue any other remedy in this Lease provided. No reentry by and no acceptance by Landlord of keys from Tenant shall be considered an acceptance of a surrender of this Lease.

26.   GENERAL PROVISIONS.

    26.1   Definition of "Landlord".   As used herein, the term "Landlord" shall mean the entity herein named as such, and its successors and assigns (each of whom shall have the same rights, remedies, powers, authorities and privileges as it would have had, had it originally signed this Lease as the Landlord). No person holding the Landlord's interest hereunder (whether or not such person is named as "Landlord" herein) shall have any liability hereunder after such person ceases to hold such interest, except for any such liability accruing while such person holds such interest. Neither Landlord nor any principal of the Landlord, whether disclosed or undisclosed, shall have any personal liability under any provision of this Lease. If the Landlord defaults in the performance of any of its obligations hereunder or otherwise, the Tenant shall look solely to the Landlord's equity, interest and rights in the Building for satisfaction of the Tenant's remedies on account thereof. Landlord represents and warrants that it is the sole owner of the Building; that it has full right, power and authority to enter into this Lease; and that no other person needs to join in the execution hereof in order for this Lease to be binding on all parties having an interest in the demised premises.

    26.2   Definition of "Tenant".   As used herein, the term "Tenant" shall mean each person hereinabove named as such and such person's heirs, personal representatives, successors and assigns, each of whom shall have the same obligations, liabilities, rights and privileges as it would have possessed had it originally executed this Lease as the Tenant; provided, that no such right or privilege shall inure to the benefit of any subtenant or assignee of the Tenant, immediate or remote, unless the assignment to such assignee or the sublease with such subtenant is made in accordance with the provisions of Paragraph 7 hereof. In the event that two or more individuals, corporations, partnerships or other business associations (or any combination of two or more thereof) shall sign this Lease as Tenant or guarantee this Lease as Guarantors, the liability of each such individual, corporation, partnership or other business association to pay Rent and perform all other obligations hereunder shall be deemed to be joint and several. In like manner, in the event that the Tenant named in this Lease shall be a partnership or other business association, the members of which are by virtue of statute or general law subject to personal liability, then, and in any event, the liability of each such member shall be deemed to be joint and several. Notwithstanding any other provisions hereof, or of any rule or provision of law, the failure or refusal by Landlord to proceed, in the event of a breach or a default by Tenant, against all the individuals, corporations, partnerships or other business associations comprising the Tenant (or any combination of two or more thereof) or against Tenant or against one or more of the Guarantors, if any, hereof shall not be deemed to be a release or waiver of any rights which Landlord may possess against such other individuals, corporations, partnerships, or associations not so proceeded against, nor shall the granting by Landlord of a release of, or execution of a covenant not to sue, any one or more of the individuals, corporations, partnerships, or other business associations comprising the Tenant (or any combination of two or more thereof) or the Guarantors, if any, constitute a release or waiver, in whole or in part, of any rights which Landlord may possess against such other individuals, corporations, partnerships, or associations not so released or granted a covenant not to sue. In the event the Tenant is a corporation or partnership, Tenant hereby represents and warrants that: the Tenant is a duly constituted corporation or partnership qualified to do business in the District of Columbia; all of Tenant's franchise and corporate taxes have been paid to date; that Tenant is otherwise in good standing in the state of its incorporation; and that the persons executing this Lease on behalf of Tenant are duly authorized to execute and deliver this Lease on behalf of Tenant.

    26.3   No Partnership.   Nothing contained in this Lease shall be deemed or construed to create a partnership or joint venture of or between Landlord and Tenant, or to create any other relationship between the parties hereto other than that of Landlord and Tenant.

    26.4   No Representation.   Neither Landlord nor any agent or employee of Landlord has made any representation or promise with respect to the demised premises or the Building except as herein expressly set forth, and no rights, privileges, easements or licenses are acquired by Tenant, except as herein expressly set forth.

    26.5   Brokers.   Landlord and Tenant each represent and warrant to the other that neither of them has employed or dealt with any broker, agent or finder, other than CRESA

**EXHIBIT A**

Partners and CB Richard Ellis (collectively, "Broker") in carrying on the negotiations relating to this Lease. Tenant shall indemnify and hold Landlord harmless from and against any claim or claims for brokerage or other commissions asserted by any broker, agent or finder engaged by Tenant or with whom Tenant has dealt, other than Broker named in the preceding sentence. Likewise, Landlord shall indemnify and hold Tenant harmless from and against any claim or claims for brokerage or other commissions asserted by any broker, agent or finder engaged by Landlord or with whom Landlord has dealt, including, without limitation, other than Broker named in the preceding sentence. Landlord shall pay a commission to Broker pursuant to a separate written agreement between Landlord and Broker.

28.6    Waiver of Jury Trial.  Landlord and Tenant hereby waive trial by jury in any action, proceeding, claim or counterclaim brought by either of the parties hereto against the other arising out of or in any way connected with this Lease.

28.7    Counterclaims.  If Landlord shall commence any proceeding for non-payment of Rent or any other payment of any kind to which Landlord may be entitled or which it may claim hereunder, Tenant will not interpose any counterclaim or setoff of whatever nature or description in any such proceeding unless Tenant's inability to do so would impair Tenant from pursuing a separate action or process on such claim, the parties hereto specifically agreeing that Tenant's covenants to pay Rent or any other payments required of it hereunder are independent of all other covenants and agreements herein contained. The provisions of the foregoing sentence shall not be construed as a waiver of Tenant's right to assert such a claim in any separate action brought by Tenant, however, Tenant hereby waives the right to have any such separate action consolidated or joined with any such proceeding brought by Landlord pursuant to the first sentence of this Paragraph.

28.8    Merger.  Tenant waives any right of defense which it may have to claim a merger, and neither the commencement of any action or proceeding nor the settlement thereof nor the entering of judgment therein shall bar Landlord from bringing subsequent actions or proceedings from time to time.

28.9    Redemption.  Tenant hereby expressly waives any and all rights of redemption granted by or under any present or future laws in the event of Tenant being evicted or dispossessed for any cause, or in the event of Landlord obtaining possession of the demised premises by reason of the violation by Tenant of any of the covenants and conditions of this Lease, or otherwise.

28.10    Invalidity of Particular Provisions.  It is the intention of the parties hereto that if any provision of this Lease is capable of two constructions, one of which would render the provision invalid and the other of which would render the provision valid, then the provision shall have the meaning which renders it valid. If any term or provision of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remaining terms and provisions of this Lease, or the application of such terms and provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of the Lease shall be valid and enforced to the fullest extent permitted by law.

28.11    Notices.  All notices required to be given hereunder by either party to the other shall be given by a recognized overnight delivery service which provides evidence of receipt (such as Federal Express), by personal delivery or by certified or registered mail, return receipt requested.  In the event notice is given by overnight delivery or personal delivery, notice shall be deemed given when delivered, and if notice is given by mail, it shall be deemed given when received or refused.

Notices to the respective parties shall be addressed as follows:

If to the Landlord:
  Mr. Edward J. Lenkin
  The Lenkin Company Management, Inc.
  4922-A St. Elmo Avenue
  Bethesda, Maryland  20814

If to the Tenant:
  Muldoon Murphy & Aguggia LLP
  5101 Wisconsin Avenue, N.W.
  Washington, D.C.  20016
  Attn:  Managing Partner

EXHIBIT A

Either party may, by like written notice, designate a new address to which such notices shall be directed.

### 28.12  Construction.

(a)     As used herein, the term "person" shall mean a natural person, a trustee, a corporation, a partnership and any other form of legal entity; and all references made (1) in the neuter, masculine or feminine gender shall be deemed to have been made in all such genders, and (2) in the singular or plural number shall be deemed to have been made, respectively, in the plural or singular number as well.

(b)     The headings of the Paragraphs hereof are provided only for convenience of reference, and shall not be considered in construing the contents thereof.

(c)     Time is of the essence with respect to each of Landlord's and Tenant's obligations under this Lease.

(d)     Although the printed provisions of this Lease were drawn by Landlord, this Lease shall not be construed for or against Landlord or Tenant, but this Lease shall be interpreted in accordance with the general tenor of the language in an effort to reach the intended result. Notwithstanding anything to the contrary contained in this Lease, Landlord and Tenant agree and acknowledge that they are entering into this Lease in reliance on each other's agreement to use "good faith" in carrying out the terms of this Lease. Accordingly, unless specifically stated to the contrary in this Lease, whenever the consent, approval, authorization or other action of either party is required or taken hereunder, the same shall not be unreasonably withheld or unduly delayed, and whenever any request is made to either party to take some specific action, such request shall not be unreasonably made.

### 28.13  Governing Law.  This Lease shall be construed and enforced in accordance with the laws of the District of Columbia, and any action or proceeding arising hereunder shall be brought in the courts of the District of Columbia. If any such action or proceeding arises under the Constitution, laws or treaties of the United States of America, or if there is a diversity of citizenship between the parties hereto, so that suit may be brought in a United States District Court, it shall be brought in the United States District Court for the District of Columbia.

### 28.14  No Personal Liability.  Notwithstanding anything herein to the contrary, no officer, shareholder, partner, director, member or employee of Tenant, including, without limitation, the signatory for Tenant on this Lease, shall have any personal liability for the performance of Tenant's obligations under the Lease or any term, covenant or condition thereof.

### 29.  ENTIRE AGREEMENT

This Lease together with the Addendum and all Exhibits attached hereto contains and embodies the entire agreement of the parties hereto, and no representations, inducements or agreements, oral or otherwise, between the parties not contained and embodied in this Lease shall be of any force or effect, and this Lease may not be modified, changed or terminated in whole or in part in any manner other than by an agreement in writing signed by all parties hereto. All of Landlord's and Tenant's duties and obligations hereunder, including, but not limited to, Tenant's duties and obligations to pay Base Annual Rent, additional rent and the costs, expenses, damages and liabilities incurred by Landlord for which Tenant is liable, and Landlord's obligation to refund any overpayment by Tenant, shall survive the expiration or termination of this Lease for any reason whatsoever.

### 30.  NO OPTION

The submission of this Lease for examination or consideration by Tenant or discussion between Tenant or Landlord does not constitute a reservation of or option for the demised premises or any other space in the Building, and this Lease shall be and become effective as a lease and agreement only upon legal execution, acknowledgment and delivery hereof by Landlord and Tenant.

**EXHIBIT A**

IN WITNESS WHEREOF, the undersigned have caused this Lease to be signed and sealed as of the day and year first above written.

LANDLORD

GARRISON ASSOCIATES, L.L.C.

WITNESS _Albert D. Mole_                BY: _____(SEAL)
                                            President

TENANT

MULDOON MURPHY & AGUGGIA LLP

WITNESS _____              BY: _____(SEAL)

                                       Title: _Victor L. Cangelosi, Managing Partner_

**EXHIBIT A**

EXHIBIT A

SITE PLAN





A-1

**EXHIBIT A**

EXHIBIT B

(Deleted)

B-1

**EXHIBIT A**

EXHIBIT C
RULES AND REGULATIONS

Unless the context otherwise requires, the terms used in this Exhibit that are defined in the Lease shall have the same meanings as provided in the Lease.

The following rules and regulations have been formulated for the safety and well-being of all tenants of the Building ("tenants"). Strict adherence to these rules and regulations is necessary to guarantee that every tenant will enjoy a safe and undisturbed occupancy of its premises in the Building. A violation of these rules and regulations by Tenant shall constitute a default by Tenant under the Lease, subject to the notice and cure provisions set forth in the Lease.

Landlord reserves the right to rescind, amend, alter or waive any of the foregoing rules or regulations at any time when, in its judgment, it deems it necessary, desirable or proper for the best interest of the tenants, and no such rescission, amendment, alteration or waiver of any rule or any regulation in favor of one tenant shall operate as a rescission, amendment, alteration or waiver in favor of any other tenant. Landlord shall not be responsible to any tenant for the non-observance of, or violation by, any other tenant of any of these rules and regulations at any time, except that Landlord shall enforce the rules and regulations against other tenants if such non-observance or violation materially interferes with Tenant's use of the demised premises.

Landlord may, upon request of any tenant, waive the compliance by such tenant of any of the rules and regulations, provided that (i) no waiver shall be effective unless signed by Landlord or Landlord's authorized agent, (ii) any such waiver shall not relieve such tenant from the obligation to comply with such rule or regulation in the future unless otherwise agreed to by Landlord, (iii) no waiver granted to any tenant shall relieve any other tenant from the obligation of complying with these rules and regulations, and (iv) any such waiver by Landlord shall not relieve Tenant from any liability to Landlord for any loss or damage occasioned as a result of Tenant's failure to comply with any rule or regulation.

1.      The passenger elevators are not to be used as service cars for deliveries or moving of equipment without the consent of Landlord or Landlord's Building manager. Any tenant violating the use of the passenger elevators will be held responsible for all damages sustained as a result of such use. The freight elevator is not to be used for general passenger traffic.

2.      Office areas, lobbies, corridors and the public rest rooms will be cleaned Monday through Friday, except holidays, after normal business hours. Only those items placed in proper trash receptacles, or clearly marked "Trash," will be disposed of by the cleaners. No trash, empty boxes or containers are to be placed outside the demised premises. Tenant shall place and store all trash, garbage and refuse on its premises in the proper containers as required by the Health and Sanitary Regulations of the District of Columbia. Tenants must make arrangements for disposal of large packing boxes or bulky items from their offices at their own expense. Desks will be dusted only if cleared of paper and working materials.

3.      No disabled vehicle, automobile, truck, trailer, or bicycle shall be left on the premises more than forty-eight (48) hours. In the event that this rule is not complied with, the Landlord shall have the right to tow away said vehicle at the expense of the Tenant without notice.

4.      Except for customary office products, tenant, or any person or firm associated with a tenant, shall at any time bring or keep upon the premises any inflammable, combustible or explosive fluid, chemical or substance.

5.      No tenant shall burn any trash or garbage of any kind in or about its premises or the Building.

6.      Tenant shall immediately notify Landlord or Landlord's Building manager of any serious breakage, sickness, fire or disorder which comes to Tenant's attention, either in a tenant area or in any common area of the Building.

7.      IMMEDIATELY, upon hearing the fire signal, each person will:

   a.      Pick up wearing apparel and personal belongings; do not carry umbrellas or other large objects with you.

C-1

**EXHIBIT A**

b. Walk - DO NOT RUN - to the nearest stairway, enter, and proceed to the ground floor. Do not use the elevators. Do not linger. Keep moving.

c. You will be advised when it is safe to re-enter the Building. Anyone discovering a fire will follow the directions posted on each fire alarm box, and then station himself or herself outside the Building to direct the responding fire equipment to the location of the fire.

8. No sweepings, rubbish, rags or other substances shall be thrown into the plumbing system. All damage resulting from misuse of the plumbing fixtures shall be borne by the Tenant, or its servants, employees, agents, visitors or licensees who caused such damage. Private plumbing fixtures tied into the Building plumbing system shall be maintained by the Tenant.

9. Except as may be otherwise permitted by the Lease, Tenant shall not tie in nor permit others to tie in to the electrical or water supply lines on the premises without the prior written consent of the Landlord.

10. Landlord reserves the right to require Tenant to discontinue any display or demonstration in or from the demised premises, which, in Landlord's opinion, creates an interference with the use of the public passageways of the Building or constitutes a nuisance or an unhealthy or unsafe condition.

11. Except for purposes of emergency, notices, posters or advertising media shall not be placed in the corridors, elevators, elevator lobbies, main lobbies or on the exterior of the Building.

12. Landlord shall have the right to prohibit any advertising by Tenant which, in Landlord's opinion, tends to impair the reputation or desirability of the Building. Tenant shall discontinue such advertising immediately upon receipt of written notice from the Landlord.

13. Canvassing, soliciting and peddling in the Building is prohibited and each Tenant shall cooperate in preventing same. Tenant shall not solicit business in the parking or common areas of the Building nor distribute handbills or other advertising material to automobiles parked in the parking lot or to offices in the Building.

14. All moving or deliveries of safes, furniture, goods, wares, merchandise or bulky matter of any description to, from or on behalf of Tenant, shall be made through the loading dock facilities. All such merchandise shall be transported to and from the premises by way of the freight elevator, and specified stairs and passageways, only during the hours from time to time designated for such purpose by Landlord. Hand trucks may be used only if equipped with non-marking tires and side guards. At no time shall the passenger elevators or main lobby be used for such deliveries or movements. Landlord shall in no way be held responsible for any charges or expenses incurred by such moving or deliveries.

15. Building employees are prohibited from signing for or receiving any package or article delivered to the Building for Tenant. Any employee who does so is acting as receiving agent for Tenant and not Landlord.

16. Tenant shall not permit the use of any device or instrument within its premises that would be disturbing to normal sensibilities of other tenants. This includes sound reproduction systems, television sets, phonographs, radios or excessively bright, changing, flashing, flickering or moving lights, which are audible or visible beyond the confines of Tenant's premises. No tenant shall make any unseemly or disturbing noises or disturb or interfere with occupants of the Building or neighboring buildings or premises or those having business with them, whether by the use of any musical instrument, radio, talking machine, whistling, singing, or in any other way. No tenant shall throw anything out of the doors or windows or down the corridors or stairs of the Building.

17. No tenant shall permit any portion of its leased space to be used for any unlawful purpose. No tenant shall use any space in the Building for lodging or sleeping or for any immoral or illegal purpose.

18. Safes and other heavy objects shall not be positioned or installed by Tenant until the size and location thereof are approved in writing by Landlord or Landlord's Building manager.

C-2

**EXHIBIT A**

19.   Tenant shall insure that all entrance doors and windows within its premises are closed and locked when the offices are not in use.

20.   No tenant shall mark, bore into, cut or in any way deface any part of the demised premises or the Building without the prior written consent of the Landlord.  All work involving partition changes, painting, repositioning of doors, installation of wiring or utility lines, shall first be approved in writing by the Landlord.

21.   If any tenant desires to install carpeting, the floor of the leased space must first be covered, without the use of cement or other similar adhesive material, and the carpet installed thereon.  Written permission of the Landlord must first be obtained.

22.   No antenna will be installed on the roof, in the windows, or upon the exterior of the demised premises or the Building by any tenant, without the prior written consent of the Landlord.

23.   Tenants who require the assistance of one of the Building employees in making repairs or alterations to their premises are requested to contact the Building manager with all such requests.  Individual Building employees are restricted to the performance of their regular duties, and additional tasks as specified by the Building manager.

24.   The sidewalks, entries, passages, elevators, public corridors and staircases and other parts of the Building which are not occupied by the Tenant shall not be obstructed or used for any other purpose than ingress or egress.  Landlord shall have the right to control and operate the public portions of the Building and the facilities furnished for common use of the tenants, in such manner as Landlord deems best for the benefit of the tenants generally.  No tenant shall permit the visit to its premises of persons in such numbers or under such conditions as to interfere with the use and enjoyment of the entrances, corridors, elevators and other public portions or facilities of the Building by other tenants.

25.   The Tenant shall not install or permit the installation of any awnings, shades, drapes, curtains, blinds, shades, screens or other window coverings and the like in the premises which are visible from the exterior of the Building, nor shall Tenant install or permit the installation of any such items on the balcony or balconies appurtenant to the premises, other than those approved by the Landlord in writing.  Drapes installed by Landlord for the use of Tenant or drapes installed by Tenant, which are visible from the exterior of the Building, must be cleaned by Tenant at least once a year, without notice from Landlord, at Tenant's own expense.

26.   Tenant shall not place any furniture, plants or other item on the balcony or balconies appurtenant to the premises, other than those items approved by Landlord in writing.

27.   No additional locks or bolts of any kind shall be placed upon any doors or windows of the demised premises nor shall any changes be made in any existing locks without Landlord's prior written consent.  The doors leading to the corridors or main halls shall be kept closed during business hours except as they may be used for ingress or egress.  Each tenant shall, upon the termination of its tenancy, return to Landlord all keys used in connection with its premises, including any keys to the premises, to rooms and offices within the premises, to storage rooms and closets, to cabinets and other built-in furniture, and to toilet rooms, whether or not such keys were furnished by Landlord or procured by Tenant, and in the event of the loss of any such keys, such tenant shall pay to Landlord the cost of replacing the locks.  On termination of a tenant's lease, the tenant shall disclose to Landlord the combination of all locks for safes, safe cabinets and vault doors, if any, remaining in the demised premises.

28.   Electric and telephone floor distribution boxes must remain accessible at all times.

29.   No bicycles, vehicles, animals, birds or pets of any kind shall be brought into the Building or any tenant's premises.  No cooking, except cooking with microwave ovens, shall be done or permitted by any tenant within the demised premises without the prior written consent of the Landlord.  No tenant shall cause or permit any unusual or objectionable odors to be produced upon or permeate from its premises.  Tenant shall be solely responsible for cleaning and maintaining any area used for cooking which has been approved by Landlord in writing so as to prevent the introduction of insects or vermin into the premises and the Building.

30.   No space in the Building shall be used for the sale of goods in the ordinary course of business, or for the sale at auction of merchandise, goods or property of any kind.  Furthermore, the use of its premises by any tenant shall not be changed without the prior

**EXHIBIT A**

written approval of Landlord. "Sale of goods in the ordinary course of business" means the sale of goods to the public at large.

31.     Landlord reserves the right to inspect all freight to be brought into the Building and to exclude from the Building all freight which violates any of these rules and regulations or the Lease.

32.     Landlord reserves the right to exclude from the Building at all times any person who is not known or does not properly identify himself to the Building manager or security company. Landlord may, at its sole option, require all persons admitted to or leaving the Building during hours other than normal hours of operation of the Building to register. Each tenant shall be responsible for all persons for whom it authorizes entry into the Building and shall be liable to Landlord for all acts or omissions of such persons.

33.     Landlord's employees shall not perform any work or do anything outside of their regular duties, unless under special instruction from the manager of the Building. The requirements of tenants will be attended to only upon application to Landlord, and any such special requirements of Tenant shall be billed to Tenant (and paid as additional rent when the next installment of Rent is due) in accordance with the schedule of charges maintained by Landlord from time to time or at such charge as is agreed upon in advance by Landlord and Tenant.

34.     Tenant shall comply in all respects with the D.C. Solid Waste Management and Multi-Material Recycling Act of 1989.

**EXHIBIT A**

<u>EXHIBIT "D"</u>
<u>FORM OF CERTIFICATE</u>

1.    This Certificate is being provided pursuant to the terms and provisions of that certain lease agreement dated _____, 200___ (the "Lease"), between GARRISON ASSOCIATES, L.L.C. and _____, The parties to the Lease desire to confirm that the following terms which are defined in the Lease shall have the meanings set forth below for all purposes in the Lease:

a. The Lease Commencement Date is _____, 20 ___.

b. The initial term of the Lease shall expire on _____ ____, 20 ___.

2.    The actual square footage of the demised premises is _____ rentable square feet. (See Paragraph 1.1 of the Lease).

3.    The actual Base Annual Rent is $ _____ payable in monthly installments of $ _____. (See Paragraph 3.1 of the Lease.)

4.    Tenant's Share of Operating Costs is _____%. (See Paragraph 3.2 of the Lease).

5.    Tenant's Share of Real Estate Taxes is _____% (See Paragraph 3.2 of the Lease).

6.    All policies or certificates of insurance and evidence of payment of premiums for all insurance required pursuant to the terms of the Lease shall be delivered by Tenant to Landlord within ten (10) days after the date hereof. (See Paragraph 13 of the Lease)."

LANDLORD:

GARRISON ASSOCIATES, L.L.C.,
a District of Columbia limited liability company

By: _____
        President

TENANT:

_____

By: _____

**EXHIBIT A**

EXHIBIT "E"
## CLEANING SPECIFICAITONS

### AREAS TO BE COVERED

Clean all areas of the building, including entrance lobby, basement areas, loading platforms, public halls, stairwells, lavatories, passageways, and elevator cabs. Areas not normally included are: vault areas, garages, elevator shafts, elevator pits, mechanical rooms, or electrical rooms.

I. **Restrooms-Daily/Weekly/Monthly**
A. Wash all mirrors.
B. Wash hand basins and bright work with a non-abrasive cleaner.
C. Wash urinals and bright work.
D. Wash toilet seats.
E. Wash toilet bowls and bright work.
F. Damp mop floor.
G. Damp wipe and clean where necessary. Walls and partitions are to be free of hand prints and dust.
H. Replenish hand soap, towels, tissues, and feminine supplies.
I. Partition and ventilating louvers are to be damp wiped weekly.
J. Machine Scrub floors with approved germicidal detergent solution on a monthly basis.

Toilet bowl brush shall be used on toilet bowls, and care shall be given to clean flush holes under the rim of bowls and passage traps. Bowl cleaner shall be used at least once each month, and more often, if necessary.

The intent of this specification is that restrooms shall be maintained in a spotlessly clean and odor free condition at all times.

II. **Offices and Hallways (Corridors**
A. *Dusting-Weekly*
All unobstructed furniture, office equipment and appliances, window sills, etc., shall be dusted with a treated cloth or static duster. This shall include all horizontal surfaces up to 84 inches high. Enough vertical surfaces shall be completed daily to complete all vertical surfaces each week. Desks and tables not cleared of paper and work materials shall only be dusted where the desk top is exposed. Equipment such as computers, calculators, telephones, printers, etc., shall not be dusted.

B. *Dust Mopping*
All non-carpeted floor areas shall be dust mopped with a treated yarn dust mop, with special attention being given to areas under desks and furniture to prevent accumulation of dust and dirt. Dust mopping shall be performed after furniture has been dusted.

C. *Wastepaper/Ashtrays*
Wastepaper baskets and ashtrays are to be emptied daily, and ashtrays are to be wiped clean. Wastebaskets shall be damp wiped as necessary. Plastic liners, where utilized, shall be changed as needed.

D. *Vacuuming-Daily-Weekly*
All rugs and carpets in office areas, as well as public spaces, shall be vacuumed daily in all traffic areas. Hard to reach places, such as under desks and chairs, shall be vacuumed weekly.

The intent of this specification is to provide a complete vacuuming at least once each week.

E. *Spot Cleaning Carpets-Daily*
All carpeted area shall be inspected daily for spots and stains. All spots and stains shall be removed, if possible, as soon as

possible. Where difficult spots are encountered, a notation shall be left with the building management representative.

F. *Wet Mopping*
When floors require wet mopping, they shall be left in a streak free condition. Extreme care shall be exercised in all mopping so as to avoid splashing walls or furniture. Transporting of water and other liquids over carpets areas shall be accomplished in such a manner so as to avoid spillage.

G. *Tile Floors*
All tile floors shall be refinished, buffed, and kept in a consistently clean condition at all times. Since some tile areas require more attention than others, refinishing and buffing shall be accomplished on an as needed basis. Transporting of floor finish and other liquids over carpeted areas shall be accomplished in such a manner so as to avoid spillage.

Care shall be exercised in applying finish so as to keep it off furniture and walls. Floor machines shall be used in a careful manner to avoid damage to the walls, base boards, and furniture.

H. *Special Floor Coverings-As Necessary*
Parquet, quarry, ceramic, raised computer floors, and other special floor coverings shall be treated with appropriate methods and approved materials separately, and if possible additional costs as determined with management.

I. *Water Coolers-Daily*
All water coolers shall be cleaned and polished daily.

J. *Spot Cleaning-Daily-As Needed*
All hand prints and spots shall be removed from doors and light switches daily. Walls, woodwork, and interior glass shall be spot cleaned as needed.

K. *Cigarette Urns-Daily*
Cigarette urns and ash receivers shall be cleaned and sanitized as necessary, and where required, the sand level shall be maintained.

L. *High Dusting-Quarterly*
Ledges, moldings, picture frames, etc., shall be cleaned quarterly, or more frequently, if necessary.

M. *Venetian Blinds-Periodic*
A sufficient number of venetian blinds shall be dusted daily, so that all blinds are dusted every 90 days.

N. *Air Conditioning Grilles-Monthly*
All areas around air conditioning and return air grilles shall be cleaned once each month, or more often, if necessary.

III. **Stairways & Landings-Weekly/Daily**
All stairways and landings shall be polished daily. They shall be damp mopped, as necessary. Spot cleaning of walls and doors shall be performed monthly. Hand rails, fire points, and other miscellaneous hardware shall be cleaned periodically. If dry personnel are available in the facility, stairwells and landings shall be dust mopped daily.

The intent of this specification is that all stairways are maintained in a neat and clean condition at all times.

IV. **Entrance Lobby-Daily**

Entrance lobbies shall be cleaned thoroughly, daily. Lobby glass and metal shall be cleaned and dusted daily. Directory board glass shall be damp cleaned and wiped. Lobby walls up to 84 inches shall be dusted and kept free from finger marks, smudges, etc. Lobby floors and entrance ways are to be dust mopped thoroughly nightly, damp mopped as needed, and buffed and refinished as necessary to maintain a clean and lustrous appearance.

V. Polishing as Necessary

All door plates, kick plates, and brass and metal fixtures within the building shall be polished as necessary, and residue from floor maintenance cleaned as necessary.

VI. Elevators-Daily

A. All elevators shall be vacuumed nightly.
B. All stainless steel and metal shall be cleaned nightly.
C. All elevator tracks shall be vacuumed as needed.
D. Elevator button panels and elevator doors shall be cleaned nightly.
E. Carpets shall be spot cleaned as necessary.
F. Ceilings, overhead plexiglass, and/or special light fixtures shall be cleaned as necessary, through arrangements with building management representative.

VII. Light Fixtures-Quarterly

The exterior of all light fixtures shall be dusted.

## GENERAL

Personnel

Employees of Contractor who are assigned permanently to the facility shall be interviewed carefully, screened, and bonded. They shall be neat and clean in appearance and properly identified.

Employees of Contractor shall not eat, drink, or smoke during their shift. Employees shall not disturb papers on desks, open drawers or cabinets, use tenants telephones, office equipment, televisions, or radios.

All employees of Contractor shall abide by all building regulations and safety rules, which may be promulgated from time to time, as they pertain to our operation.

Supervision

Competent supervisory personnel shall be employed by the Contractor, and shall, at a minimum, have completed our 10 week Supervisory Training Course.

Supervisory personnel shall arrive and depart approximately one half hour before and after the cleaning crew.

The Supervisor shall report to the building management any conditions such as leaky faucets, spaced toilets and drains, broken fixtures, etc. The Supervisor shall also report any unusual happenings in the building.

## OTHER:

Contractor shall furnish the necessary, appropriate, tested and approved, implements, machinery, and cleaning supplies for the satisfactory performance of our services.

Sufficient space in the premises shall be assigned to Contractor for storage of cleaning materials, implements, and machinery. Adequate utilities shall be provided to Contractor, without charge, for the performance of assigned duties.

A communications log book shall be kept in a designated place on the premises, in which a record shall be made promptly of any occurrences requiring building management or contractor's attention.

Contractor shall furnish Workers Compensation and Public Liability insurance, certification of which is available on request. Contractor shall be responsible for loss or damage caused by its employees and for the conduct of its employees. Contractor shall make reasonable and prompt restitution for any damage for which it is proven liable, subject to approval by building management.

All office cleaning, where applicable, shall be performed behind locked doors. On the completion of the assigned duties, the Contractor shall ensure that all shop sinks and equipment storage areas are left in a neat and orderly condition, all lights are extinguished, and all doors are locked.

Building management may require, in writing, the dismissal of any employee who is incompetent, careless, insubordinate, or otherwise objectionable, or whose continued employment is contrary to a consistent, positive relationship with tenants or building management.

Regular, periodic inspections of the facility shall be performed by our management staff, accompanied by a management representative, in addition to the regular nightly inspections performed by the Supervisory staff.

## SCHEDULE OF CLEANING

Nightly cleaning services shall normally be rendered five nights per week, Mondays through Fridays, with the exception of legal holidays.

## DAY PERSONNEL (IF REQUIRED)

Contractor shall provide uniformed day personnel whose duties shall be coordinated by building management. Day staff shall work eight hours per day, five days per week, Mondays through Fridays, with the exception of holidays, to perform the following:

Entrance Lobby

Police and maintain the lobbies to ensure they are maintained in a neat and clean condition. Lobby glass shall be washed and cleaned as necessary. Particular attention shall be give to floors and glass doors during inclement weather.

Lavatories

Day personnel shall make periodic checks of restrooms to ensure they are maintained in a neat and clean condition. Restroom supplies shall be restocked as necessary. Planters shall be cleaned, waste cans emptied, etc., as necessary.

Building Exterior

Entrance of building shall be swept clean of litter and hosed down where possible. Police and maintain loading and driveway areas to ensure a neat and clean appearance.

Interior Public Areas

Interior public areas shall be policed and floors mopped as necessary.

Miscellaneous

Perform other duties within the scope of job assignment as assigned by building management and Contractor.

**EXHIBIT A**

## AMENDMENT TO LEASE AGREEMENT

This Amendment is made the 6ᵗʰ day of June, 2007, by and between GARRISON ASSOCIATES, L.L.C. ("Landlord") and MULDOON MURPHY & AGUGGIA LLP ("Tenant").

Whereas, the parties hereto entered into a Lease Agreement dated May 29, 2007 (the "Lease"), and have since agreed to amend the same as set forth below;

Now, therefore the parties agree as follows:

Paragraph 17, line 2, of the Lease is hereby amended to delete the number "seven (7)", and insert instead the number, "six (6)".

In witness whereof, the undersigned have caused this Amendment to be signed and sealed as of the date above written.

WITNESS:                                    LANDLORD:

                                            GARRISON ASSOCIATES, L.L.C.

_____            By: _____ (SEAL)

                                            TENANT:

                                            MULDOON MURPHY & AGUGGIA LLP

_____            By: _____ (SEAL)

                                            Victor L. Cangelosi
                                            Managing Partner

**EXHIBIT A**

EXHIBIT B

SITE PLAN



| INTERFLEX | Building 5101 Wisconsin Avenue Washington, D.C. | Title Base Building Core Plan | Date 04/18/01 Scale N.T.S. | Sheet 5 | Interflexed Designs, Inc. |

B-1

**EXHIBIT A**

**WALKER & CO., LLP**

EXHIBIT C

## Furniture & Fixtures

| File Cabinets (Cream Steel) | Book Cases (Wood) | | Chairs | |
|---|---|---|---|---|
| 1  4-drawer lateral | 1   Tall | | 6   Stackable chairs | |
| 1  3-drawer lateral | 1   Short (3 shelves) | | 2   Brown Leather w/teed seats | |
| 1  4-drawer letter size | | | 1   Brown Leather high back | |
| | **Tables** | | 1   Red tweed fabric | |
| **File Cabinets (Black Steel)** | 1   long folding table | | 2   Gray tweed fabric | |
| 2  5-drawer letter size | 1   short folding table | | 1   Diamond design fabric | |
| 2  4-drawer lateral | 2   round tables (gray top) | | | |
| | | | **Miscellaneous** | |
| **File Cabinets (Wood)** | **Credenzas/Desk (Wood)** | | 1   Printer | |
| 6  2-drawer lateral | 1  Desk | | 1   Small Microwave oven (black) | |
| | 3  Credenzas | | 1   Small Stainless Steel Refrigerator | |
| **Shelving (Metal/tan)** | | | | |
| 5   File tall shelves w/backs | | | | |

**EXHIBIT A**

EXHIBIT "D"

WORK LETTER

ARTICLE 1 - DEFINITIONS

The following terms shall have the meanings described below.  Terms not defined herein shall have the meaning given in the Sublease:

Contractor shall mean such contractor chosen by Subtenant and approved by Prime Landlord.

Construction Contract shall mean the agreement to be entered between Subtenant and Contractor for the construction of the Subtenant Improvements.

Substantial Completion or Substantially Complete shall be as described in Section 3.04 of this Work Letter.

Subtenant's Architect shall mean such architect chosen by Subtenant and approved by Prime Landlord.

Subtenant Improvements shall mean all improvements (including, without limitation, Alterations) constructed or installed in or on the Sublease Premises in accordance with the Subtenant Improvement Construction Documents.

Subtenant Improvement Costs shall mean the aggregate cost for the Subtenant Improvements.

Subtenant Improvement Construction Documents shall mean the working drawings, plans and specifications and finish schedules for the Subtenant Improvements.

Subtenant Space Plans shall mean the schematic presentation of the Sublease Premises prepared by Subtenant's Architect and consented to by Sublandlord and Prime Landlord in accordance herewith.

ARTICLE 2.  SUBTENANT SPACE PLANS AND SUBTENANT IMPROVEMENT PLANS AND SPECIFICATIONS

Section 2.01 Schedule for Preparation

Subtenant shall contract with Subtenant's Architect for the preparation of the Subtenant Space Plans and Subtenant Improvement Construction Documents for the Subtenant Improvements to be constructed in the Sublease Premises, which are subject to the consent of Sublandlord and Prime Landlord.   Any approval or consent by Sublandlord and Prime Landlord of any items submitted by Subtenant or Subtenant's Architect to and/or reviewed by Sublandlord and Prime Landlord pursuant to this Work Letter shall be deemed to be strictly limited to an

acknowledgment of approval or consent by Sublandlord and Prime Landlord thereto and shall not imply or be deemed to imply any representation or warranty by Sublandlord and Prime Landlord that the design is safe or structurally sound or will comply with any legal or governmental requirements. Any deficiency, mistake or error in design, although the same has the consent or approval of Sublandlord and Prime Landlord, shall be the sole responsibility of Subtenant, and Subtenant shall be liable for all costs and expenses which may be incurred and all delays suffered in connection with or resulting from any such deficiency, mistake or error in design.

Section 2.02 Timing of Sublandlord's Review and Approval.

Wherever in this Work Letter a matter is subject to Sublandlord's reasonable consent or approval (or words of similar meaning), Sublandlord agrees to provide its consent or disapproval of such matter within seven (7) days of the full submission of same from Subtenant.

## ARTICLE 3. CONSTRUCTION OF SUBTENANT IMPROVEMENTS

Section 3.01 Delivery of the Premises

On the later of (i) the date Sublandlord delivers possession of the Sublease Premises to Subtenant, or (ii) the date Sublandlord and Prime Landlord approve the Subtenant Space Plans and Subtenant Improvement Construction Documents for the Subtenant Improvements to be constructed in the Sublease Premises, Subtenant may commence construction of the Subtenant Improvements, subject to the terms and conditions of this Exhibit "D." Sublandlord shall deliver possession of the Sublease Premises to Subtenant promptly following satisfaction of the conditions described in Section 1 of the Sublease. Notwithstanding the foregoing, Subtenant shall not commence construction of the Subtenant Improvements until Subtenant has provided Sublandlord with evidence of the Subtenant Improvement Costs and evidence reasonably satisfactory to Sublandlord that Subtenant has the funds to pay the Subtenant Improvement Costs.

Section 3.02 Construction of Subtenant Improvements.

A.    Subtenant shall enter into a standard AIA or other form reasonably acceptable to Sublandlord, Construction Contract with Contractor to construct the Subtenant Improvements.

B.    All Subtenant Improvements shall be constructed and installed by the Contractor; provided, however, that all subcontractors shall be subject to the prior approval of Prime Landlord.

C.    Subtenant shall construct the Subtenant Improvements, at its sole cost and expense, in accordance with the Subtenant Improvement Construction Documents (and any changes thereto approved by Sublandlord and Prime Landlord) and in accordance with the following requirements:

1.    All Subtenant Improvements shall be done and installed in compliance with all applicable governmental codes, laws, ordinances, orders and regulations and

**EXHIBIT A**

otherwise substantially in accordance with the Subtenant Improvement Construction Documents. Subtenant, and not Sublandlord nor Prime Landlord, shall be responsible for assuring that each and every aspect of the Subtenant Improvement Construction Documents comply and conform with all applicable governmental laws, codes and regulations; and approval by Sublandlord and Prime Landlord of such Subtenant Improvement Construction Documents shall not be deemed confirmation or agreement that same so comply or conform with such laws, codes or regulations or otherwise constitute a representation or warranty by Sublandlord or Prime Landlord of any kind with respect to the improvements to be constructed pursuant to the Subtenant Improvement Construction Documents, including, without limitation as to the merchantability or structural soundness of such improvements or the fitness thereof for any particular purpose.

2.    In connection with construction of the Subtenant Improvements, Subtenant shall file all drawings, plans and specifications, pay all fees and obtain all permits and applications from any authorities having jurisdiction; and Subtenant shall obtain a Certificate of Occupancy and any and all other approvals required for Subtenant to use and occupy the Sublease Premises and to open for business to the public. Subtenant shall be responsible for conformance with all codes and ordinances of authorities having jurisdiction over the Subtenant Improvements.

3.    The Contractor shall be required to provide, without limiting the insurance required of Subtenant pursuant to the Prime Lease and Sublease, the following types of insurance:

(1)    Liability Insurance. At all times during the period of construction of the Subtenant Improvements until completion and final acceptance thereof, the Contractor shall maintain in effect commercial general liability insurance covering all activities in or about the Sublease Premises in amounts not less than $1,000,000 per occurrence for bodily injury and for property damage, together with umbrella liability coverage in an amount not less than $2,000,000. Such liability insurance shall be on a comprehensive basis including:

(a)    Premises - Operations (including X-C-U);

(b)    Independent contractors' protection;

(c)    Products and completed operations (which must be maintained for two (2) years commencing with the issuance of the final certificate of payment);

(d)    Contractual liability;

(e)    Owned, non-owned and hired motor vehicles; and

3

**EXHIBIT A**

(f)     Broad form coverage for property damage.

Should the Contractor engage a subcontractor, the same requirement will apply under this agreement to each subcontract, consistent with the Contractor's prudent business practice.

(2)   Workers' Compensation.  At all times during the period of construction of Subtenant's Work, Subtenant's contractors and subcontractors shall maintain in effect statutory Workers' Compensation as required by the District of Columbia.

All insurance policies procured and maintained pursuant to this Section 3.03 shall name Sublandlord and Prime Landlord and any lender of Prime Landlord as additional insureds, shall be carried with companies licensed to do business in the District of Columbia reasonably satisfactory to Sublandlord and Prime Landlord and shall be non-cancellable except after thirty (30) days [ten (10) days in the case of cancellation for non-payment of premiums] written notice to Sublandlord and Prime Landlord. Such policies or duly executed certificates of insurance with respect thereto shall be delivered to Landlord before the commencement of the Subtenant Improvements, and renewals thereof as required shall be delivered to Landlord at least thirty (30) days prior to the expiration of each respective policy term.

4.     Subtenant shall conduct its work in such a manner as to maintain harmonious labor relations, and the Contractor and subcontractors engaged by Subtenant shall employ persons and means to insure so far as may be possible that the progress of work or other work in the Building will not be stopped due to interruption on account of strikes, work stoppage or similar causes for delay.

5.     Contractors and/or subcontractors participating in the Subtenant Improvements shall be required to remove and dispose of, at no cost and expense to Sublandlord, all debris and rubbish caused by or resulting from Subtenant's work and, upon completion, to remove all temporary structures, surplus materials, debris and rubbish of whatever kind remaining on any part of the Sublease Premises or in proximity thereto which was brought in or created in the performance of the Subtenant Improvements.

6.     The Contractor shall guarantee that the work done by it and its subcontractors will be free from any defects in workmanship and materials for a period of not less than one (1) year from date of completion thereof. This guarantee as to materials and workmanship with respect to the Subtenant Improvements shall be contained in the contract which shall provide that said guarantee shall inure to the benefit of both Sublandlord and Subtenant and shall be directly enforceable by either of them.  Subtenant covenants to give to Sublandlord any assignment or other assurance necessary to effect such right of direct enforcement.

4

D.     Subtenant is not authorized to contract for or on behalf of Sublandlord or Prime Landlord for work on or the furnishing of materials to the Sublease Premises or any other part of the Building.    Subtenant shall discharge of record by bond or otherwise any mechanic's, materialman's, or similar lien filed against the Sublease Premises or the Building for work or materials claimed to have been furnished to or for the benefit of Subtenant and/or the Sublease Premises.

Section 3.04 Completion of Sublease Premises

A.     Subtenant, at Subtenant's sole cost and expense, shall complete the Subtenant Improvements in all respects in substantial accordance with the Subtenant Improvement Construction Documents.   The Subtenant Improvements shall be deemed substantially completed after Subtenant shall have delivered to Sublandlord all of the following items:

a.     Evidence satisfactory to Sublandlord that all of the Subtenant Improvements have been paid for in full, that any and all liens therefor that have been or might be filed have been discharged of record (by payment, bond, order of a court of competent jurisdiction or otherwise) or waived, and that no security interests relating thereto are outstanding.

b.     A temporary or permanent certificate of occupancy (if required by applicable law) for the Sublease Premises issued by the appropriate governmental authority which permits occupancy of the Sublease Premises.

c.     A certificate from Subtenant's Contractor or any other person or persons suitable to Landlord certifying that all work performed in the Sublease Premises is in substantial accordance with the Subtenant Improvement Construction Documents and all applicable laws, ordinances and codes.

B.     Subtenant shall, within thirty (30) days after completion of any Alterations, furnish Landlord with "as-built" Plans for such Alterations prepared on an AutoCAD Computer Assisted Drafting and Design System (or such other system or medium as Landlord may accept), using naming conventions issued by the American Institute of Architects in June, 1990 (or such other naming conventions as Prime Landlord may accept) and magnetic computer media of such record drawings and specifications translated in DXG format or another format acceptable to Prime Landlord.

## ARTICLE 4. PAYMENT OF COSTS

Section 4.01 Subtenant Responsible for Subtenant Improvement Costs

A.     Sublandlord shall have no obligation to fund any amount to or on behalf of Subtenant respecting the Subtenant Improvements or any other improvements to the Sublease Premises.

B.      Subtenant shall promptly pay for all costs and expenses relating to the Subtenant Improvements as the same become due and payable. After completion of the Subtenant Improvements and the issuance of a Certificate of Occupancy for the Sublease Premises, Subtenant shall submit to Sublandlord (i) contractor's affidavits and sworn statements evidencing the cost of the Subtenant Improvements with supporting documentation; (ii) final lien waivers with respect to work performed or materials supplied in a form approved by Sublandlord; (iii) certification from Subtenant and Subtenant's Architect to Sublandlord that the Subtenant Improvements have been completed and installed in accordance with the Subtenant Improvement Construction Documents; (iv) delivery of evidence reasonably satisfactory to Sublandlord that all of the work or materials have been installed in the Sublease Premises as required by the applicable contract documents and that the same are free and clear of all liens, title retention agreements and security interests whatsoever; and (v) delivery of evidence reasonably satisfactory to Sublandlord that all governmental requirements required to be satisfied by Subtenant in connection with the improvements to the Sublease Premises have been satisfied.

Section 4.02 Sublandlord's Costs

Subtenant shall pay to Sublandlord all reasonable fees for architects, engineers, interior designers, and other professionals and design specialists actually incurred by Sublandlord in connection with the Subtenant Improvements, up to a maximum amount of $1,000.00.

6

## EXHIBIT A-1

### Sublease Agreement between Kilpatrick and Walker

[see attached]

**EXHIBIT A**

**EXHIBIT**
*A-1*

## SUBLEASE AGREEMENT

This SUBLEASE AGREEMENT (this "**Sublease**") is made and entered into as of the 11th day of October, 2010 by and between **Kilpatrick Stockton, L.L.P.** a Georgia limited liability partnership, ("**Sublandlord**"); and **Walker & Company, LLP**, a District of Columbia limited liability partnership ("**Subtenant**") (Sublandlord and Subtenant will hereinafter be collectively referred to as the "**Parties**").

### WITNESSETH:

WHEREAS, **Garrison Associates, L.L.C.**, as landlord ("**Prime Landlord**"), and Muldoon Murphy and Aguggia LLP, as tenant ("**Tenant**"), entered into that certain Lease Agreement dated May 29, 2007, as amended (as the same may hereafter be amended, and as redacted, the "**Prime Lease**", which Prime Lease is attached hereto as **Exhibit "A"** and incorporated herein by reference); whereby Tenant leased from Prime Landlord certain premises containing, in the aggregate, approximately 22,126 rentable square feet and more particularly described in the Prime Lease (the "**Prime Lease Premises**"), in the building located at 5101 Wisconsin Avenue, N.W., Washington, D.C. (the "**Building**"); and

WHEREAS, Tenant assigned the Prime Lease to Sublandlord and Sublandlord assumed the Prime Lease;

WHEREAS, Sublandlord desires to sublease to Subtenant a portion of the Prime Lease Premises, being the entire rentable area located on the 5th floor of the Building, consisting of approximately 8,730 rentable square feet, as more particularly depicted on **Exhibit "B"** attached hereto and incorporated herein by reference (the "**Sublease Premises**"), and Subtenant desires to sublease the Sublease Premises from Sublandlord, all upon the terms and subject to the conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the premises, the mutual covenants contained herein, ten dollars ($10.00) and other good and valuable consideration, the receipt, sufficiency and adequacy of which are hereby acknowledged by all parties hereto, the Parties, intending to be legally bound, hereby covenant, acknowledge, represent and agree as follows:

1.   **DEMISE; TERM.** Sublandlord hereby subleases the Sublease Premises to Subtenant, and Subtenant hereby subleases the Sublease Premises from Sublandlord, on the terms and conditions contained herein. The term of this Sublease (the "**Sublease Term**" or the "**Term**" of this Sublease) shall commence on the date on which the last of the following has occurred:  (i) this Sublease is fully executed and delivered by the Parties; (ii) the Consent (as defined in **Section 23** hereof) has been obtained; and (iii) the date Sublandlord has delivered possession of the Sublease Premises to Subtenant (the "**Commencement Date**").  Subtenant shall not take possession of the Sublease Premises until Subtenant shall have delivered all certificates of insurance and the Security Deposit.  The Term of this Sublease shall expire on **February 27, 2015** (the "**Expiration Date**") or on such earlier date upon which the Term of this Sublease shall expire or be cancelled or terminated pursuant to any of the conditions or covenants of this Sublease or pursuant to law.  Anything contained in this Sublease to the

**EXHIBIT A**

contrary notwithstanding, in the event the Prime Lease is terminated for any reason, then this Sublease shall terminate as of the date prior thereto. Upon the occurrence of the Commencement Date, either party shall have the right to require both parties hereto to confirm the Commencement Date in writing.

2.    **RENT.**

    (a)    **Sublease Base Rent.** Subtenant agrees to pay to Sublandlord, without demand therefor and without right of set-off, abatement, credit or deduction, monthly rent for the Sublease Premises (the "**Sublease Base Rent**") commencing on the earlier of the date (i) Subtenant commences to conduct business in the Sublease Premises and (ii) December 1, 2010 (the "**Completion Date**"), further subject to the abatement of Sublease Base Rent following the Completion Date for the first eleven (11) months as described below, as follows:

| Period | Monthly Rent |
|---|---|
| Completion Date – through the end of the first Lease Year* | $22,188.75* |
| Second Lease Year | $22,741.65 |
| Third Lease Year | $23,309.10 |
| Fourth Lease Year | $23,891.10 |
| Commencement of the fifth Lease Year through 2/27/15 | $24,487.65 |

\* Sublease Base Rent shall be abated for eleven (11) consecutive months beginning on the Completion Date and ending eleven (11) months following the Completion Date.

Sublease Base Rent shall be paid to Sublandlord at the address for delivery of notices to Sublandlord as set forth herein or at such other address as Sublandlord directs by written notice to Subtenant from time to time. Sublease Base Rent shall be payable to Sublandlord in advance commencing on the Completion Date (subject to the rent abatement described above) and thereafter in advance on the first day of each month during the Sublease Term. Sublease Base Rent for any partial month shall be prorated on a per diem basis. Furthermore, if the Completion Date shall occur on any day other than the first day of a calendar month, the Sublease Base Rent for the calendar month in which the Completion Date occurs shall be pro-rated based upon the actual number of days in such calendar month.

    (b)    Reference is made to the Prime Lease for the definitions of "Operating Costs" and "Real Estate Taxes". Commencing with the beginning of the second Lease Year, Subtenant shall pay to Sublandlord, in addition to Sublease Base Rent, (i) 14.12% of the amount by which all Operating Costs for each calendar year exceeds the amount of all Operating Costs attributable to the calendar year 2010, and (ii) 14.12% of the amount by which all Real Estate Taxes for each D.C. fiscal tax year exceeds the amount of Real Estate Taxes attributable to the D.C. fiscal tax year ending September 30, 2010

2

(individually, and collectively referred to herein as the "Sublease Base Year"), adjusted, if necessary, to reflect a ninety-five percent (95%) occupied Building. The determination of Operating Expenses and Real Estate Taxes by Prime Landlord shall be conclusive upon Subtenant. Commencing with the beginning of the second Lease Year, Subtenant shall make monthly payments to Sublandlord on account of estimated increases in Operating Costs and Real Estate Taxes for each calendar year. Sublandlord shall submit to Subtenant an estimate as soon as practicable after Sublandlord's receipt of Prime Landlord's estimate thereof after the end of each calendar year. Following the receipt of each such estimate, Subtenant shall pay to Sublandlord, monthly, on the first day of each month through and including the month in which Subtenant receives Sublandlord's next such estimate, an amount equal to one-twelfth (1/12th) of Subtenant's share of estimated increases in Operating Costs and Real Estate Taxes. If Subtenant's total payments on account of estimated increases in Operating Costs and Real Estate Taxes made through December of the immediately preceding calendar year exceed the amount of the increase actually due for that calendar year, Sublandlord shall credit the difference against the next installment of Sublease Additional Rent due from Subtenant. If, on the other hand, such payments were less than the amount of the increase actually due, Subtenant shall pay the difference to Sublandlord with its next installment of Base Sublease Rent due (but no sooner than thirty (30) days). Subtenant's liability for Subtenant's share of increases in Operating Costs and Real Estate Taxes for the last calendar year of the Sublease Term of this Sublease shall survive the expiration of this Sublease. Similarly, Sublandlord's obligation to refund to Subtenant the excess, if any, of the amount of Subtenant's payment on account of estimated increases for such last calendar year over Subtenant's actual liability therefor shall survive the expiration of the Sublease Term. Sublandlord may at any time or from time to time, but not more than once per year, furnish to Subtenant a revised estimate for any calendar year and in such case Subtenant's payments on account of estimated increases for such calendar year shall be adjusted accordingly.

(c) **Other Payments.** Other than Base Annual Rent (as defined in the Prime Lease) and Tenant's Share of Operating Costs and Tenant's Share of Real Estate Taxes (as such terms are defined in the Prime Lease), unless otherwise provided in this Sublease, Subtenant agrees to pay to Sublandlord all payments for which Sublandlord shall become responsible to Prime Landlord under the Prime Lease attributable to the Sublease Premises accruing during the Sublease Term, Subtenant's use or occupancy of the Sublease Premises, or by reason of any act or omission of Subtenant or Subtenant Parties, including, without limitation, any payments accruing as a result of (i) any increases in insurance premiums resulting from any act or omission of Subtenant, (ii) any sums payable on account of Subtenant's use of extra heating, ventilation or air conditioning; and (iii) any sums payable on account of any services requested by and provided to Subtenant.

(d) **Parking.** Sublandlord shall assign to Subtenant seventeen (17) garage parking spaces and four (4) surface parking spaces. Subtenant shall pay Sublandlord the cost thereof at the rate charged to Sublandlord, such payments to be made on the same dates as Sublease Base Rent.

3

**EXHIBIT A**

(e)  **Net Rent.**  All sums due under this **Section 2**, including, without limitation, Sublease Base Rent, shall be payable without offset, reduction or abatement for any cause except as otherwise specifically provided in this Sublease.  For purposes of this Sublease, all sums due under this Section or under any other provision of this Sublease, other than Sublease Base Rent, shall be collectively referred to herein as "**Sublease Additional Rent**", and all Sublease Base Rent and Sublease Additional Rent shall be collectively referred to herein as "**Rent**".  Sublease Additional Rent shall be due on demand unless otherwise specifically provided herein.

(f)  **Lease Year.**  As used herein, **Lease Year** shall mean: **(i)** if the Completion Date is the **first (1st)** day of a calendar month, the **twelve (12) calendar month** period commencing on the Completion Date and ending on the day immediately preceding the **first (1st)** anniversary of the Completion Date, and each succeeding such **twelve (12) calendar month** period during the Sublease Term; and **(ii)** if the Completion Date is a day other than the **first (1st)** day of a calendar month, the **twelve (12) calendar month** period commencing on the **first (1st)** day of the **first (1st)** calendar month following the Completion Date and ending on the day immediately preceding the **first (1st)** anniversary of such date, and each succeeding such **twelve (12) calendar month** period during the Sublease Term; **provided, however**, that the first Lease Year shall include the period from the Commencement Date until the Completion Date, and if the Completion Date is a day other than the **first (1st) day** of a calendar month, the first Lease Year shall also include the period from the Completion Date through the last day of the calendar month during which the Completion Date occurs.

3.  **INSURANCE.**  Subtenant shall carry, at its sole cost and expense, (a) commercial general liability insurance, on an occurrence form, including premises operations, products/completed operations, hazard and contractual coverage, and coverage for all of Subtenant's indemnity obligations under this Sublease, with limits of no less than $3,000,000 per occurrence and $3,000,000 general aggregate, (b) fire and extended coverage property insurance in an amount equal to the full replacement value of the contents of the Sublease Premises, including without limitation, all leasehold improvements, the Furniture and Fixtures (as hereinafter defined) and all of the personal property, and removable trade fixtures located in the Sublease Premises, and (c) such insurance as set forth in the Prime Lease and as required by the Prime Landlord.  All insurance required under this Sublease shall be written by a carrier licensed to write insurance in the District of Columbia with a Best's rating of A- IX or better and otherwise reasonably acceptable to Sublandlord, and such insurance shall show Sublandlord and Prime Landlord together with any other party as Sublandlord shall require as additional insureds, as their interests may appear.  Additionally, Subtenant, at its sole cost and expense, shall carry workers' compensation insurance with liability limits required by the laws of the District of Columbia and such other insurance as may be required by "Law" (as hereinafter defined).  All policies required of Subtenant hereunder shall be primary and shall contain a provision whereby the same cannot be canceled, terminated, reduced or materially changed unless Sublandlord and Prime Landlord are given at least thirty (30) days' prior written notice.  Subtenant covenants to deliver to Sublandlord copies of all policies required of Subtenant hereunder and/or certificates evidencing such coverage.  Subtenant acknowledges and agrees that it is solely responsible for any damage to its personal property from any cause whatsoever, and Subtenant waives and releases any and all rights it may have against Sublandlord and Prime Landlord for such damage.

4

4.     **ASSIGNMENT; SUBLETTING.**   Subtenant will not sublet the Sublease Premises, or any portion thereof, or assign this Sublease in whole or in part, for collateral purposes or otherwise, or permit use or occupancy of the Sublease Premises, or any portion thereof, by others without the prior written consent of Sublandlord in each instance being first obtained, which consent shall not be unreasonably withheld, conditioned or delayed.   In the event Sublandlord shall consent to any specific assignment, subletting or occupancy, such consent shall not be construed as relieving Subtenant from any liability under this Sublease or from responsibility for obtaining Sublandlord's prior written consent to any further assignment, subletting or occupancy.   With respect to the allocable portion of the Sublease Premises sublet, (i) in the event all of the Sublease Premises is sublet, Subtenant shall pay to Sublandlord **seventy five percent (75%)** of the Excess (as hereinafter defined) within ten (10) days of receipt of the same, and (ii) in the event less than all of the Sublease Premises is sublet, Subtenant shall pay to Sublandlord **fifty percent (50%)** of the Excess within ten (10) days of receipt of the same, and such amount shall be deemed a component of Rent under this Sublease.   With respect to any assignment of this Sublease, Subtenant shall pay to Sublandlord, within ten (10) days of receipt of the same, **fifty percent (50%)** of the Excess.   For purposes hereof, the "**Excess**" shall mean the gross revenue received by Subtenant from the assignee or sublessee, less (a) the Rent paid to Sublandlord by Subtenant with respect to the subleased space during the period of the sublease term or attributable to the period from and after the effective date of the assignment, (b) any improvement allowance or other economic concession (planning allowance, moving expenses, etc.) actually paid or provided by Subtenant to the sublessee or assignee, and (c) reasonable brokerage commissions and legal fees and any fees to Prime Landlord or Sublandlord actually paid in connection with such sublease or assignment.   Subtenant shall not mortgage, convey, encumber or hypothecate its interest under this Sublease.

5.     **CONDITION    OF    SUBLEASE    PREMISES.**      SUBTENANT ACKNOWLEDGES THAT IT HAS FULLY INSPECTED THE SUBLEASE PREMISES AND THE FURNITURE AND FIXTURES, IS SATISFIED WITH THE CONDITION THEREOF AND IS TAKING THE SUBLEASE PREMISES IN AN "AS-IS" AND "WHERE-IS" CONDITION, "WITH ALL FAULTS," AND SUBLANDLORD MAKES NO REPRESENTATIONS OR WARRANTIES (EITHER EXPRESS OR IMPLIED) OF HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND SUBLANDLORD EXPRESSLY DISCLAIMS THE SAME. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, NEITHER SUBLANDLORD NOR ANY EMPLOYEE, AGENT OR REPRESENTATIVE OF SUBLANDLORD HAS MADE ANY PROMISE TO ALTER, REMODEL OR IMPROVE THE SUBLEASE PREMISES OR THE FURNITURE AND FIXTURES, OR ANY PORTION THEREOF OR ANY REPRESENTATION (EITHER EXPRESS OR IMPLIED) RESPECTING THE CONDITION OF THE SUBLEASE PREMISES OR THE FURNITURE AND FIXTURES. SUBTENANT'S TAKING OF POSSESSION OF THE SUBLEASE PREMISES AND THE FURNITURE AND FIXTURES SHALL CONSTITUTE AN UNCONDITIONAL ACCEPTANCE BY IT OF THE CONDITION THEREOF AS SUITABLE FOR THE PURPOSES INTENDED. SUBTENANT SPECIFICALLY ACKNOWLEDGES AND AGREES THAT IT HEREBY WAIVES, RELEASES AND DISCHARGES ANY CLAIM IT HAS, MIGHT HAVE HAD OR MAY HAVE AGAINST SUBLANDLORD WITH RESPECT TO THE CONDITION OF THE SUBLEASE PREMISES AND THE FURNITURE AND FIXTURES, EITHER PATENT OR LATENT.    NOTWITHSTANDING ANYTHING IN THE FOREGOING TO THE

5

**EXHIBIT A**

CONTRARY, SUBLANDLORD, AT SUBLANDLORD'S SOLE COST, SHALL ENCLOSE THE EXISTING INTERNAL STAIRWAY CONNECTING THE FOURTH AND FIFTH FLOORS IN A CODE COMPLIANT MANNER. IF SUCH ENCLOSURE OF THE INTERNAL STAIRWAY RESULTS IN ANY CHANGE IN THE RENTABLE AREA OF THE SUBLEASE PREMISES (AS DETERMINED PURSUANT TO THE STANDARD METHOD FOR MEASURING FLOOR AREA IN OFFICE BUILDINGS, ANSI/BOMA Z65.1 1996), ALL ECONOMIC TERMS OF THIS SUBLEASE SHALL BE PROPORTIONATELY ADJUSTED.

6. **PERMITTED USE OF SUBLEASE PREMISES; COMPLIANCE WITH LAWS.** Subtenant covenants and agrees that it shall use the Sublease Premises only for general office purposes. Subtenant shall not use the Sublease Premises for any other purpose except as expressly provided in this Section without first obtaining the prior written consent of Sublandlord, which consent may be withheld in Sublandlord's sole and absolute discretion. Anything contained in this Section to the contrary notwithstanding, Subtenant shall, at all times and at Subtenant's sole cost and expense, (a) use the Sublease Premises and cause the same (including compliance by all employees, agents, servants, licensees, invitees, contractors, representatives and others acting on Subtenant's behalf (collectively, the **"Subtenant Parties"**)) to be in full and strict compliance with all applicable federal, state, local, city, county, administrative and other laws, ordinances, codes, rules, regulations and orders, whether present or future, foreseen or unforeseen, including, without limitation, all judicial and regulatory interpretations of the same and the requirements of any Board of Fire Underwriters (collectively, **"Laws"**), provided that Subtenant shall not be responsible for any structural alterations unless the need therefor arises out of Alterations or Subtenant's particular use of the Sublease Premises, (b) not engage in any activities on the Sublease Premises or act in any way which may be considered to be ultra-hazardous or extra-hazardous or which would violate any Laws, and (c) install (to the extent there are none or insufficient numbers thereof) and maintain in good and working order throughout the Sublease Premises fire extinguishers in such number and in such locations as may be required by Laws or as may be reasonably required by Prime Landlord (except to the extent the Prime Lease requires Prime Landlord to install and maintain same) in order to minimize the risk of fire resulting from Subtenant's use of the Sublease Premises.

7. **ALTERATIONS.**

(a)     Subtenant shall not make any alterations or improvements to the Sublease Premises (**"Alterations"**) unless Subtenant shall have first obtained the prior written consent of Sublandlord (not to be unreasonably withheld, delayed or conditioned) and Prime Landlord. Alterations shall be made in accordance with and subject to the provisions of the Work Letter attached hereto as **Exhibit "D"**. Alterations may be made only at Subtenant's expense, by contractors or subcontractors approved by Prime Landlord, and only after Subtenant has obtained all necessary permits from governmental authorities having jurisdiction and has furnished copies of the permits to Sublandlord. All Alterations which affect or in any way relate to the mechanical, electrical, plumbing, heating, air conditioning, or structural systems of the Building shall be done only by Prime Landlord or Prime Landlord's contractor or agent at Subtenant's expense (unless Prime Landlord agrees that Subtenant may use another contractor). Any Alterations permitted under this Sublease shall be made by Subtenant in a good, workmanlike and

6

**EXHIBIT A**

lien-free manner using new materials, and, upon completion, such Alterations shall remain a part of the Sublease Premises and be surrendered along with the rest of the Sublease Premises at the expiration or earlier termination of the Term of this Sublease, all without any compensation to Subtenant therefor. Notwithstanding the foregoing to the contrary, prior to the Expiration Date, or upon any earlier termination of this Sublease, Subtenant, at the request of Prime Landlord (but only to the extent Prime Landlord is entitled to impose such requirement pursuant to the Prime Lease), shall remove all Alterations, repair all damage resulting from such removal and, if so required by Prime Landlord (but only to the extent Prime Landlord is entitled to impose such requirement pursuant to the Prime Lease), restore the Sublease Premises to the condition as of the date possession was delivered to Subtenant. If Subtenant fails or refuses to remove such Alterations, or fails to correct, repair and restore the Sublease Premises, Prime Landlord or Sublandlord may cause the same to be removed, and repairs and restoration to be made, in which event Subtenant shall reimburse to the party who caused said Alterations to be removed and repairs made, the cost of such removal, repairs and restoration, together with any and all damages which Prime Landlord or Sublandlord may suffer and sustain by reason of Subtenant's failure or refusal to remove said Alterations. In no event, however, shall Subtenant be obligated to remove any data/telecom cabling from the Sublease Premises.

(b)   Should the walls surrounding the internal stairwell be required to be removed at the expiration of the Prime Lease by Prime Landlord, Sublandlord shall be liable for the cost thereof, notwithstanding the foregoing to the contrary.

(c)   Subject to any required consent of Prime Landlord, Sublandlord grants to Subtenant the right to listings identifying Subtenant and up to three (3) of Subtenant's principals on the building directory at Sublandlord's cost.

## 8.   SECURITY DEPOSIT.

(a)   Contemporaneously with Subtenant's execution of this Sublease, Subtenant shall pay to Sublandlord the sum of **Forty-Four Thousand Three Hundred Seventy-Seven and 50/100 Dollars ($44,377.50)** as security for the prompt, full and faithful performance by Subtenant of the terms and provisions hereof (the **"Security Deposit"**). Upon the occurrence of a default or event of default by Subtenant hereunder, Sublandlord shall have the right (in addition to any other remedy Sublandlord may have as a result thereof), but not the obligation, to apply all or any portion of the Security Deposit against the obligations of Subtenant due hereunder, but without such application being deemed to be a cure of Subtenant's default, in which event Subtenant shall immediately pay to Sublandlord any amount necessary to restore the Security Deposit to the original amount thereof. In the event Subtenant has fully performed all of Subtenant's obligations hereunder, Sublandlord shall return the Security Deposit (or the remaining portion thereof) to Subtenant, without interest, within thirty (30) days after the expiration of the Sublease Term. Sublandlord may commingle the Security Deposit with its general funds, and the Security Deposit shall not be considered trust funds.

(b)     Notwithstanding anything to the contrary in the paragraph above, the Security Deposit may be in the form of a letter of credit in accordance with the terms hereof. Such letter of credit shall be an unconditional, clean, irrevocable standby letter of credit, in a form acceptable to Sublandlord, and issued by a bank reasonably acceptable to Sublandlord (the "**Letter of Credit**"). If the Security Deposit is not initially paid in cash pursuant to Section 8(a) above, the Letter of Credit shall be delivered to Sublandlord with executed copies of this Sublease. If Subtenant initially delivers to Sublandlord a cash Security Deposit in accordance with Section 8(a), Subtenant may thereafter substitute the Letter of Credit for the cash Security Deposit at any time that Subtenant is not in default under this Sublease. The Letter of Credit shall (i) be unconditional, irrevocable, transferable, payable to Sublandlord upon presentment of original to the issuer in person or by courier, in partial or full draws, and (ii) contain an "evergreen" provision which provides that it is automatically renewed on an annual basis (subject to the permitted date of termination set forth below) unless the issuer delivers thirty (30) days' prior written notice of cancellation to Sublandlord and Subtenant. Without limiting any of Sublandlord's rights or remedies hereunder, if the bank issuing the Letter of Credit provides Sublandlord with a cancellation notice, Sublandlord may immediately draw upon all or any part of the Letter of Credit and hold the proceeds thereof as a cash Security Deposit. Any and all fees or costs charged by the issuer in connection with the Letter of Credit shall be paid by Subtenant. The irrevocable stand-by Letter of Credit shall remain effective through the date that is sixty (60) days following the expiration date this Sublease. If Subtenant defaults with respect to any provision of this Sublease beyond applicable notice and cure periods, including but not limited to the provisions relating to the payment of Rent, Sublandlord may draw upon all or any part of Subtenant's Letter of Credit. If any portion of the Security Deposit is so used, applied, or retained, Subtenant will, within ten (10) days after written demand from Sublandlord, provide to Sublandlord an additional irrevocable, stand-by letter of credit, which shall be in form and substance satisfactory to Sublandlord, issued by a bank reasonably acceptable to Sublandlord, in an amount sufficient to restore the Security Deposit to its required amount pursuant to this Section. Subtenant's failure to replenish the Security Deposit shall constitute a failure to pay Rent.

9.     **REPAIRS AND MAINTENANCE.**   Subtenant, during the Term of this Sublease, shall, at its sole cost and expense, make all repairs and maintenance as shall be necessary to keep the Sublease Premises in good condition, working order and repair, normal wear, loss by fire or other casualty not caused by Subtenant or the Subtenant Parties, and condemnation excepted. Subtenant further agrees that all damage or injury of whatever nature done to the Sublease Premises by the Subtenant, the Subtenant Parties or by any other person in or upon the Subtenant Premises shall be repaired by Subtenant at its sole cost and expense.

10.     **INDEMNIFICATION.**   Subtenant hereby indemnifies and agrees to defend and hold Sublandlord harmless from and against any and all costs, claims, actions, damages, demands, expenses (including, without limitation, reasonable attorneys' and consultants' fees), injuries, judgments, settlements, liabilities, penalties, losses and suits (individually and collectively, "**Losses**"), suffered, sustained or incurred by Sublandlord, its employees, officers, directors, agents, or representatives in connection with, or as a result of, any accident, act or omission, claim, hazard, injury, violation of any environmental, health, fire, zoning, building or

8

safety codes or Laws, death or damage to person or property arising, directly or indirectly, in whole or in part, from any act or omission of Subtenant or any Subtenant Party, or the breach or default by Subtenant or any Subtenant Party of any term, provision, covenant, or condition contained in the Prime Lease or this Sublease, or from the use by Subtenant or any of the Subtenant Parties of the Sublease Premises, whether or not in compliance with the terms of this Sublease. The scope of this indemnification shall, at Sublandlord's option, include, but not be limited to, defending or resisting, with attorneys reasonably satisfactory to Sublandlord, any action, suit, claim, demand or proceeding that may be filed, instituted or brought against Sublandlord or to which Sublandlord may be made a party. The indemnification obligations contained in this Section are in addition to and not in lieu of the indemnification obligations which Subtenant incurs by virtue of the Prime Lease as set forth in **Section 12, infra**.

11.    **WAIVER OF CLAIMS.**  Sublandlord, its employees, agents or servants shall not be liable to Subtenant, the Subtenant Parties or to any other person for any damage (including consequential damage) to, injury to, loss of, compensation for or claim with respect to property, including but not limited to, claims for the interruption of or loss to Subtenant's business, based on, arising out of or resulting from any cause whatsoever (except as otherwise provided in this **paragraph 11**), including but not limited to the following:  repairs to any portion of the Sublease Premises; interruption in the use of the Sublease Premises or any equipment therein; any accident or damage resulting from the use or operation (by Sublandlord, Subtenant or any other person or entity) of elevators, or of the heating, cooling, electrical, sewerage, or plumbing equipment or apparatus; the termination of this Sublease by reason of the destruction of the Sublease Premises or the Building; any fire, robbery, theft, vandalism, mysterious disappearance and/or any other casualty; the actions of any other tenants of the Building or of any other person or entity; and any leakage in any part or portion of the Sublease Premises or the Building, or from water, rain, ice or snow that may leak into, or flow from, any part of the Sublease Premises or the Building, or from drains, pipes or plumbing fixtures in the Building. Any goods, property or personal effects stored or placed by Subtenant, its employees or agents in or about the Sublease Premises shall be at the sole risk of Subtenant, and Sublandlord shall not in any manner be held responsible therefor. Inasmuch as the aforesaid waiver will preclude the assignment of any such claim by way of subrogation or otherwise to an insurance company or any other person, Subtenant agrees to give each insurance company which has issued fire and extended coverage or other property coverage, written notice of the terms of said waiver immediately and shall have said insurance policies properly endorsed with a waiver of subrogation. Evidence of said waiver shall be forwarded to Sublandlord within **thirty (30) days** after the execution of this Sublease.

12.    **SUBJECT TO THE PRIME LEASE.**

(a)    This Sublease, at all times, shall be subject and subordinate to the terms and conditions of the Prime Lease and all matters to which it is subject or subordinate.

(b)    All the obligations imposed by the Prime Lease upon Sublandlord, as tenant under the Prime Lease, are hereby imposed upon Subtenant and accepted and assumed by Subtenant with respect to the Sublease Premises, except as otherwise expressly set forth in this Sublease.  Subtenant shall, with respect to the Sublease Premises, duly, fully and strictly keep, observe and perform each and every term and

9

US2000 11875341.3

covenant on Sublandlord's part to be observed and performed as tenant under the Prime Lease, except as such terms and covenants are redacted from the Prime Lease attached hereto or expressly by reference thereto herein modified by the terms of this Sublease. Anything to the contrary contained herein notwithstanding, Subtenant shall not, except for the payment of rent to Prime Landlord under the Prime Lease, (i) take any action or fail to take any action which is or would be inconsistent with the terms of the Prime Lease, (ii) do or permit to be done by any of the Subtenant Parties anything prohibited to Sublandlord as the tenant under the Prime Lease, or which would constitute, with or without the giving of notice or the passage of time or both, a default under the Prime Lease, or (iii) take any action, fail to take any action or do or permit anything which would result in any additional cost or liability to Sublandlord under the Prime Lease. With respect to any provision of the Prime Lease that provides for an abatement of rent under certain circumstances during the Sublease Term, Subtenant shall not be entitled to any rent abatement thereunder unless Sublandlord actually receives a rent abatement under the Prime Lease with respect to the Sublease Premises. If Prime Landlord is released from liability to Sublandlord for any actions or omissions of Prime Landlord or for any causes whatsoever, then Sublandlord shall not be liable to Subtenant for such actions or omissions and causes. Any inconsistency between the Prime Lease and this Sublease which relates to obligations of, or restrictions on, Subtenant shall be resolved in favor of that obligation which is more onerous to Subtenant or that restriction which is more restrictive of Subtenant, as the case may be.

(c)     Sublandlord shall not be obligated to perform and shall not be liable for the performance by Prime Landlord of any of the obligations of the Prime Landlord under the Prime Lease. Without limiting the generality of the foregoing, Sublandlord shall have no obligation to render any services to Subtenant in or to the Sublease Premises, to construct any improvements or make any alterations on the Sublease Premises, nor shall Sublandlord have any obligation to repair or restore the Sublease Premises following a casualty or condemnation. Sublandlord shall not be liable with respect to any representations or warranties of Prime Landlord contained in the Prime Lease. Subtenant shall have no claim against Sublandlord by reason of any default on the part of Prime Landlord, and Subtenant hereby waives and relinquishes any and all such claims Subtenant might have, whether known or unknown, matured or contingent, foreseeable or unforeseeable. In furtherance of the foregoing, Subtenant shall not make any claim against Sublandlord for any damages which may arise by reason of any act or omission, whether intentional or negligent, of Prime Landlord. Nothing herein contained shall be deemed to authorize Subtenant to represent Sublandlord in connection with any suit or claim by or against Prime Landlord. Subtenant agrees to look solely to Prime Landlord for the furnishing of any services to which Subtenant may be entitled under the Prime Lease. Provided Subtenant is not in default under this Sublease, Sublandlord agrees to cooperate with Subtenant and to use reasonable efforts (without, however, incurring any liabilities or expenses) to enforce, for the benefit of Subtenant, the obligations of Prime Landlord to Sublandlord under the Prime Lease insofar as they relate to the Sublease Premises. Any and all out-of-pocket expenses of Sublandlord arising from Sublandlord's action taken pursuant to this **Section 12(c)** shall be reimbursed by Subtenant as Sublease Additional Rent, which shall be due within **ten (10) days** after receipt of written demand

therefor in reasonable detail. The foregoing shall not be deemed to require that Sublandlord commence legal action to enforce the obligations of Prime Landlord.

(d)     The provisions of the Prime Lease redacted on the copy of the Prime Lease attached hereto shall not apply to Subtenant and shall not be incorporated into this Sublease. In addition, the terms of this Sublease shall not include the discretionary elections and consents provided to Sublandlord, as tenant, under the Prime Lease. The right to make all such elections and provide all such consents shall be reserved solely to Sublandlord, and Sublandlord shall in no event be liable to Subtenant for any loss or damage occasioned by or resulting from any elections made or not made or consents given or not given by Sublandlord, as tenant, under the Prime Lease. In the event of any inconsistency between the terms and provisions of this **Section 12(d)** and the other terms and provisions of this Sublease, the terms and provisions of this **Section 12(d)** shall control.

(e)     Sublandlord represents and warrants that the Lease is currently in force and effect, and that Sublandlord has not received within the twelve (12) month period prior to the date of this Sublease written notice from Prime Landlord alleging any breach or default by Sublandlord under the Prime Lease. Provided Subtenant is not in default of this Sublease beyond any applicable notice or cure period, during the Term of this Sublease, Sublandlord shall not (i) do anything that results in a default under the Prime Lease; (ii) agree to any voluntary termination of the Prime Lease (except by reason of casualty damage or condemnation or any matter under the Prime Lease that gives Sublandlord the right to terminate the Prime Lease); or (iii) modify, amend or otherwise change any of the terms and conditions of the Prime Lease which would have a material and adverse effect on Subtenant or the Sublease Premises or Subtenant's intended use of the Sublease Premises.

13.     **CONSENT OF SUBLANDLORD.**  Whenever the consent of Sublandlord is required under this Sublease, such consent may not be unreasonably withheld, except to the extent otherwise provided herein. Anything contained herein to the contrary notwithstanding, in any case where this Sublease or the Prime Lease requires Subtenant to obtain the consent or approval of Sublandlord, whether prior to the taking of any action or otherwise, Subtenant shall, in addition to obtaining the consent or approval of Sublandlord, obtain (at the time required) the consent or approval of Prime Landlord, if such consent or approval is required by the Prime Lease. In the event that Prime Landlord's consent or approval is so required, Subtenant shall not contact Prime Landlord directly, but Subtenant shall instead deliver a written request to Sublandlord to obtain the consent or approval of Prime Landlord. Sublandlord shall promptly transmit to Prime Landlord Subtenant's request for such consent or approval. Subtenant shall keep Sublandlord apprised of any communications between Prime Landlord and Subtenant. To the extent the Prime Landlord withholds its consent or fails to respond to any request for consent, then Sublandlord may withhold its consent to the matter, and such withholding of consent by Sublandlord shall be conclusively presumed to have been reasonable, and Subtenant shall have no claim or cause of action against Sublandlord on account thereof.

14.     **DEFAULT.**  If Subtenant shall default in the fulfillment of any of its covenants and agreements set forth herein or under the Prime Lease (without the benefit of any applicable

11

**EXHIBIT A**

notice and/or cure periods provided under the Prime Lease, provided that if any applicable notice and/or cure period is provided to Sublandlord under the Prime Lease, then Subtenant shall be entitled to the same notice and/or cure period as provided in the Prime Lease less two (2) Business Days), Sublandlord shall have the same rights and remedies with respect to such default as provided to Prime Landlord under the Prime Lease in addition to those rights available to Sublandlord at law or in equity. Notwithstanding the foregoing, and not in limitation thereof, Sublandlord shall also have the right at any time, but shall not be obligated, to cure any breach or default of Subtenant under this Sublease, or in the Prime Lease, and any and all costs incurred by Sublandlord in connection with the curing of any such breach or default shall become immediately due and payable to Sublandlord as Sublease Additional Rent.

15.    **LATE FEES AND INTEREST.**  To the extent that any Rent due hereunder is not paid when due, Subtenant shall pay Sublandlord (a) the late fee set forth in the Prime Lease for past due amounts and (b) interest on the past due amount at the lesser of the interest rate set forth in the Prime Lease for late payments or the highest non-usurious amount permitted by Law from the first day the same becomes past due through the date the same is paid in full together with interest thereon as required hereby. Any payment default shall not be deemed to have been cured unless and until all accrued and unpaid interest due thereon is paid in full together with all outstanding amounts due hereunder.

16.    **NON-WAIVER.**  Failure of Sublandlord or Subtenant to declare any default immediately upon occurrence thereof, or any delay in taking any action in connection therewith, shall not waive such action in law or in equity. No waiver by Sublandlord or Subtenant of a default by the other shall be implied, and no express waiver by Sublandlord or Subtenant shall affect any such default other than the default specified in such waiver and then only for the time and extension therein stated. No payment by Subtenant or receipt by Sublandlord of a lesser amount than the correct amount or manner of payment of rental due hereunder shall be deemed to be other than a payment on account, nor shall any endorsement or statement on any check or any letter accompanying any check or payment be deemed to effect or evidence an accord and satisfaction, and Sublandlord may accept any checks or payments as made without prejudice to Sublandlord's right to recover the balance or pursue any other remedy in this Sublease or otherwise provided at law or equity.

17.    **SURRENDER; HOLD OVER.**

(a)     Upon expiration of the Sublease Term, or if, at any time prior to expiration of the Sublease Term, this Sublease shall be terminated, Subtenant shall immediately quit and surrender up to Sublandlord possession of the Sublease Premises in broom-clean condition and in good and working order and repair, ordinary wear and tear excepted, and Subtenant shall remove all of its property therefrom. To the extent Subtenant fails to remove all of its property from the Sublease Premises on or before the expiration or earlier termination of the Sublease Term, then such of its property remaining thereon thereafter shall be conclusively deemed to have been abandoned by Subtenant, and Sublandlord, thereafter, may dispose of the same in such manner as Sublandlord deems desirable, and Subtenant shall not be entitled to any proceeds from such disposal, but Subtenant shall be obligated to reimburse Sublandlord, as Sublease Additional Rent, for the actual costs incurred in removing and disposing of such abandoned property within

12

**EXHIBIT A**

ten (10) days after receipt of written demand therefor. Subtenant's obligation to observe and perform the covenants set forth in this Section shall survive the expiration or termination of this Sublease. IN NO EVENT SHALL SUBTENANT REMOVE ANY OF PRIME LANDLORD'S PERSONALTY.

(b)     Should Subtenant hold over after the termination of this Sublease, Subtenant shall become a tenant at sufferance and shall be bound by each and all of the terms herein provided as may be applicable to such tenancy at sufferance. Any such holding over shall not constitute an extension of this Sublease by Law or otherwise. Subtenant shall indemnify and hold harmless Sublandlord for all costs, expenses and liabilities in connection with such hold over, including, without limitation, reasonable attorneys' fees and disbursements, any damages incurred by Sublandlord arising directly or indirectly out of such hold over, including without limitation, any damages for which Sublandlord is liable to Prime Landlord for the failure of Sublandlord to deliver possession of the Prime Lease Premises to Prime Landlord as required by the Prime Lease.

18.     **NOTICES.** All notices, requests, demands and other communications required or permitted to be given hereunder shall be by certified first-class U.S. mail with adequate postage prepaid and with return receipt requested, by hand delivery, or by overnight courier, in each case with all applicable delivery charges paid by the sender, to the Parties at the addresses set forth below or by facsimile at the numbers set forth below. Such notices shall be in writing in the English language and shall be deemed to have been received on the earlier of actual receipt or refusal to accept receipt or inability to deliver because of a change of address of which no notice has been given in accordance with this Section. The term **"Business Day"** shall mean any day which is not a Saturday, Sunday or legal holiday on which banks in Washington, D.C. are authorized or required to close. The notice addresses for the Parties are as follows:

| | |
|---|---|
| If to Sublandlord: | Kilpatrick Stockton, L.L.P. <br> 1100 Peachtree Street, Suite 2800 <br> Atlanta, Georgia 30309-4530 <br> Attn: Managing Partner <br> Facsimile No.: (404) 815-6555 |
| with a copy to: | Kilpatrick Stockton, L.L.P. <br> 1100 Peachtree Street, Suite 2800 <br> Atlanta, Georgia 30309-4530 <br> Attn: Chief Operating Officer <br> Facsimile No.: (404) 815-6555 |

13

| If to Subtenant prior to occupancy of the Sublease Premises: | Walker & Co., LLP<br>4200 Wisconsin Avenue, N.W.<br>Suite 300<br>Washington, D.C. 20016<br>Attn: President |
|---|---|
| If to Subtenant prior after occupancy of the Sublease Premises: | At the Sublease Premises<br>Attn: President |

Sublandlord shall give Subtenant prompt written notice of all written notices from Prime Landlord to Sublandlord under the Prime Lease which affects the Sublease Premises. Subtenant shall give Sublandlord prompt written notice of all written notices from Prime Landlord to Subtenant which affects the Sublease Premises or any other portion of the Prime Lease Premises.

19. **RECORDING.** Subtenant shall not record this Sublease or any memorandum or summary thereof without the prior written consent of Sublandlord, which may be withheld in Sublandlord's sole and absolute discretion.

20. **FURNITURE AND FIXTURES.** Sublandlord leases to Subtenant such furniture and fixtures presently in the Premises as are listed on **Exhibit C** annexed hereto (the "**Furniture and Fixtures**") for the Sublease Term at no additional charge. Prior to the Commencement Date, Sublandlord shall remove from the Premises all furniture and fixtures not listed on Exhibit C. The Furniture and Fixtures shall remain the property of Sublandlord, but Subtenant shall maintain and repair the Furniture and Fixtures during the Sublease Term in good condition at Subtenant's expense; however Subtenant shall have no obligation to replace any of the Furniture and Fixtures that reaches the end of its useful life during the Sublease Term. Subtenant shall re-deliver the Furniture and Fixtures to Sublandlord at the end of the Sublease Term or earlier termination of this Sublease in good condition, reasonable wear and tear excepted.

21. **MISCELLANEOUS.**

(a) This Sublease constitutes the entire agreement of the Parties relative to the subject matter hereof, and all prior negotiations, conversations, representations, agreements and understandings are specifically merged herein and superseded hereby. This Sublease may be modified only by written instrument executed by the Parties hereto. This Sublease is the result of the prior negotiations, conversations, representations, agreements and understandings of the Parties and is to be construed as the jointly prepared product of the Parties.

(b) TIME IS OF THE ESSENCE OF THIS SUBLEASE.

(c) This Sublease shall be construed in accordance with and governed by the laws of the District of Columbia without reference to its conflicts of laws.

14

(d)    The paragraph headings used in this Sublease have been inserted for convenience of reference only and should not be construed to limit or restrict the terms and provisions, covenants and conditions hereof.

(e)    If any term or provision of this Sublease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Sublease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each remaining term and provision of this Sublease shall be valid and be enforced to the fullest extent permitted by law.  To that end, each of the terms and provisions of this Sublease are hereby declared to be severable.

(f)    This Sublease and any modifications or amendments hereto shall not take effect and be binding upon Sublandlord until Sublandlord and Subtenant execute the same and obtain the consent of Prime Landlord.  Submission of this Sublease to the Subtenant shall not be (nor construed to be) an offer to sublease the Sublease Premises.

(g)    This Sublease may be executed in two or more counterparts, each of which shall be deemed an original and which together shall constitute one and the same instrument.

(h)    Sublandlord reserves the right to amend or modify the Prime Lease, in any manner that does not have a material adverse impact upon Subtenant or the use of the Sublease Premises without obtaining Subtenant's consent, and each person, upon receiving notice of such amendment or modification, shall be bound by the same in accordance with the terms of this Sublease.

(i)    Any provision to the contrary contained in this Sublease notwithstanding, Subtenant's obligations to indemnify Sublandlord hereunder shall survive the expiration of the Sublease Term or any earlier termination of this Sublease.

(j)    Each party hereto warrants and represents that such party has full and complete authority to enter into this Sublease and each person executing this Sublease on behalf of a party warrants and represents that he has been fully authorized to execute this Sublease on behalf of such party and that such party is bound by the signature of such representative.

(k)    Notwithstanding anything contained herein, this Sublease shall be deemed to be a sublease of a portion of the Prime Lease Premises and not an assignment, in whole or in part, of Sublandlord's interest in the Prime Lease.

22.    **LIMITATION OF LIABILITY**.  Subtenant acknowledges and agrees that (A) no partner or partners of Sublandlord are personally or individually liable or responsible for any of the duties, obligations, liabilities or responsibilities of Sublandlord under this Sublease; (B) neither the partners nor any individual partner of Sublandlord: (1) shall be personally liable or responsible for any of the duties, obligations, liabilities or responsibilities of Sublandlord under this Sublease or (2) shall have any duty or obligation, enforceable by or for the benefit of Subtenant, to make contributions of capital or any other contributions to Sublandlord to satisfy

15

**EXHIBIT A**

any liability of Sublandlord under this Sublease or otherwise; and (C) Subtenant shall not take any action or institute any proceedings against the partners or any partner, the estates of the partners or any partner, or the personal assets of the partners or any partner, of Sublandlord, for the enforcement or recovery of any of liability of Sublandlord under this Sublease or otherwise.

23.  **PRIME LANDLORD'S CONSENT.** This Sublease shall not be effective until Prime Landlord has given its written consent to this Sublease (the "Consent") and it is hereby acknowledged by Sublandlord and Subtenant (by their execution of this Sublease) that the giving of Prime Landlord's consent to this Sublease: (i) shall not make Prime Landlord a party to this Sublease; (ii) shall not be deemed approval of any signage, parking, alterations or other improvements, if any, to be made or given in connection with this Sublease; (iii) shall not create any right, entitlement, or benefit on the part of Subtenant from Prime Landlord; (iv) shall not create any contractual liability or duty on the part of Prime Landlord to Subtenant; and (v) shall not in any manner increase, decrease or otherwise affect the rights and obligations of Prime Landlord and Sublandlord, as the tenant under the Prime Lease, in respect of the Sublease Premises. If Prime Landlord does not provide its written consent of this Sublease within thirty (30) days after the date of Prime Landlord's receipt of a written request therefor, or within thirty seven (37) days after the date of this Sublease, whichever is earlier, then this Sublease shall automatically terminate and be of no force or effect, neither Sublandlord nor Subtenant shall have any further obligations or liability hereunder or to each other with respect to the Sublease Premises and Sublandlord will return any Rent and Security Deposits paid to Sublandlord.

24.  **BROKER.** Each party hereto covenants, warrants and represents to the other party that it has had no dealings, conversations or negotiations with any broker concerning the execution and delivery of this Sublease except for Studley, Inc., who has represented Sublandlord, and The Meyer Group, Ltd., who has represented Subtenant. Sublandlord shall pay the commissions to the foregoing brokers pursuant to the terms of a separate agreement. Each party hereto agrees to defend, indemnify and hold harmless the other party against and from any claims for any brokerage commissions and all costs, expenses and liabilities in connection therewith, including, without limitation, reasonable attorneys' fees and disbursements, arising out of its respective representations and warranties contained in this Section being untrue. The provisions of this Section shall survive the expiration or earlier termination of this Sublease.

25.  **ESTOPPEL CERTIFICATE.** Subtenant shall, without charge, at any time, and from time to time, within five (5) Business Days after receipt of written request by Sublandlord, execute, acknowledge and deliver to Sublandlord a written estoppel certificate certifying to Prime Landlord, Sublandlord, any mortgagee, ground lessor, assignee of a mortgagee or ground lessor, or any purchaser of the Building or any other person designated by Sublandlord, as of the date of such estoppel certificate, the following: (i) whether or not Subtenant is in possession of the Sublease Premises; (ii) whether or not this Sublease is unmodified and in full force and effect (or if there has been a modification, that this Sublease is in full force and effect as modified and setting forth such modification); (iii) whether or not there are then existing any set-offs or defenses against the enforcement of any right hereunder (and, if so specifying the same in detail); (iv) the dates, if any, to which rent or other charges have been paid in advance; (v) that Subtenant has no knowledge of any then uncured defaults on the part of Sublandlord of Sublandlord's obligations under this Sublease or of Prime Landlord or Prime Landlord's obligations under the Lease (or if Subtenant has knowledge of any such uncured defaults, specifying the same in

16

**EXHIBIT A**

detail); (vi) that Subtenant has no knowledge of any event having occurred that authorizes the termination of this Sublease by Sublandlord (or if Subtenant has such knowledge, specifying the same in detail); and (vii) the address to which notices to Subtenant should be sent. Any such estoppel certificate delivered pursuant to this Section may be relied upon by Prime Landlord, Sublandlord or any prospective purchaser or mortgagee of the Building or any part thereof or estate therein. Subtenant's failure or refusal to deliver such certificates within the time period aforesaid, if it continues for five (5) days following notice to Subtenant stating that the certificate was not delivered when required hereunder, shall be deemed a default for which Subtenant shall not be entitled to a further notice or cure period.

*[SIGNATURES APPEAR ON FOLLOWING PAGE]*

US2000.11875341.3

**EXHIBIT A**

        IN WITNESS WHEREOF, the Parties have executed and delivered this Sublease as of the date first set forth above.

SUBLANDLORD:

KILPATRICK STOCKTON, L.L.P., a
Georgia limited liability partnership

By: _Diane L Pavins_____
Name: _____
Title: _____

SUBTENANT:

WALKER & COMPANY, LLP, a District of
Columbia limited liability partnership

By: _RWalker_____
Name: _RONALD P. WALKER_____
Title: _MANAGING PARTNER_____

**EXHIBIT A**

EXHIBIT "A"

Prime Lease

[See Attached]

**EXHIBIT A**

EXHIBIT "B"

Sublease Premises

[See Attached Drawing, which is not to scale – measurements are approximate only]

**EXHIBIT A**

EXHIBIT "C"

Furniture and Fixtures

**EXHIBIT A**

## EXHIBIT "D"

## WORK LETTER

## ARTICLE 1 - DEFINITIONS

The following terms shall have the meanings described below. Terms not defined herein shall have the meaning given in the Sublease:

Contractor shall mean such contractor chosen by Subtenant and approved by Prime Landlord.

Construction Contract shall mean the agreement to be entered between Subtenant and Contractor for the construction of the Subtenant Improvements.

Substantial Completion or Substantially Complete shall be as described in Section 3.04 of this Work Letter.

Subtenant's Architect shall mean such architect chosen by Subtenant and approved by Prime Landlord.

Subtenant Improvements shall mean all improvements (including, without limitation, Alterations) constructed or installed in or on the Sublease Premises in accordance with the Subtenant Improvement Construction Documents.

Subtenant Improvement Costs shall mean the aggregate cost for the Subtenant Improvements.

Subtenant Improvement Construction Documents shall mean the working drawings, plans and specifications and finish schedules for the Subtenant Improvements.

Subtenant Space Plans shall mean the schematic presentation of the Sublease Premises prepared by Subtenant's Architect and consented to by Sublandlord and Prime Landlord in accordance herewith.

## ARTICLE 2. SUBTENANT SPACE PLANS AND SUBTENANT IMPROVEMENT PLANS AND SPECIFICATIONS

Section 2.01 Schedule for Preparation

Subtenant shall contract with Subtenant's Architect for the preparation of the Subtenant Space Plans and Subtenant Improvement Construction Documents for the Subtenant Improvements to be constructed in the Sublease Premises, which are subject to the consent of Sublandlord and Prime Landlord. Any approval or consent by Sublandlord and Prime Landlord of any items submitted by Subtenant or Subtenant's Architect to and/or reviewed by Sublandlord and Prime Landlord pursuant to this Work Letter shall be deemed to be strictly limited to an

acknowledgment of approval or consent by Sublandlord and Prime Landlord thereto and shall not imply or be deemed to imply any representation or warranty by Sublandlord and Prime Landlord that the design is safe or structurally sound or will comply with any legal or governmental requirements. Any deficiency, mistake or error in design, although the same has the consent or approval of Sublandlord and Prime Landlord, shall be the sole responsibility of Subtenant; and Subtenant shall be liable for all costs and expenses which may be incurred and all delays suffered in connection with or resulting from any such deficiency, mistake or error in design.

Section 2.02  Timing of Sublandlord's Review and Approval.

Wherever in this Work Letter a matter is subject to Sublandlord's reasonable consent or approval (or words of similar meaning), Sublandlord agrees to provide its consent or disapproval of such matter within seven (7) days of the full submission of same from Subtenant.

### ARTICLE 3.  CONSTRUCTION OF SUBTENANT IMPROVEMENTS

Section 3.01 Delivery of the Premises

On the later of (i) the date Sublandlord delivers possession of the Sublease Premises to Subtenant, or (ii) the date Sublandlord and Prime Landlord approve the Subtenant Space Plans and Subtenant Improvement Construction Documents for the Subtenant Improvements to be constructed in the Sublease Premises, Subtenant may commence construction of the Subtenant Improvements, subject to the terms and conditions of this Exhibit "D." Sublandlord shall deliver possession of the Sublease Premises to Subtenant promptly following satisfaction of the conditions described in Section 1 of the Sublease. Notwithstanding the foregoing, Subtenant shall not commence construction of the Subtenant Improvements until Subtenant has provided Sublandlord with evidence of the Subtenant Improvement Costs and evidence reasonably satisfactory to Sublandlord that Subtenant has the funds to pay the Subtenant Improvement Costs.

Section 3.02 Construction of Subtenant Improvements.

A.      Subtenant shall enter into a standard AIA or other form reasonably acceptable to Sublandlord, Construction Contract with Contractor to construct the Subtenant Improvements.

B.      All Subtenant Improvements shall be constructed and installed by the Contractor; provided, however, that all subcontractors shall be subject to the prior approval of Prime Landlord.

C.      Subtenant shall construct the Subtenant Improvements, at its sole cost and expense, in accordance with the Subtenant Improvement Construction Documents (and any changes thereto approved by Sublandlord and Prime Landlord) and in accordance with the following requirements:

1.      All Subtenant Improvements shall be done and installed in compliance with all applicable governmental codes, laws, ordinances, orders and regulations and

2

US2000 11875541.3

otherwise substantially in accordance with the Subtenant Improvement Construction Documents. Subtenant, and not Sublandlord nor Prime Landlord, shall be responsible for assuring that each and every aspect of the Subtenant Improvement Construction Documents comply and conform with all applicable governmental laws, codes and regulations; and approval by Sublandlord and Prime Landlord of such Subtenant Improvement Construction Documents shall not be deemed confirmation or agreement that same so comply or conform with such laws, codes or regulations or otherwise constitute a representation or warranty by Sublandlord or Prime Landlord of any kind with respect to the improvements to be constructed pursuant to the Subtenant Improvement Construction Documents, including, without limitation as to the merchantability or structural soundness of such improvements or the fitness thereof for any particular purpose.

2. In connection with construction of the Subtenant Improvements, Subtenant shall file all drawings, plans and specifications, pay all fees and obtain all permits and applications from any authorities having jurisdiction; and Subtenant shall obtain a Certificate of Occupancy and any and all other approvals required for Subtenant to use and occupy the Sublease Premises and to open for business to the public. Subtenant shall be responsible for conformance with all codes and ordinances of authorities having jurisdiction over the Subtenant Improvements.

3. The Contractor shall be required to provide, without limiting the insurance required of Subtenant pursuant to the Prime Lease and Sublease, the following types of insurance:

   (1) Liability Insurance. At all times during the period of construction of the Subtenant Improvements until completion and final acceptance thereof, the Contractor shall maintain in effect commercial general liability insurance covering all activities in or about the Sublease Premises in amounts not less than $1,000,000 per occurrence for bodily injury and for property damage, together with umbrella liability coverage in an amount not less than $2,000,000. Such liability insurance shall be on a comprehensive basis including:

      (a) Premises - Operations (including X-C-U);

      (b) Independent contractors' protection;

      (c) Products and completed operations (which must be maintained for two (2) years commencing with the issuance of the final certificate of payment);

      (d) Contractual liability;

      (e) Owned, non-owned and hired motor vehicles; and

3

**EXHIBIT A**

(f)    Broad form coverage for property damage.

Should the Contractor engage a subcontractor, the same requirement will apply under this agreement to each subcontract, consistent with the Contractor's prudent business practice.

(2)    Workers' Compensation.   At all times during the period of construction of Subtenant's Work, Subtenant's contractors and subcontractors shall maintain in effect statutory Workers' Compensation as required by the District of Columbia.

All insurance policies procured and maintained pursuant to this Section 3.03 shall name Sublandlord and Prime Landlord and any lender of Prime Landlord as additional insureds, shall be carried with companies licensed to do business in the District of Columbia reasonably satisfactory to Sublandlord and Prime Landlord and shall be non-cancellable except after thirty (30) days [ten (10) days in the case of cancellation for non-payment of premiums] written notice to Sublandlord and Prime Landlord.   Such policies or duly executed certificates of insurance with respect thereto shall be delivered to Landlord before the commencement of the Subtenant Improvements, and renewals thereof as required shall be delivered to Landlord at least thirty (30) days prior to the expiration of each respective policy term.

4.    Subtenant shall conduct its work in such a manner as to maintain harmonious labor relations, and the Contractor and subcontractors engaged by Subtenant shall employ persons and means to insure so far as may be possible that the progress of work or other work in the Building will not be stopped due to interruption on account of strikes, work stoppage or similar causes for delay.

5.    Contractors and/or subcontractors participating in the Subtenant Improvements shall be required to remove and dispose of, at no cost and expense to Sublandlord, all debris and rubbish caused by or resulting from Subtenant's work and, upon completion, to remove all temporary structures, surplus materials, debris and rubbish of whatever kind remaining on any part of the Sublease Premises or in proximity thereto which was brought in or created in the performance of the Subtenant Improvements.

6.    The Contractor shall guarantee that the work done by it and its subcontractors will be free from any defects in workmanship and materials for a period of not less than one (1) year from date of completion thereof.  This guarantee as to materials and workmanship with respect to the Subtenant Improvements shall be contained in the contract which shall provide that said guarantee shall inure to the benefit of both Sublandlord and Subtenant and shall be directly enforceable by either of them.   Subtenant covenants to give to Sublandlord any assignment or other assurance necessary to effect such right of direct enforcement.

4

D.      Subtenant is not authorized to contract for or on behalf of Sublandlord or Prime Landlord for work on or the furnishing of materials to the Sublease Premises or any other part of the Building.   Subtenant shall discharge of record by bond or otherwise any mechanic's, materialman's, or similar lien filed against the Sublease Premises or the Building for work or materials claimed to have been furnished to or for the benefit of Subtenant and/or the Sublease Premises.

Section 3.04 Completion of Sublease Premises

A.      Subtenant, at Subtenant's sole cost and expense, shall complete the Subtenant Improvements in all respects in substantial accordance with the Subtenant Improvement Construction Documents.   The Subtenant Improvements shall be deemed substantially completed after Subtenant shall have delivered to Sublandlord all of the following items:

a.      Evidence satisfactory to Sublandlord that all of the Subtenant Improvements have been paid for in full, that any and all liens therefor that have been or might be filed have been discharged of record (by payment, bond, order of a court of competent jurisdiction or otherwise) or waived, and that no security interests relating thereto are outstanding.

b.      A temporary or permanent certificate of occupancy (if required by applicable law) for the Sublease Premises issued by the appropriate governmental authority which permits occupancy of the Sublease Premises.

c.      A certificate from Subtenant's Contractor or any other person or persons suitable to Landlord certifying that all work performed in the Sublease Premises is in substantial accordance with the Subtenant Improvement Construction Documents and all applicable laws, ordinances and codes.

B.      Subtenant shall, within thirty (30) days after completion of any Alterations, furnish Landlord with "as-built" Plans for such Alterations prepared on an AutoCAD Computer Assisted Drafting and Design System (or such other system or medium as Landlord may accept), using naming conventions issued by the American Institute of Architects in June, 1990 (or such other naming conventions as Prime Landlord may accept) and magnetic computer media of such record drawings and specifications translated in DXG format or another format acceptable to Prime Landlord.

## ARTICLE 4.  PAYMENT OF COSTS

Section 4.01 Subtenant Responsible for Subtenant Improvement Costs

A.      Sublandlord shall have no obligation to fund any amount to or on behalf of Subtenant respecting the Subtenant Improvements or any other improvements to the Sublease Premises.

B,      Subtenant shall promptly pay for all costs and expenses relating to the Subtenant Improvements as the same become due and payable. After completion of the Subtenant Improvements and the issuance of a Certificate of Occupancy for the Sublease Premises, Subtenant shall submit to Sublandlord (i) contractor's affidavits and sworn statements evidencing the cost of the Subtenant Improvements with supporting documentation; (ii) final lien waivers with respect to work performed or materials supplied in a form approved by Sublandlord; (iii) certification from Subtenant and Subtenant's Architect to Sublandlord that the Subtenant Improvements have been completed and installed in accordance with the Subtenant Improvement Construction Documents; (iv) delivery of evidence reasonably satisfactory to Sublandlord that all of the work or materials have been installed in the Sublease Premises as required by the applicable contract documents and that the same are free and clear of all liens, title retention agreements and security interests whatsoever; and (v) delivery of evidence reasonably satisfactory to Sublandlord that all governmental requirements required to be satisfied by Subtenant in connection with the improvements to the Sublease Premises have been satisfied.

## Section 4.02 Sublandlord's Costs

Subtenant shall pay to Sublandlord all reasonable fees for architects, engineers, interior designers, and other professionals and design specialists actually incurred by Sublandlord in connection with the Subtenant Improvements, up to a maximum amount of $1,000.00.

**EXHIBIT A**



**EXHIBIT A**

### EXHIBIT "C"

### Furniture and Fixtures

All FF&E currently in or about the Sublease Premises to the extent not marked or labeled as belonging to Subtenant 2.

**EXHIBIT "D"**

PROMISSORY NOTE

Amount:     $481,218.96                                      November 1, 2011

　　　FOR VALUE RECEIVED, Walker & Company, LLP, a District of Columbia limited
liability partnership ("Maker"), promises to pay to the order of Computing TechnologieS, Inc., a
Virginia corporation (hereinafter referred to as the "Holder", which term shall include any
subsequent holder of this Note), at such place as the Holder may from time to time designate in
writing to Maker, the principal sum of Four Hundred Eighty-One Thousand Two Hundred
Eighteen and 96/100 Dollars ($481,218.96), together with interest on the amount thereof
outstanding from time to time at the rate of five percent (5%) per annum. Interest shall accrue
from the date hereof on the unpaid principal balance of this Note from time to time outstanding
until paid in full, and interest shall be calculated on the basis of the actual number of days
elapsed.

　　　Interest and principal in the amounts set forth on Schedule A attached hereto ("Principal
and Interest") shall be payable in monthly installments beginning on November 1, 2011 and on
the first day of every month thereafter until paid in full. All outstanding principal accrued and
unpaid interest shall be due and payable in full no later than August 1, 2014, unless this Note
shall be accelerated sooner pursuant to any provision hereof. In addition Maker shall pay a late
charge of two percent (2%) on any payment ("Late Charge") which is not made by Maker within
five (5) days of when such payment is due.

　　　This Note may be prepaid, in whole or in part, at any time without premium or penalty.

　　　All payments received hereunder shall be applied first to late charges, then to accrued
interest and the balance, if any, shall be applied to principal.

　　　Payments of Principal and Interest and Late Charges (collectively, "Note Payments"), if
any, under this Note are to be offset against any amounts ("Rent") due Maker from Holder under
that certain Sublease Agreement dated the date hereof between Maker as Sublandlord and Holder
as Subtenant attached hereto as Exhibit A (the "Sublease"). To the extent that on the first day of
any month Maker owes Holder under the terms of this Note more Note Payments than Holder
owes Maker as Rent under the terms of the Sublease, then no Rent shall be due Maker under the
Sublease on such date, and Maker shall pay Holder only the difference between (i) the Note
Payment owed by Maker to Holder for such month and (ii) the Rent owed by Holder to Maker
for such month as full satisfaction of the Note Payments due on such date hereunder. To the
extent that Holder owes Maker under the terms of the Sublease more Rent than Maker owes
Holder as Note Payments under this Note, then no Note Payment shall be due Holder under this
Note on such date, and Holder shall pay Maker only the difference between (i) the Rent owed by
Holder for such month and (ii) the Note Payments owed by Maker to Holder for such month in
full satisfaction of the Rent due on such date under the Sublease. In the event that on the first
day of any month the Rent owed under the Sublease shall be equal to the Note Payments owed
under this Note, then neither party shall owe the other.

\35307074.6

In no event will termination of the Sublease for any reason, or the default by either party under the terms of the Sublease, terminate the obligations of the Maker pursuant to this Note, which obligations of the Maker shall continue with or without offset for Rent, until paid in full as set forth herein.

Upon the occurrence of any of the events described below, notwithstanding anything set forth herein or in the Sublease, Holder shall have the right, at its sole option, to declare the entire unpaid principal balance of this Note and all accrued interest thereon to be immediately due and payable:

    (a)    In the event Maker fails to pay when due any payment required by this Note and such failure continues for a period of five (5) days after such payment is due.

    (b)    In the event Maker defaults in the performance of any agreement, covenant, condition or obligation to be performed by Maker under the Sublease.

Failure or forbearance by Holder, upon the occurrence of any of the events described above, to avail itself fully or partially of any remedy provided for herein or under applicable law shall not constitute a waiver thereof, but such remedies shall remain available to Holder continuously thereafter unless waived in writing by Holder. All remedies are expressly declared to be cumulative.

If this Note is not paid when due, whether at maturity or by acceleration, Maker agrees to pay all costs and expenses of collection, whether or not suit is filed, including reasonable attorneys' fees incurred by Holder.

Maker and all others who may become liable for all or any part of this Note, agree herby to be jointly and severally bound, and jointly and severally (i) waive and renounce any and all homestead exemption rights and the benefits of all valuation and appraisement privileges as against this debt or any renewal or extension hereof; (ii) waive presentment, demand, protest, notice of nonpayment, notice of dishonor, and any and all lack of diligence or delays in the collection or enforcement hereof; (iii) consent to the release or substitution of any of the collateral securing this Note; and (iv) consent to any extension of the time for payment of this Note and any other indulgence or forbearance by Holder. Any such extension, release, substitution, indulgence or forbearance may be made without notice to any party and without in any way affecting the personal liability of any party liable heron.

In no event shall the amount of interest due or payable hereunder exceed the maximum rate of interest allowed by applicable law, and in the event any payment is made which exceeds such maximum lawful rate, then the amount of such excess sum shall be credited as a payment of principal. It is the express intent hereof that Maker shall not pay and the Holder shall not receive, directly or indirectly, interest in excess of what may lawfully be paid by Maker under applicable law.

It is understood and agreed that all payments due under this Note shall be made when due without any set-off or deduction whatsoever.

\35307074.6

**EXHIBIT A**

Maker herby represents and warrants that the indebtedness evidenced by this Note is being obtained for the purpose of acquiring and carrying on a business or commercial enterprise and all proceeds of such indebtedness will be used solely in connection with such business or commercial investment.

This Note shall be governed by and construed in accordance with the laws of the District of Columbia.

This Note shall be binding on Maker and its successors and assigns and shall inure to the benefit of Holder and its successors and assigns.

IN WITNESS WHEREOF, the undersigned, with full power and authority to do so, have executed and delivered this Promissory Note as of the day and year first above written on behalf of the Maker, Walker & Company, LLP.

Witness:

Walker & Company, LLP, a District of Columbia limited partnership

By: _____
       General Partner

Name: _____

_____

By: _____
       General Partner

Name: _____

_____

28

\35307074.6

**EXHIBIT A**

<u>EXHIBIT A</u>

SUBLEASE

\35307074.6

**EXHIBIT A**

## SCHEDULE A

Chart Detailing Payments of Principal and Interest Due Holder on a Monthly Basis

| Loan Amount | 481,218.96 |
|---|---|
| Interest rate | 5% |
| First monthly payment | 10,000.00 |
| Second monthly payment | 20,000.00 |

| Date | Beginning | Interest | Monthly Pmt | Ending balance | Ending balance |
|---|---|---|---|---|---|
| 11/1/2011 | 481,218.96 | 2,005.08 | 10,000.00 | 473,224.04 | 473,224.04 |
| 12/1/2011 | 473,224.04 | 1,971.77 | 10,000.00 | 465,195.81 | 465,195.81 |
| 1/1/2012 | 465,195.81 | 1,938.32 | 10,000.00 | 457,134.12 | 457,134.12 |
| 2/1/2012 | 457,134.12 | 1,904.73 | 10,000.00 | 449,038.85 | 449,038.85 |
| 3/1/2012 | 449,038.85 | 1,871.00 | 10,000.00 | 440,909.84 | 440,909.84 |
| 4/1/2012 | 440,909.84 | 1,837.12 | 10,000.00 | 432,746.97 | 432,746.97 |
| 5/1/2012 | 432,746.97 | 1,803.11 | 10,000.00 | 424,550.08 | 424,550.08 |
| 6/1/2012 | 424,550.08 | 1,768.96 | 10,000.00 | 416,319.04 | 416,319.04 |
| 7/1/2012 | 416,319.04 | 1,734.66 | 10,000.00 | 408,053.70 | 408,053.70 |
| 8/1/2012 | 408,053.70 | 1,700.22 | 10,000.00 | 399,753.92 | 399,753.92 |
| 9/1/2012 | 399,753.92 | 1,665.64 | 10,000.00 | 391,419.57 | 391,419.57 |
| 10/1/2012 | 391,419.57 | 1,630.91 | 10,000.00 | 383,050.48 | 383,050.48 |
| 11/1/2012 | 383,050.48 | 1,596.04 | 10,000.00 | 374,646.52 | 374,646.52 |
| 12/1/2012 | 374,646.52 | 1,561.03 | 10,000.00 | 366,207.55 | 366,207.55 |
| 1/1/2013 | 366,207.55 | 1,525.86 | 20,000.00 | 347,733.42 | 347,733.42 |
| 2/1/2013 | 347,733.42 | 1,448.89 | 20,000.00 | 329,182.31 | 329,182.31 |
| 3/1/2013 | 329,182.31 | 1,371.59 | 20,000.00 | 310,553.90 | 310,553.90 |
| 4/1/2013 | 310,553.90 | 1,293.97 | 20,000.00 | 291,847.87 | 291,847.87 |
| 5/1/2013 | 291,847.87 | 1,216.03 | 20,000.00 | 273,063.91 | 273,063.91 |

\35307074.6

**EXHIBIT A**

| 6/1/2013 | 273,063.91 | 1,137.77 | 20,000.00 | 254,201.67 | 254,201.67 |
|---|---|---|---|---|---|
| 7/1/2013 | 254,201.67 | 1,059.17 | 20,000.00 | 235,260.85 | 235,260.85 |
| 8/1/2013 | 235,260.85 | 980.25 | 20,000.00 | 216,241.10 | 216,241.10 |
| 9/1/2013 | 216,241.10 | 901.00 | 20,000.00 | 197,142.10 | 197,142.10 |
| 10/1/2013 | 197,142.10 | 821.43 | 20,000.00 | 177,963.53 | 177,963.53 |
| 11/1/2013 | 177,963.53 | 741.51 | 20,000.00 | 158,705.04 | 158,705.04 |
| 12/1/2013 | 158,705.04 | 661.27 | 20,000.00 | 139,366.31 | 139,366.31 |
| 1/1/2014 | 139,366.31 | 580.69 | 20,000.00 | 119,947.01 | 119,947.01 |
| 2/1/2014 | 119,947.01 | 499.78 | 20,000.00 | 100,446.79 | 100,446.79 |
| 3/1/2014 | 100,446.79 | 418.53 | 20,000.00 | 80,865.32 | 80,865.32 |
| 4/1/2014 | 80,865.32 | 336.94 | 20,000.00 | 61,202.25 | 61,202.25 |
| 5/1/2014 | 61,202.25 | 255.01 | 20,000.00 | 41,457.26 | 41,457.26 |
| 6/1/2014 | 41,457.26 | 172.74 | 20,000.00 | 21,630.00 | 21,630.00 |
| 7/1/2014 | 21,630.00 | 90.13 | 20,000.00 | 1,720.13 | 1,720.13 |
| 8/1/2014 | 1,720.13 | 7.17 | 1,727.30 | (0.00) | (0.00) |

\35307074.6